# In the United States Court of Appeals for the Federal Circuit

———————————

NATIONAL VETERANS LEGAL SERVICES PROGRAM,
NATIONAL CONSUMER LAW CENTER, and ALLIANCE FOR JUSTICE,
for themselves and all others similarly situated,
*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,
*Defendant-Cross-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 1:16-745-ESH (THE HON. ELLEN S. HUVELLE)

———————————

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

———————————

WILLIAM H. NARWOLD
MEGHAN OLIVER
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
bnarwold@motleyrice.com

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
deepak@guptawessler.com

*Counsel for Plaintiffs-Appellants*

January 16, 2019

# CERTIFICATE OF INTEREST

As required by Federal Circuit Rule 47.4, I certify the following:

1. The full names of all parties represented by me are: National Veterans Legal Services Program, National Consumer Law Center, and Alliance For Justice.

2. The names of the real parties in interest, if different from the parties named above, are: Not applicable.

3. There are no parent corporations or publicly held companies that own 10% or more of the stock of any party represented by me.

4. The names of all law firms and the partners and associates that appeared for the plaintiffs-appellants in the trial court or are expected to appear in this court are:

> DEEPAK GUPTA
> JONATHAN E. TAYLOR
> GUPTA WESSLER PLLC
> 1900 L Street NW, Suite 312
> Washington DC 20036
>
> WILLIAM H. NARWOLD
> ELIZABETH SMITH
> MEGHAN S.B. OLIVER
> MOTLEY RICE LLC
> 28 Bridgeside Blvd.
> Mount Pleasant, SC 29464

Dated: January 16, 2019

*/s/ Deepak Gupta*
DEEPAK GUPTA
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*deepak@guptawessler.com*

# TABLE OF CONTENTS

Certificate of interest.......................................................................... i

Table of authorities......................................................................... iii

Statement of related cases............................................................ vii

Introduction ....................................................................................... 1

Jurisdictional statement.................................................................. 5

Statement of the issues ................................................................... 6

Statement of the case ...................................................................... 7

    I.      Factual background................................................... 7

         A.    Overview of PACER fees...................................... 7

         B.    History of PACER fees ......................................... 8

         C.    Use of PACER fees .............................................. 15

    II.     Procedural background ......................................... 18

Standard of review .......................................................................... 21

Summary of argument .................................................................... 21

Argument .......................................................................................... 24

    I.      PACER fees may be charged "only to the extent necessary" to "reimburse expenses incurred" in providing access to records through PACER—the "services rendered" for the fees. ................... 24

         A.    Every interpretive tool—the text, structure, precedent, history, and canons of construction—compels this reading. .............................................................. 25

         B.    The district court correctly rejected the government's reading and found it liable for the overcharge.......................... 32

         C.    Congress did not clearly authorize the use of PACER fees to recover the costs of certain non-PACER programs............. 36

    II.     Because the government "readily admits that PACER fees are being used to cover expenses that are not part of the 'marginal cost' of operating PACER," the government is liable........................ 43

Conclusion ........................................................................................ 45

Addendum

# TABLE OF AUTHORITIES

## Cases

*Advocate Health Care Network v. Stapleton,*
　137 S. Ct. 1652 (2017) ................................................................ 42

*Aerolineas Argentinas v. United States,*
　77 F.3d 1564 (Fed. Cir. 1996) ................................................. 5, 18

*Bausch & Lomb, Inc. v. United States,*
　148 F.3d 1363 (Fed. Cir. 1998) ................................................... 29

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
　511 U.S. 164 (1994) .................................................................... 41

*Conyers v. Merit Systems Protection Board,*
　388 F.3d 1380 (D.C. Cir. 2004) ................................................... 11

*Cox v. New Hampshire,*
　312 U.S. 569 (1941) .................................................................... 31

*Duncan v. Walker,*
　533 U.S. 167 (2001) .................................................................... 26

*DWA Holdings LLC v. United States,*
　889 F.3d 1361 (Fed. Cir. 2018) ............................................ 21, 25

*Eastern Connecticut Citizens Action Group v. Powers,*
　723 F.2d 1050 (2d Cir. 1983) ............................................22, 30, 31

*Engine Manufacturers Association v. EPA,*
　20 F.3d 1177 (D.C. Cir. 1994) .................................................... 27

*Federal Power Commission v. New England Power Co.,*
　415 U.S. 345 (1974) .................................................................... 43

*Fernandes v. Limmer,*
　663 F.2d 619 (5th Cir. 1981) ....................................................... 30

*Florida Power & Light Co. v. United States,*
　846 F.2d 765 (D.C. Cir. 1988) .................................................... 27

*GPX International Tire Corp. v. United States,*
    678 F.3d 1308 (Fed. Cir. 2012) ....................................... 29, 41

*Murdock v. Pennsylvania,*
    319 U.S. 105 (1943) ...................................................... 30

*Northern California Power Agency v. United States,*
    122 Fed. Cl. 111 (2015) ................................................. 19

*National Association of Broadcasters v. FCC,*
    554 F.2d 1118 (D.C. Cir. 1976) ....................................... 27

*National Cable Television Association, Inc. v. United States,*
    415 U.S. 336 (1974) ..............................................26, 27, 43, 45

*Norman v. United States,*
    429 F.3d 1081 (Fed. Cir. 2005) ....................................... 18

*Peretz v. United States,*
    501 U.S. 923 (1991) ...................................................... 31

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980) ...................................................... 30

*Ross v. Blake,*
    136 S. Ct. 1850 (2016) ............................................ 2, 29, 41

*Skinner v. Mid-Am. Pipeline Co.,*
    490 U.S. 212 (1989) ................................................ *passim*

*Sullivan v. City of Augusta,*
    511 F.3d 16 (1st Cir. 2007) ............................................ 30

*Torres v. Lynch,*
    136 S. Ct. 1619 (2016) .................................................. 39

*TVA v. Hill,*
    437 U.S. 153 (1978) ................................................. *passim*

**Statutes**

5 U.S.C. § 552 (a)(4)(A)(iv) ................................................ 38

8 U.S.C. § 612(c)(1) ........................................................ 35

28 U.S.C. § 1292 (c)(1) ............................................................. 6

28 U.S.C. § 1292(b) ................................................................. 6

28 U.S.C. § 1913 note ........................................................ *passim*

28 U.S.C. § 612(c)(1) .............................................................. 11

31 U.S.C. § 9701(a) ...............................................................43

31 U.S.C. § 9701(b) ...............................................................43

Judiciary Appropriations Act, 1991,
    Pub. L. No. 101-515, § 404, 104 Stat. 2129 ..................... 8

Pub. L. No. 107-347, § 205(e), 116 Stat. 2899 (2002) .................... 10

## Legislative materials

H. Rep. 108-221 (2003) ..........................................................33

S. Rep. No. 107-174 (2002) ..................................................... 10

## Other authorities

ABA,
    *Federal Court Funding*, June 27, 2018, https://perma.cc/493P-CW54 ..................... 15

David S. Ardia,
    *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835 (2017) .............. 31

*FY 2018 Judiciary Report Requirement on PACER, July 2018*, attached to
    Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, &
    Quigley (July 19, 2018) ..........................................................21

Matthew E. Glassman,
    CRS, *Judiciary Appropriations FY2016* (June 18, 2015),
    https://perma.cc/NN8G-D84F ............................................. 16

N. Gregory Mankiw,
    *Principles of Economics* (6th ed. 2012) ..................................... 10

Office of Law Revision Counsel,
    *Detailed Guide to the United States Code*, at IV(E), https://perma.cc/X2DB-
    U6VZ. .................................................................................................. 11

Antonin Scalia & Bryan A. Garner,
    *Reading Law* (2012) ............................................................................... 32

Stephen Schultze,
    *The Price of Ignorance: The Constitutional Cost of Fees for Access to Electronic*
    *Public Court Records*, 106 Geo. L. J. 1197 (2018) ....................................... 31

Subcomm. on Privacy & Pub. Access to Electronic Case Files, Judicial
    Conference of the U.S., *Report of the Judicial Conference Comm. on Court Admin.*
    *& Case Mgmt. on Privacy & Public Access to Elec. Case Files* (2001),
    https://perma.cc/52YK-23JF ............................................................... 30

## STATEMENT OF RELATED CASES

Plaintiffs-appellants are unaware of any cases related to this appeal.

## INTRODUCTION

This case challenges the legality of user fees charged by the federal judiciary for access to records via its Public Access to Court Electronic Records system, or PACER. It is undisputed that these fees far exceed the costs of providing such records—costs that have decreased exponentially even as fees have risen. The district court held that PACER fees have been unlawfully set above the amount authorized by Congress and found the government liable for the excess. Appx3169. This appeal concerns whether the unlawful excess identified by the district court was too little (the plaintiffs' view), too much (the government's view), or just right.

Before 2002, the law authorized PACER fees "as a charge for services rendered" to "reimburse expenses incurred in providing these services." That year, Congress found that PACER fees (then $.07 per page) were "higher than the marginal cost of disseminating the information." Appx2523. It sought to ensure that records would instead be "freely available to the greatest extent possible." *Id.* To this end, Congress passed the E-Government Act of 2002, which amended the statute by adding the words "only to the extent necessary." 28 U.S.C. § 1913 note.

Despite this express limitation, PACER fees have twice been *increased* since the E-Government Act's passage. This prompted the Act's sponsor, Senator Lieberman, to reproach the Administrative Office of the U.S. Courts (or AO) for continuing to charge fees "well higher than the cost of dissemination"—"against the requirement

of the E-Government Act"—rather than doing what the Act demands: "create a payment system that is used only to recover the direct cost of distributing documents via PACER." Appx2549, Appx2554. Instead of complying with this law, the AO has used PACER fees to fund projects far removed from the costs of providing records on request—for example, using the money to buy flat-screen TVs for jurors, to send notices to bankruptcy creditors, and to fund a study by Mississippi for its own court system.

The best reading of the statute is that it does exactly what it says: It authorizes PACER fees "only to the extent necessary" to "reimburse expenses incurred in providing" the "services rendered" for the fees—namely, access to records through PACER. 28 U.S.C. § 1913 note. Or put more pithily: PACER fees must be limited to PACER costs. Were it otherwise, the 2002 amendment would have had no effect. And "courts must presume" that amendments "have real and substantial effect." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The only effect that could have been intended by adding the words "only to the extent necessary" was to require a reduction in PACER fees to correspond "only" to PACER costs.

This is the fundamental, insurmountable problem for the government in this litigation: It seeks to transform a statute that Congress amended for the sole purpose of *reducing* PACER fees into one somehow authorizing "expanded authority" to *increase* fees. Appx3018. That argument is unpersuasive on its own terms. But it is even

weaker in light of a background constitutional rule: Because only *Congress* may impose taxes, a user fee may not exceed the cost of providing services "inuring directly to the benefit" of the person who pays the user fee, unless Congress has "indicate[d] clearly its intention to delegate" its taxing power. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). Here, Congress did just the opposite.

Lacking the necessary authorization in the statute, the government has tried to look elsewhere to justify the fees. In the district court, its "main argument," Appx3175, was that the fees were later implicitly authorized by Appropriations Committees, which (to use the AO's earlier words) "amended" the statute to confer "expanded authority." Appx3018. But "substantive legislation [cannot be] undone by the simple—and brief—insertion of some inconsistent language in Appropriations Committees' Report." *TVA v. Hill*, 437 U.S. 153, 191 (1978).

Rejecting the government's position, the district court correctly held that PACER fees may be used to recover the costs of operating the PACER system but may not be set so high as to be used as a revenue source for a number of non-PACER programs. Those unrelated programs must instead be funded through the appropriations process—just like over 98% of the judiciary's budget. And since the district court's decision, the judiciary has taken steps to do just that, seeking appropriated funds for those programs "to reduce potential future legal exposure."

This is a welcome development. As Congress recognized when it passed the E-Government Act, PACER fees are much higher than necessary, inflicting harms on litigants and the public alike. And whereas the impact of excess fees on the judiciary's $7-billion-plus annual budget are slight, these harms are anything but: High fees thwart equal access to justice, impose often insuperable barriers for low-income and *pro se* litigants, discourage academic research and journalism, and thereby inhibit public understanding of the courts. Congress was therefore right to impose a statutory limit on PACER fees. The district court was right to find that the fees exceed the amount authorized by statute. And the judiciary was right to begin a lawful process that will result in their reduction, with no effect on the budget of the federal courts.

But the law demands more. While there is much to praise in the district court's decision, it ultimately took too permissive a view of the statutory authorization, reading it to allow PACER fees to fund certain non-PACER expenses. In reaching this conclusion, the court made two interpretive mistakes: It failed to understand, as a textual matter, that the statutory phrase "these services" refers to the "services rendered" in exchange for the fees. 28 U.S.C. § 1913 note. And it misapprehended the effect of the E-Government Act of 2002, reading it to "effectively affirm[]" the fee regime that preexisted it, Appx3183, and to do so with sufficient clarity to satisfy *Skinner*'s clear-authorization rule, Appx3173.

And yet, even with these allowances, the district court still concluded that the fees have exceeded the scope of the statutory authorization, making PACER users pay for programs that must instead be funded by Congress. That basic conclusion is correct, as is the judiciary's decision to abide by it. At a minimum, therefore, this Court should affirm that conclusion and remand for further proceedings.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power," or when the money was "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–74 (Fed. Cir. 1996). On March 31, 2018, the district court denied the plaintiffs' motion for summary judgment as to liability and granted in part and denied in part the government's cross-motion. Appx3146. On August 13, 2018, the court certified that order—and only that order—for an interlocutory appeal under 28 U.S.C. § 1292(b), while amending the order to include the statement required by section 1292(b). Appx3391–3392. On August 22, the plaintiffs timely filed a petition with this Court for permission to take an interlocutory appeal, and the government timely filed its own petition the next

day. This Court has appellate jurisdiction because it granted the parties' petitions on October 16, 2018. *See* 28 U.S.C. § 1292(b), (c)(1).

## STATEMENT OF THE ISSUES

Congress has conferred limited authority on the judiciary to charge fees for access to electronic court records. These fees may be imposed "as a charge for services rendered" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. But after the judiciary began charging more in PACER fees than necessary to reimburse the expenses of operating PACER, Congress amended the statute in 2002 to add the words "only to the extent necessary." The question in this interlocutory appeal is what that language means. Did it require a *reduction* in PACER fees, as the plaintiffs contend, limiting them to the amount necessary to pay for PACER (the service provided for the fee)? Did it lock in the *status quo*, as the district court held? Or did it instead "indicate clearly" that Congress intended to authorize an *expansion* in fees, as the government maintains, such that PACER users may be made to pay for many services that do not "inur[e] directly to the[ir] benefit," *Skinner*, 490 U.S. at 224?

# STATEMENT OF THE CASE

## I. Factual background

### A. Overview of PACER fees

PACER is a system that provides online access to federal judicial records and is managed by the AO. Appx2673. The current fee to access records through PACER is $.10 per page (with a maximum of $3.00 for "any case document, docket sheet, or case-specific report") and $2.40 per audio file. Appx2673–2674. Unless a person obtains a fee waiver or incurs less than $15 in PACER charges in a given quarter, he or she will incur an obligation to pay the fees. Appx2673–2674.

Although PACER fees are not the only public-access fees charged by the judiciary, they might as well be. Under the "Electronic Public Access Fee Schedule," the judiciary charges fees for only two other services: (1) for using the PACER Service Center—specifically, "[f]or every search of court records conducted by the PACER Service Center," and for having it "reproduce on paper any record pertaining to a PACER account"—and (2) for printing documents at the courthouse. Appx2449. But PACER fees make up over 99.8% of the total fees "charged for providing electronic public access to court records" under the fee schedule. *Id.* In fiscal year 2015, for example, the judiciary collected 835 times more in PACER fees than it did in print fees. Appx2593. No other service is provided in exchange for a public-access fee.

## B.    History of PACER fees

***Congress authorizes fees "to reimburse" PACER expenses***. This system stretches back to the late 1980s, when the judiciary created "an experimental program of electronic access for the public to court information"—or put differently, for the "release and sale of court data." Appx2830. The judiciary hoped that the fees charged to access this information "could defray a significant portion of the cost of providing such services." *Id.*

In 1991, after the pilot program ended, Congress required the judiciary to set a rate schedule imposing "reasonable fees" for electronic access to records. Judiciary Appropriations Act, 1991, Pub. L. No. 101-515, § 404, 104 Stat. 2129, 2132–33. In doing so, Congress signaled an intent to limit the fees to the cost of providing the records, adding the following statutory provision: "All fees hereafter collected by the Judiciary . . . as a charge for services rendered shall be deposited as offsetting collections . . . to reimburse expenses incurred in providing these services." *Id.*

"The fee was initially established at $1.00 per minute." Appx2847. But the revenue began fast "exceed[ing] the costs of providing the service," so the fee was reduced to $0.75 per minute in 1995. Appx3152. The stated reason for this was "to avoid an ongoing surplus." Appx2847. The next year, the fee was reduced "further, from 75 cents per minute to 60 cents per minute." *Id.*

***The AO begins using excess PACER fees to fund ECF.*** The year after that, in 1997, the judiciary started planning for a new Electronic Case Filing system, known as ECF. *Id.* The AO's staff produced a paper discussing how the system would be funded. *Id.* It emphasized the "long-standing principle" that, when charging a user fee, "the government should seek, not to earn a profit, but only to charge fees commensurate with the cost of providing a particular service." *Id.* Yet, two pages later, the paper contemplated that ECF could be funded with "revenues generated from electronic public access fees"—that is, PACER fees. *Id.* The paper did not offer any statutory authority or legal reasoning to support this view.

Shortly thereafter, the AO revised the schedule for PACER fees, pegging them to the number of pages downloaded and setting the rate at $.07 per page in 1998. Appx2674. This amount was far more than necessary to recover the cost of providing access to records. But this time, that was by design. Rather than reduce the rate to cover only the costs incurred, like it had done before, the AO instead used the extra revenue to subsidize other information-technology-related projects, beginning with ECF—a mission creep that only grew worse over time.

***Congress responds by passing the E-Government Act of 2002.*** When Congress revisited the subject of PACER fees a few years later, it did not relax the requirement that the fees be limited to the cost of providing access to records. To the contrary, it amended the statute to *strengthen* this requirement.

Recognizing that, under "existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information," Congress amended the law "to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." Appx2523 (S. Rep. No. 107-174, at 23 (2002)).[1]

The result was a provision of the E-Government Act of 2002 that amended the language authorizing the imposition of fees in two ways. *First*, Congress replaced the word "shall" with "may," thereby allowing the judiciary to grant free access to records through PACER if it wanted. *Second*, Congress added language providing that, if the judiciary declined to grant free access, fees could now be charged "only to the extent necessary." Pub. L. No. 107-347, § 205(e), 116 Stat. 2899, 2915 (2002) (codified at 28 U.S.C. § 1913 note). The full text of the amended statute is as follows:

> (a) The Judicial Conference may, only to the extent necessary, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections for access to information available through automatic data processing equipment. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the [AO], under the direction of the Judicial Conference of the United States, shall prescribe a schedule

---

[1] In the language of economics, marginal cost means "the increase in total cost that arises from an extra unit of production." N. Gregory Mankiw, *Principles of Economics* 268 (6th ed. 2012).

of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. § 612(c)(1)(A) to reimburse expenses incurred in providing these services.

28 U.S.C. § 1913 note.[2]

### *Even after the E-Government Act, the AO increased PACER fees.*

Rather than reduce or eliminate PACER fees, however, the AO increased them to $.08 per page in 2005. Appx2676. To justify this increase, the AO did not point to any growing costs of providing access to records through PACER. It relied instead on the fact that the judiciary's information-technology fund (or JITF)—the account into which PACER fees and other funds (including "funds appropriated to the judiciary" for "information technology resources") are deposited, 28 U.S.C. § 612(c)(1)—could be used to pay the costs of technology-related expenses like ECF. *See id.*; Appx2525–2526; Appx2559 (Letter from AO Director James Duff explaining:

---

[2] It is "of no moment" that this law was "codified as a statutory note," rather than as section text. *Conyers v. Merit Sys. Prot. Bd.*, 388 F.3d 1380, 1382 n.2 (Fed. Cir. 2004). As noted on the website for the United States Code: "A provision of a Federal statute is the law whether the provision appears in the Code as section text or as a statutory note . . . The fact that a provision is set out as a note is merely the result of an editorial decision and has no effect on its meaning or validity." Office of the Law Revision Counsel, *Detailed Guide to the U.S. Code*, at IV(E), https://perma.cc/X2DB-U6VZ.

"The JITF finances the IT requirements of the entire Judiciary and is comprised primarily of 'no-year' appropriated funds which are expected to be carried forward each year."). As before, the AO cited no statutory authority for this increase.

***The AO finds new ways to spend extra PACER fees as they keep growing.*** By 2006, the judiciary's information-technology fund had accumulated a surplus of nearly $150 million—at least $32 million of which was from PACER fees. Appx2676. But once again, the AO did not reduce or eliminate PACER fees. *Id.* It instead sought out new ways to spend the excess, using it to cover "courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance"—services that relate to those provided by PACER only in the sense that they too concern technology and the courts. *Id.*

Two years later, in 2008, the chair of the judiciary's budget committee testified before the House. She admitted that the judiciary used PACER fees not only to reimburse the cost of "run[ning] the PACER program," but also "to offset some costs in our information technology program that would otherwise have to be funded with appropriated funds." Appx2677. Specifically, she testified, "[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in PACER fees will be available to finance information technology requirements . . . , thereby reducing our need for appropriated funds." *Id.*

***The E-Government Act's sponsor complains that the AO has been violating the law.*** In early 2009, Senator Lieberman, the sponsor of the E-Government Act, wrote to the AO "to inquire if [it] is complying" with the law. Appx2554. He noted that the Act's "goal" was "to increase free public access to [judicial] records"—allowing fees to be charged only to recover "the marginal cost of disseminating the information"—yet "PACER [is] charging a higher rate" than it did when the law was passed. *Id.* Importantly, he explained, "the funds generated by these fees are still well higher than the cost of dissemination." *Id.* Invoking the key statutory text, he asked the judiciary to explain "whether [it] is only charging 'to the extent necessary' for records using the PACER system." *Id.*

The AO's Director replied with a letter defending the AO's position that it may use PACER fees to recoup non-PACER-related costs. Appx2557. The letter acknowledged that the Act "contemplates a fee structure in which electronic court information 'is freely available to the greatest extent possible.'" *Id.* And it did not deny that the statutory text, as amended by the Act, allowed the judiciary to charge fees "for electronic access to court files as a way to pay for this service," but prohibited fees that exceeded the costs of providing this service. Appx2558. Yet the letter claimed that the statute had been subsequently "amended" to "expand the permissible use of the fee revenue to pay for other services." *Id.*

The sole support that the AO offered for this purported amendment was a sentence in a conference report accompanying the 2004 appropriations bill, which said that the Appropriations Committee "expects the fee for the Electronic Public Access program to provide for [ECF] system enhancements and operational costs." *Id.* The letter did not provide any support, even from a committee report, for using fees to recover non-PACER-related expenses beyond ECF. Nor did it explain how a report from the Appropriations Committee could "amend" a statute when the Supreme Court has held the opposite. *See Hill*, 437 U.S. at 191.

The following year, in his annual letter to the Appropriations Committee, Senator Lieberman expressed his "concerns" about the AO's interpretation. Appx2548. "[D]espite the technological innovations that should have led to reduced costs in the past eight years," he observed, the "cost for these documents has gone up." Appx2549. It has done so because the AO uses the fees to fund "initiatives that are unrelated to providing public access via PACER." *Id.* He reiterated his view that this is "against the requirement of the E-Government Act," which permits "a payment system that is used only to recover the direct cost of distributing documents via PACER." *Id.* Other technology-related projects, he stressed, "should be funded through direct appropriations." *Id.*

**The AO again increases PACER fees.** The AO responded by raising PACER fees once again, to $.10 per page beginning in 2012. Appx2678. It

14

acknowledged that "[f]unds generated by PACER are used to pay the entire cost of the Judiciary's public access program, including telecommunications, replication, and archiving expenses, the [ECF] system, electronic bankruptcy noticing, Violent Crime Control Act Victim Notification, on-line juror services, and courtroom technology." *Id.* But the AO claimed that the fees are statutorily authorized because they "are only used for public access." *Id.* It did not elaborate.

Under this fee schedule (which remains in effect), fees are "charged for providing electronic public access to court records." Appx2449. Most of these fees are for accessing records through PACER (or for using the PACER Service Center). But the schedule also includes a separate $.10-per-page fee "[f]or printing copies of any record or document accessed electronically at a public terminal in a courthouse." *Id.* No other fee for any other service is included on the schedule.

## C.    Use of PACER fees

From fiscal year 2010 to 2016, the judiciary received an average of over $6 billion in appropriations each year. *See, e.g.*, ABA, *Federal Court Funding*, June 27, 2018, https://perma.cc/493P-CW54. Over that same period, the PACER fees collected by the judiciary went from $102.5 million in 2010 to $146.4 million in 2016. *See* Appx2680, Appx2684, Appx2687, Appx2690, Appx2692, Appx2695, Appx2699.

As a percentage of the judiciary's total budget, these fees are small. Based on the judiciary's budget request of $7.533 billion for fiscal year 2016, PACER fees make

up less than 2% of the total budget—meaning that the excess fees are just a fraction of that small fraction. Glassman, CRS, *Judiciary Appropriations FY2016*, at 1 (June 18, 2015), https://perma.cc/NN8G-D84F.

The chart below (which is uncontested) illustrates the rapid growth in PACER revenue over the past two decades, a period when "technological innovations," including exponentially cheaper data storage, "should have led to reduced costs." Appx2549; *see also* Appx2659–2660 (explaining that the cost per gigabyte of storage fell by 99.9%—from $65.37 to $0.028—over this period).



Indeed, the costs of operating the "Electronic Public Access Program"—according to the AO's own records—steeply declined over this period, going from nearly $19 million for fiscal year 2010 to less than $1 million for 2016. Appx2680 & Appx2699. Even including all other expenses designated by the AO as part of the costs of providing "Public Access Services"—including "[d]evelopment and [i]mplementation costs for CM/ECF," "expenses for CM/ECF servers," "costs

associated with the support of the uscourts.gov website," and "[c]osts associated with managing the non-technical portion of the PACER Service Center"—the total annual expenses of providing these services ranged between $12 and $24 million over this period. Appx2680, Appx2684, Appx2687, Appx2690, Appx2692–2693, Appx2695–2696, Appx2699.

The excess PACER fees have been used to fund a variety of programs beyond administering PACER itself. To highlight just a few, the AO used PACER fees to fund the following programs from fiscal year 2010 to 2016:

- $185 million on courtroom technology, Appx2680, Appx2684, Appx2687, Appx2690, Appx2693, Appx2696, Appx2699;

- $75 million to send notices to creditors in bankruptcy proceedings, Appx2681, Appx2685, Appx2688, Appx2691, Appx2694, Appx2697, Appx2700;

- $9.5 million to provide web-based jury services, Appx2688, Appx2691, Appx2693, Appx2696, Appx2700;

- $3.5 million to send notices to local law-enforcement agencies under the Violent Crime Control Act, Appx2681, Appx2685, Appx2687, Appx2690, Appx2693, Appx2696, Appx2700; and

- $120,000 for the State of Mississippi study on "the feasibility of sharing the Judiciary's CM/ECF filing system at the state level," Appx2681.

## II.    Procedural background

In April 2016, three nonprofit organizations—National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice—filed this suit asking the district court to determine that the PACER fee schedule violates the E-Government Act and to award a full recovery of past overcharges.

The nonprofits brought the case under the Little Tucker Act, 28 U.S.C. § 1346(a), which waives sovereign immunity and "provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power," or when the money "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas*, 77 F.3d at 1572–74 (allowing an illegal-exaction claim for excess user fees). As the complaint explained: "Courts have long recognized such an 'illegal exaction' claim—a claim that money was 'improperly paid, exacted, or taken from the claimant' in violation of a statute, *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)—regardless of whether the statute itself creates an express cause of action." Appx14; *see Aerolineas Argentinas*, 77 F.3d at 1573 ("[A]n illegal exaction has occurred when 'the Government has the citizen's money in its pocket.' Suit can then be maintained under the Tucker Act to recover the money exacted."). Further, the complaint continued, "'the lack of express money-mandating language in the statute does not defeat [an] illegal exaction claim'" because "'otherwise, the Government

could assess any fee or payment it wants from a plaintiff acting under the color of a statute that does not expressly require compensation to the plaintiff for wrongful or illegal action by the Government, and the plaintiff would have no recourse.'" Appx14 (quoting *N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015)).

The district court denied the government's motion to dismiss in December 2016. Appx354. In its motion, the government argued that the suit is barred for two reasons: (1) because a different case had been brought challenging PACER fees and (2) because the plaintiffs did not first present their challenge to the PACER Service Center for administrative exhaustion. Beyond these arguments, the government did not contest jurisdiction in any respect, nor challenge the propriety of the plaintiffs' illegal-exaction claim. The district court rejected both arguments. Appx355–362. The next month, the court certified the case as a class action. Appx2281. Neither of these orders has been certified for an interlocutory appeal. *See* Appx3391–3392.

After some limited informal discovery, the parties filed competing motions for summary judgment. The plaintiffs took the position that PACER fees could be charged only to the extent necessary to reimburse the marginal costs of operating PACER. Because the fees far exceed these costs, the plaintiffs sought summary adjudication on liability, with damages to be determined later. The government, in contrast, took the position that the statute authorizes fees to recover the costs of any project related to "disseminating information through electronic means." Appx3175.

The district court took a third view. It explained that the government's position "ignored" the "statutory language," and rejected the government's contention that actions of the Appropriations Committee had expanded the statutory authorization. *Id.* Citing Supreme Court precedent, the court explained that "the post-enactment action of an appropriations committee cannot alter the meaning of the statute," and there is nothing to suggest that the committee endorsed the AO's "interpretation" here in any event. Appx3176–3178. But the court also rejected the plaintiffs' reading. As the court saw it, "when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of [such] fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and [Electronic Bankruptcy Notification]." Appx3184. The court thus concluded that the government "properly used PACER fees to pay for CM/ECF and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the expenditures for Courtroom Technology." Appx3179–3180.

Although the court's order formally denied the plaintiffs' motion, the court made clear that it was "find[ing] the defendant liable" for the excessive fees. Appx3170. The court later certified the March 2018 order for an interlocutory appeal, finding that it satisfies the stringent criteria of 28 U.S.C. § 1292(b). Appx3391–3400. This Court accepted the parties' petitions for interlocutory review.

Since the district court's decision, the judiciary has taken steps "to implement the district court's ruling" and "to begin transitioning disallowed expenditures from the [PACER] program to courts' Salaries and Expenses appropriated funding." *See FY 2018 Judiciary Report Requirement on PACER, July 2018*, at 4, attached to Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19, 2018), https://perma.cc/CP8S-XRVQ. In July 2018, the AO's Director informed the House Appropriations Committee that, "beginning in FY 2019, Courtroom Technology, Web-based Juror Services, and Violent Crime Control Act Notification categories will no longer be funded" with PACER fees, "to reduce potential future legal exposure." *Id.* "The Judiciary will instead seek appropriated funds for those categories, as needed, through the FY 2019 budget re-estimate process." *Id.*

## STANDARD OF REVIEW

This Court decides "questions of statutory interpretation de novo." *DWA Holdings LLC v. United States*, 889 F.3d 1361, 1367 (Fed. Cir. 2018).

## SUMMARY OF ARGUMENT

**I.A.1.** By statute, the judiciary may impose fees for electronic access to information, "as a charge for services rendered," but "only to the extent necessary" to "reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. This text is unambiguous: PACER fees may be charged only to the extent necessary to recover the costs of providing access to records via PACER (the service rendered).

**2.** Even if the statutory text were ambiguous, however, the same result would be compelled by precedent. The Supreme Court has long required Congress to give clear authorization before another branch of government may charge user fees to "recover [the] administrative costs" of programs "not inuring directly to the benefit" of those paying the costs. *Skinner,* 490 U.S. at 224. Congress did no such thing here.

**3.** In fact, it did the opposite. In 2002, Congress found that "users of PACER [were] charged fees that [were] higher than the marginal cost of disseminating the information," Appx2523, and it amended the statute to authorize fees "only to the extent necessary." This Court must give "real and substantial effect" to this language. *Ross*, 136 S. Ct. at 158. The only effect it could have had is to require a *reduction* in fees. It certainly did not provide clear authorization for the subsequent *increase* in fees.

This reading is bolstered by another background rule: Fees implicating First Amendment interests are permissible "only to the extent necessary" to "defray administrative expenses." *E. Conn. Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983). There is no reason for a more fee-friendly rule here, where Congress amended a fee statute to add the same language ("only to the extent necessary").

**B.** The district court correctly rejected the government's arguments defending PACER fees. *First*, it rejected the government's "main argument," Appx3176—the notion that the Appropriations Committee "amended" the statute in 2004 and 2007 to give the AO "expanded authority" to raise revenue via fees, Appx3018. That

argument is foreclosed by *TVA v. Hill*, 437 U.S. at 191. And it is especially unpersuasive here anyway: The Appropriations Committee has no authority over how revenue is raised, but only how it is spent, and the Committee has not even attempted to provide (nor could it provide) the necessary clear congressional authorization to delegate taxing authority. *Second*, the court correctly rejected the government's reliance on the fact that PACER fees are deposited into the judiciary's information-technology fund. That fact is irrelevant to the question in this case.

**C.** The district court, however, erred in one important respect. It misread the statute as unambiguously authorizing imposition of some PACER fees that exceed the amount necessary to fund PACER, so long as they are used only to fund certain non-PACER expenses. The court reached this conclusion by failing to understand that the services reimbursable by fees are the "services rendered" in exchange for them, 28 U.S.C. § 1913 note, and by failing to give effect to the 2002 amendment. Instead, the court drew significance from what Congress did not do when it amended the law, and then found that the amendment merely "affirmed" the status quo—and did so with sufficient clarity to satisfy the clear-statement rule. That is mistaken.

**II.** But ultimately, the court was right to "find[] the defendant liable" for violating the statute. Appx3170. The government "readily admits that PACER fees are being used to cover expenses that are not part of the 'marginal cost' of operating PACER." Appx3169. As a result, "liability is established." Appx3169–3170.

## ARGUMENT

**I.**  **PACER fees may be charged "only to the extent necessary" to "reimburse expenses incurred" in providing access to records through PACER—the "services rendered" for the fees.**

This interlocutory appeal raises a single "question of statutory interpretation: what restrictions does 28 U.S.C. § 1913 note place on the amount the judiciary may charge in PACER fees?" Appx3394. That statutory provision authorizes the AO to charge "reasonable" fees for providing electronic access to court records, but "only to the extent necessary." 28 U.S.C. § 1913 note. The key dispute between the parties concerns the meaning of this phrase: "only to the extent necessary" *to what*?

The answer is that fees are statutorily authorized only to the extent necessary "to reimburse [the] expenses incurred in providing" the "services rendered" in exchange for the fees (here, providing access to records through PACER). *Id.* That is the correct answer for three reasons: *First*, it is the only plausible reading of the statutory text. *Second*, even if it were not the only plausible reading, the text does not provide a clear statement from Congress, as required by longstanding Supreme Court precedent, to authorize user fees that exceed the costs of the service for which they are charged. *Third*, if anything, Congress's decision to step in and amend the statute in 2002 shows that Congress intended the opposite—to *restrict* fees to the amount necessary to recover the total marginal costs of operating PACER.

**A.** **Every interpretive tool—the text, structure, precedent, history, and canons of construction—compels this reading.**

**1.** *Statutory text and structure*

"As in any case of statutory construction, [the] analysis begins with the language of the statute." *DWA Holdings*, 889 F.3d at 1368. The statute in this case (the full text of which can be found on pages 10–11) contains five sentences. The first authorizes imposition of "reasonable" fees "for access to information available" electronically, but "only to the extent necessary." 28 U.S.C. § 1913 note. The second allows for fee waivers and other exemptions. *Id.* The third says that the AO must "prescribe a schedule of reasonable fees for electronic access to information," *id.*, which it has done by charging fees for three services—primarily for PACER access, but also for printing records at the courthouse and conducting searches and printing copies via the PACER Service Center. *See* Appx2449. The fourth sentence then provides a procedural requirement that the fee schedule be sent to Congress at least 30 days before it becomes effective. 28 U.S.C. § 1913 note. And the last sentence says that any fee collected "as a charge for services rendered" shall be deposited into the judiciary's information-technology fund "to reimburse expenses incurred in providing these services." *Id.*

Putting this all together, the way to determine the maximum authorized fee is to look at the fee schedule and see what "electronic access" "services [are] rendered" in exchange for the fees "charge[d]" under that schedule. *Id.* The amount of the fees

cannot exceed the amount "necessary" "to reimburse expenses incurred in providing *these services*." *Id.* (emphasis added) That is not only the best reading of the statutory text; it is the *only* plausible reading. No other reading gives effect "to every clause and word of [the] statute." *See Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Applying this rule to the current schedule, PACER fees may be no more than necessary to recover the costs of operating PACER. And the separate fees for using the PACER Service Center and printing records may be no more than necessary to recover the costs of providing those services, respectively. Or at most, the collective fees for these three services may not exceed the collective costs of providing them.

### 2. *The Supreme Court's clear-authorization rule*

Even if this were not the only plausible reading, it would still be mandated here. That is because the statute lacks the clear authorization that has long been required by Supreme Court precedent before a user fee may go beyond the cost of providing the service for which the fee is charged. Under this longstanding user-fee precedent, a clear statement is necessary "to avoid constitutional problems." *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 341 (1974) (interpreting user-fee statute "narrowly" for this reason).

The problems have to do with the separation of powers. In our system of government, Congress has the exclusive authority to raise revenue from the people. *See id.* at 340–42 ("Taxation is a legislative function, and Congress [is] the sole organ

for levying taxes."). A user fee, however, is different than a tax because it "is incident to a voluntary act," in exchange for which the government "bestows a benefit" on the person paying the fee that is "not shared by other members of society." *Id.* at 340–41. So the fee may be used to recover the costs of "performing those services." *Id.*

But that's as far as it goes. The fee may *not* be redistributed to fund other programs providing other services to other people, or to the public more broadly. When user fees "exceed their reasonable attributable cost they cease being fees and become taxes levied, not by Congress, but by an agency" (or here, the AO), which is "prohibited" unless clearly authorized by Congress. *Nat'l Ass'n of Broadcasters v. FCC*, 554 F.2d 1118, 1129 n.28 (D.C. Cir. 1976). As the Supreme Court articulated the rule in *Skinner*: Congress "must indicate clearly its intention to delegate to the Executive [or Judiciary] the discretionary authority to recover administrative costs not inuring directly to the benefit" of those paying the costs. 490 U.S. at 224; *see also Fla. Power & Light Co. v. United States*, 846 F.2d 765 (D.C. Cir. 1988). Absent such clear authorization, user fees may be imposed only "for a service that confers a specific benefit" on the people who pay the fees, and only to reimburse the costs of providing that service. *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1180 (D.C. Cir. 1994). No more.

This longstanding constitutional default rule is plainly applicable here. An administrative body of a different branch of government has imposed a fee that vastly

exceeds the costs of providing the service for which the fee is charged. And it has done so for the express purpose of funding other projects that provide services to other people (*e.g.*, filing services to lawyers and litigants, flat screens and web services to jurors, bankruptcy notices to creditors, and so on). The question under *Skinner* is whether Congress has "indicate[d] clearly its intention to delegate" the authority to do so. 490 U.S. at 224.

Whatever else can be said about section 1913 note, as amended by the E-Government Act, it does not unambiguously delegate authority to the AO to "charge [fees] for services rendered" beyond the amount "necessary" "to reimburse expenses incurred in providing these services." 28 U.S.C. § 1913 note. To the contrary, Congress intended just the opposite.

### *3.* *The 2002 amendment and constitutional avoidance*

*a. The 2002 amendment.* The E-Government Act's text confirms that Congress amended the law to eliminate excessive PACER fees, not authorize them. By making PACER fees optional ("may") and cheaper ("only to the extent necessary"), Congress sought to make records "freely available to the greatest extent possible." Appx2523. Whereas under "existing law, users of PACER [were] charged fees that [were] higher than the marginal cost of disseminating the information," Congress added language to change the "existing law" and remove any doubt that the AO must

reduce PACER fees to (at most) the amount necessary to recover that cost. *Id.* And yet the AO responded by doing nothing—and then increasing fees three years later.

That is not what Congress intended (much less "clearly" intended). "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Ross*, 136 S. Ct. at 1858 (cleaned up); *see Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) ("A change in the language of a statute is generally construed to import a change in meaning.") Courts may not "act[] as though the amendment" had "not taken place," *Ross*, 136 S. Ct. at 1858, or read a statute "in a manner that would negate its recent revision, and indeed would render it largely meaningless." *GPX Int'l Tire Corp. v. United States*, 678 F.3d 1308, 1312 (Fed. Cir. 2012) (cleaned up).

This black-letter interpretive rule is fatal to any bid for a clear authorization here. Logically, there is no way to both (a) give effect to Congress's decision to amend the statute to add the limiting phrase "only to the extent necessary," and (b) find that the clear-authorization requirement is satisfied. As a result, the constitutionally mandated default rule applies with full force: PACER fees must be limited to the costs of providing access to records through PACER. And that is exactly how Senator Lieberman, who sponsored the amendment, understood the requirement that it imposed—the creation of "a payment system that is used only to recover the direct cost of distributing documents via PACER." Appx2678.

*b. Constitutional avoidance.* That is also the reading that avoids a separate constitutional problem, grounded in the First Amendment right of access to courts and court records. The Judicial Conference has itself recognized that "public access to federal court case files" via PACER implicates these "constitutional principles."[3] And "[t]he Supreme Court has held that a government cannot profit from imposing" a fee "on the exercise of a First Amendment right." *Sullivan v. City of Augusta*, 511 F.3d 16, 38 (1st Cir. 2007) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943)). When First Amendment interests are implicated, "fees used to defray administrative expenses are permissible, but *only to the extent necessary* for that purpose." *Powers*, 723 F.2d at 1056 (emphasis added); *see Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981) (citing cases invalidating excess fees). Notably, this language mirrors the E-Government Act ("only to the extent necessary").[4]

---

[3] Subcomm. on Privacy & Pub. Access to Electronic Case Files, Judicial Conference of the U.S., *Report of the Judicial Conference Comm. on Court Admin. & Case Mgmt. on Privacy & Public Access to Elec. Case Files* (2001), https://perma.cc/52YK-23JF (App. A-4) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575–78 (1980)).

[4] For example, the Second Circuit invalidated a fee to use "state property as a forum for political expression" because it exceeded "the expense of processing the application." *Powers*, 723 F.2d at 1052, 1056; *see also Sullivan*, 511 F.3d at 38 (finding that a fee exceeded "the actual administrative expenses" and invalidating "the excessive amount charged"); *Fernandes*, 663 F.2d at 633, n.11 (invalidating permit fee because it exceeded the amount "needed to defray the costs of operating the permit system"). By contrast, the Supreme Court has upheld a parade-permit fee because it was "not a revenue tax," but was instead "limited" to what was necessary "to meet

This case law confirms what the other tools of statutory construction already make apparent: PACER fees must be limited to PACER costs. Interpreting the statute to allow the AO to profit from providing access to public case files—rather than permitting fees "only to the extent necessary" to "defray administrative expenses"—would raise serious constitutional questions. *See Powers*, 723 F.2d at 1056. While the public has a First Amendment interest in accessing the courts, the AO has no legitimate interest in hindering access to court records by imposing an excessive fee to pay for other things that should be funded through the appropriations process. *See generally* Schultze, *The Price of Ignorance: The Constitutional Cost of Fees for Access to Electronic Public Court Records*, 106 Geo. L.J. 1197 (2018); Ardia, *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835 (2017). Indeed, excessive PACER fees inhibit public understanding of the courts and thwart equal access to justice, erecting a financial barrier that many ordinary citizens are unable to clear.

This does not necessarily mean that a law would actually *be* unconstitutional if it were to expressly allow the judiciary to recoup more than the costs of operating PACER when imposing PACER fees. What it does mean, at a minimum, is that this is a "substantial constitutional question," so there must be "clear evidence that Congress actually intended" this result. *Peretz v. United States*, 501 U.S. 923, 930 (1991);

---

the expense incident to the administration of the [permit] and to the maintenance of public order" during the parade. *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941).

*see* Scalia & Garner, *Reading Law* 247–48 (2012) (explaining that the constitutional-doubt canon "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality"). As already explained, there's nothing of the sort here.

## B. The district court correctly rejected the government's reading and found it liable for the overcharge.

As against all this, the government has sought to defend the PACER fees in two ways. It has relied on post-enactment actions of the Appropriations Committees, claiming that they provide the necessary clear congressional authorization. And it has seized on the fact that PACER fees are deposited into the information-technology fund. The district court correctly rejected both of these arguments.

*1. Snippets from the Appropriations Committee did not "amend" or "expand" the statute.* In moving for summary judgment, the government's "main argument" was premised on the AO's interactions with the Appropriations Committees, Appx3176, in which the AO acknowledged that it lacked statutory authority to impose higher fees and would therefore need "expanded authority," Appx3018. The government argued that the AO had received such authority.

How? Because after the E-Government Act of 2002, and seven years before the class period in this case began, the AO seems to have informed the Committees that it would use PACER fees to fund other technology-related services, and the House Committee responded by putting language in a report stating, without

32

explanation, that it "expects" the AO to use the fees "to provide for [ECF] system enhancements and operational costs." H. Rep. 108-221, at 116 (2003); *see also* Appx3074–3075 (citing this sentence as the sole support for the fees). That is the same sentence on which the AO relied in 2009, when it claimed that PACER fees were lawful because the Appropriations Committee had "amended" the statute "to expand the permissible use of the fee revenue to pay for other services" beyond PACER. Appx2558.

In one sense, the AO was right then: The statute did not authorize its request. But the AO was wrong to think that the Appropriations Committee could (or did) "amend[]" the statute. The government was eventually forced to concede as much below. By the close of summary-judgment briefing, it acknowledged that any authority for the fees must come from the statute—as amended *by Congress*—and not from the subsequent actions of the Appropriations Committee. *See* Appx 2983.

That concession is well taken for many reasons. *First*, as the district court explained (at Appx3060–3061), "[e]xpressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress." *Hill*, 437 U.S. at 191. "[S]ubstantive legislation [cannot be] undone by the simple—and brief— insertion of some inconsistent language in Appropriations Committees' Report." *Id.* And that is particularly true here because that committee deals with how money is *spent* (outputs), not how it is *raised* (inputs).

*Second*, even setting aside the E-Government Act, a sentence in a report stating that a committee "expects" the AO to use PACER fees to fund ECF is nowhere close to a sufficiently clear indication of Congress's intent to delegate taxing authority to another branch of government. *Skinner*, 490 U.S. at 224.

*Third*, the 2004 report predates the class period by seven years, and so cannot authorize the fees at issue here. As for the appropriations process during the class period, it did not yield anything remotely resembling a clear authorization to delegate taxing authority. For example, when the AO was seeking approval for its fiscal year 2013 spending—at the end of that year, after the bill had passed and the money had been spent—the AO asked a committee staffer by email: "Would you be able to send us an email or something approving the plan?" Appx3040. The response came 45 minutes later, when the staffer said that "we have no objection." *Id.* There is no mention of section 1913 note, nor any indication that the Committee even knew it existed, much less that they intended to give it an authoritative interpretation. This kind of correspondence is not what the Supreme Court had it mind when it said that Congress must clearly indicate its intent to delegate taxing authority before a user fee may exceed the costs of providing the service for which the fee is charged.

*Fourth*, the committee report speaks only of using PACER fees to fund ECF— not to fund the many other technology-related services for which the AO has used the fees. The only authority the AO can point to that even arguably authorizes using

34

PACER fees to cover these costs is a 2007 letter signed by two members of the Senate Appropriations Committee saying they have "no objection" to "the expanded use of Electronic Public Access Receipts" in fiscal year 2007. *See* Appx2873. That is not nearly enough. Particularly in light of the Supreme Court's clear-statement rule, these statements from two Senators cannot rewrite the law enacted by the full Congress—and therefore cannot authorize the PACER fees at issue in this case. *See Hill*, 437 U.S. at 189–93.

**2. That PACER fees are deposited into the information-technology fund is irrelevant.** That leaves only one other argument raised by the government in defense of the full PACER fee. In the district court, the government tried to make something of the fact that, a decade before the E-Government Act, Congress created the judiciary's information-technology fund (JITF) and made its money available to fund various information-technology projects, and then "selected [the fund] as the source for depositing PACER receipts." Appx2809. The government claimed that this decision "informs how Congress intended the fees received from PACER access to be spent"—that is, on any of the "broad range of information technology expenditures approved by Congress" in establishing the JITF. *Id.*

The district court easily disposed of this argument. The JITF contains "funds appropriated to the judiciary" for "information technology resources." 8 U.S.C. § 612(c)(1). Although Congress decided in the 1990s to have Electronic Public Access

fees deposited into this account as well, that decision tells us nothing about whether—ten years later—Congress clearly intended to authorize PACER fees to exceed the costs of operating PACER. Nor does it negate the surrounding statutory text. As the court explained, "while the statute provides that PACER fees are to be deposited in the JTIF, it also directs that they are to be used to 'reimburse expenses incurred'" in providing the services rendered in return for the fee. Appx3175. The government's argument simply "ignore[s]" that language. *Id.*

## C. Congress did not clearly authorize the use of PACER fees to recover the costs of certain non-PACER programs.

After rejecting the government's position, the district court held that PACER fees exceed the amount authorized by statute and found the government liable for the excess. Appx3170. That holding is correct and should be affirmed. At the same time, however, the court read the statute to authorize some fees that go beyond what is necessary to recover the costs of PACER. That holding is incorrect. None of the court's reasons can justify this interpretation.

*First*, the court discussed the statutory phrase "to reimburse expenses incurred in providing these services." Appx3171. The court rightly noted that this "language cannot be ignored." Appx3175. And it did not deny (at least in this part of its opinion) that "these services" can reasonably be read to "include only the services that the AO is actually charging fees for as set forth in the EPA Fee Schedule, *i.e.*, the PACER system, the PACER Service Center, and the provision of printed copies of

documents accessed electronically at a public terminal in a courthouse." Appx3171. Yet the court posited that "[t]he term 'these services' could also mean any service that provides 'access to information available through automatic data processing equipment,' whether or not it is expressly part of the EPA fee schedule." *Id.*

There are at least three problems with this point. For one thing, the statutory text makes clear that the services being referred to in the phrase "these services" are the "services rendered" in exchange for the "charge" imposed. 28 U.S.C. § 1913 note. Those services are found in the fee schedule. For another thing, the question is not whether the statute "could also mean" something else. Appx3171. It is whether the statute could *only* mean that, so as to unambiguously delegate taxing authority. For still another, even this proposed alternative reading does not support the court's conclusion that PACER fees may cover the costs of CM/ECF. The service provided by ECF is not "access to information"; it is allowing lawyers and litigants to file their submissions electronically, from the comfort of their offices. And the "CM" part of CM/ECF is an internal case-management system that exists for the benefit of the courts, not to provide public access to information.

*Second*, the district court relied on the fact that the terms "marginal cost" and "PACER" are in the 2002 Senate Report and not the statutory text. Appx3055. But "marginal cost" does not have to be in the text. The language already in the statute at the time Congress amended it—"expenses incurred in providing these services"—

captures the same meaning. By adding the phrase "only to the extent necessary," Congress was making clear that fees would now be limited to the amount necessary to reimburse those expenses.[5]

As for the fact that Congress mentioned PACER by name in the legislative history but not in the statutory amendment itself, that too is no reason to reject our reading. To the contrary, it shows that Congress was focused on PACER fees when it amended the statute, but that it also understood that PACER was just one of the three services for which fees are charged under the schedule (with the other two making up a fraction of a percent of the revenue collected in PACER fees).[6]

---

[5] At one point, the district court suggested that the costs of CM/ECF might be considered part of the "necessary" "expenses incurred" in providing access to records through PACER, 28 U.S.C. § 1913 note, on the theory that these records are available "only because of CM/ECF." *See* Appx3184–3185. But that kind of but-for logic has no stopping point. It would allow PACER fees to be used to recover all the costs necessary to have a court in the first place (including the courthouse itself), for without a court there can be no court records. That logic cannot be correct. These court expenses would exist irrespective of whether court records were made publicly accessible, so they are not recoverable through PACER fees. And the same is true of CM/ECF. Courts can only function as courts if they have a system for accepting and storing case filings. Consider an example: Suppose that the judiciary wanted to allow public access to court records in the early 1900s, and to charge fees for providing such access. Under a fees-only-to-the-extent-necessary regime, the judiciary could charge fees as necessary to reimburse the costs of searching the files and providing copies of the records, as well as the associated labor costs. But the judiciary could not charge fees to reimburse the costs of accepting documents for filing and storing them with the court, or for other overhead costs (much like an agency, in responding to a public-records request today, may not charge a fee that exceeds "the direct costs of search, duplication, or review," 5 U.S.C. § 552 (a)(4)(A)(iv)).

[6] The district court also briefly pointed to the fact that the Senate Report used the phrase "electronic docketing systems," which could "encompass CM/ECF."

A broader point: It is true that Congress could have conceivably used even clearer language to accomplish its goal in amending the statute. "But the same could be said of many (even most) statutes," and courts "have long been mindful of that fact when interpreting laws." *Torres v. Lynch*, 136 S. Ct. 1619, 1633 (2016). "Rather than expecting (let alone demanding) perfection in drafting," the Supreme Court has "routinely construed statutes to have a particular meaning even as [it] acknowledged that Congress could have expressed itself more clearly." *Id.* "The question [here], then, is not: Could Congress have indicated" its intent "in more crystalline fashion" to limit PACER fees to the costs of operating PACER? *See id.* at 1634. "The question is instead, and more simply: Is that the right and fair reading of the statute" that Congress actually wrote? *Id.* For the reasons already given, it is.

*Third*, the district court found it "most telling[]" that Congress did not also amend the last sentence in the statute, Appx3056, which provides that fees collected "as a charge for services rendered" are deposited "to reimburse expenses incurred in providing these services," 28 U.S.C. § 1913 note. Because Congress left this language intact, the court determined that the amendment "did not address which services

––––––––––––––––––––

Appx3172. But this language was used to describe the AO's fee structure before the law was amended, and the rest of the sentence (the forward-looking part) discusses "this information [being] freely available to the greatest extent possible." Appx2523. Information about docketing information is made available through PACER, while CM/ECF is an internal case-management system and an e-filing system.

could be reimbursed, but only the amount of fees for services that could be charged." But again, Congress didn't need to change the last sentence. The "services" it refers to are the "services rendered" for the fees. *Id.* So Congress could accomplish its goal most efficiently by keeping that language and adding the requirement that fees no longer exceed the amount "necessary" to "reimburse expenses incurred in providing these services." *Id.*

*Finally*, the district court held that *Skinner*'s clear-authorization rule is satisfied. Although the court indicated a few pages earlier that it thought the term "these services" is ambiguous, it now said that the statute is unambiguous. Appx3174. In its view, the statute "clearly state[s] that the judiciary has the authority to use its PACER fees for services that may not directly benefit a particular PACER user." *Id.* The court reached this conclusion based on the 2002 amendment, which it believed "resolve[d] any ambiguity in [the statute's] meaning," Appx3180, and "effectively affirmed the judiciary's use of EPA fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and EBN." Appx3184.[7]

This conclusion is puzzling. It cannot be based on Congress's decision to add the phrase "only to the extent necessary." Limiting language of this kind can resolve

---

[7] The court also looked to "the reports of Committee on Appropriations that predated the passage of the E-Government Act." Appx3181. But these committee reports are not legislation, and they shed no light on whether the statute, as later amended by the E-Government Act, meets *Skinner*'s clear-statement rule.

ambiguity in just one direction: downward. So the conclusion must rest instead on the fact that Congress did not also alter or clarify the meaning of "these services" when it amended the law (the source of ambiguity previously perceived by the court). By failing to do so, the reasoning apparently goes, Congress acquiesced in the AO's "interpretation." "Congressional inaction," however, "cannot amend a duly enacted statute," *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994), much less provide a clear statement of the sort required by *Skinner*.

More broadly, the district court's conclusion that the 2002 amendment merely "affirmed" the fee schedule—in other words, that it did nothing—cannot be correct. It runs headlong into the rule that amendments should mean something. Instead of trying to give meaning to what Congress *didn't* do in 2002, the district court should have given meaning to what Congress actually did: add the words "only to the extent necessary" (in addition to changing "shall" to "may"). The court should have presumed that Congress wanted that language to have "real and substantial effect," *Ross*, 136 S. Ct. at 1858, not be "render[ed] . . . largely meaningless," *GPX*, 678 F.3d at 1312. The only meaning the phrase "only to the extent necessary" can have is to limit the scope of the authorization. It obviously does not expand the scope. And it is a particularly poor candidate for merely affirming what the statute already said (unless Congress thought that the AO had not been complying with the statute). After

all, if Congress thought that the AO was complying and did not have to lower PACER fees, there would have been no need to add this language.

Stated another way, the district court's reading renders the phrase "only to the extent necessary" superfluous. Like the government, the court "offer[ed] no account of what function that language [was designed to] serve." *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017). On the court's reading, the AO did not violate the statute until after 2004, when it began using PACER fees to fund services beyond PACER, CM/ECF, and electronic bankruptcy notification. But those additional services do not fit within even the district court's more capacious understanding of what "[t]he term 'these services' could also mean." Appx3054. So those additional "services could [not] be reimbursed" by PACER fees under even the pre-2002 version of the statute, as interpreted by the district court. Appx3056. The district court never confronted this fatal problem with its reading.[8]

Nor did it explain how its application of *Skinner* can be squared with Supreme Court precedent. Nearly 50 years ago, the Court considered a much broader user-fee statute than the one here. That statute, the Independent Offices Appropriations Act (or IOAA), authorizes agencies to charge a user fee for a "service or thing of

---

[8] Nor did it say anything about the First Amendment. And the fact that other portions of the E-Government Act require courts to provide public information (like creating websites) even though funds had not yet been appropriated for that purpose is irrelevant to the scope of the fee authorization in section 1913 note.

value provided by [the] agency." 31 U.S.C. § 9701(a). It requires user fees to be "fair" and "based on" four factors, including "public policy" and any "other relevant facts." 31 U.S.C. § 9701(b). Notwithstanding this potentially limitless language, the Court declined to read the IOAA "literally," and instead interpreted it to forbid agencies from charging fees that exceed the costs of providing the service. *Nat'l Cable Television*, 415 U.S. 336. As the Court reasoned: "It would be such a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power that we read [the IOAA] narrowly as authorizing not a 'tax' but a 'fee.'" *Id.* at 341; *see also Fed. Power Comm'n v. New England Power Co.*, 415 U.S. 345 (1974). If that was true of a statute expressly authorizing fees based on "public policy" and "other relevant facts," then *a fortiori* it is true of a narrower statute that Congress nevertheless amended to limit fees "only to the extent necessary."

**II.    Because the government "readily admits that PACER fees are being used to cover expenses that are not part of the 'marginal cost' of operating PACER," the government is liable.**

There is no doubt that the AO is charging more in fees than is necessary to administer PACER and provide access to records to those who use the system. In 2007, the AO admitted that PACER fees were well "above the level needed for the PACER program." Appx3017. And Congress made the same observation when it enacted the E-Government Act, finding that "users of PACER are charged fees that are higher than the marginal cost of disseminating the information." Appx2523.

This is even more true today. Since 1998, "the cost of a gigabyte of storage" has fallen "from $65.37 to $0.028, a reduction of over 99.9%," while "PACER's per-page fees increased 43%, from $0.07 to $0.10." Appx2659–2660. As Senator Lieberman has remarked: "[D]espite the technological innovations that should have led to reduced costs in the past eight years," the "cost for these documents has gone up" because the AO has used the fees to fund "initiatives that are unrelated to providing public access via PACER." Appx2549. Doing so is "against the requirement of the E-Government Act." *Id.*

Indeed, our technical experts estimate that the true cost of retrieving a document from PACER—including the cost of data storage with a secure service used by many federal agencies—should be $0.0000006 per page (about one half of one ten-thousandth of a penny). Appx2663–2664. This means that the fees actually collected by PACER would cover the costs associated with "215,271,893,258,900 requests, or approximately 1,825 pages per day for every person in the United States." *Id.* Or to make the point a different way: If the AO were to use the market leader for data storage, the "total yearly estimate for storing and serving PACER's dataset" (based on very generous estimates of the size of that dataset) would be "$227,399.84, or 0.16% of PACER's reported 2016 fee revenue." Appx2663. Charging more than 600 times that amount is unreasonable and excessive, especially when access to justice and public understanding of the courts lies in the balance.

One last thing: The plaintiffs do not mean to suggest that the non-PACER programs funded by PACER fees are not worthwhile. They are, and they deserve to be fully funded. But they "should be funded through direct appropriations," as Senator Lieberman has explained (and as the AO has already begun to take steps to achieve). Appx2549. By statute, they may not be funded by erecting an ever-increasing paywall to access public court records. Allowing the AO to use a paywall to public records as a way to fund the judiciary's general electronic operations takes the AO "far from its customary orbit and puts it in search of revenue in the manner of an Appropriations Committee of the House." *Nat'l Cable Television*, 415 U.S. at 341. Congress did not intend that result.

## CONCLUSION

The Court should answer the controlling question of law that formed the basis of this interlocutory appeal by interpreting 28 U.S.C. § 1913 note, as amended by the E-Government Act of 2002, to authorize PACER fees "only to the extent necessary" to "reimburse expenses incurred" in providing access to records through PACER, which is the "service[] rendered" in return for the fees. 28 U.S.C. § 1913 note. Further, the Court should hold that the government has violated this statute by imposing PACER fees that exceed the expenses incurred in providing records upon request through PACER. Accordingly, the Court should reverse the district court's denial of the plaintiffs' motion for summary adjudication as to liability, reverse the court's

partial grant of the government's cross-motion for summary judgment, and remand

to the district court for further proceedings.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*deepak@guptawessler.com*

WILLIAM H. NARWOLD
MEGHAN OLIVER
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
*bnarwold@motleyrice.com*

January 16, 2019                    *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,388 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Baskerville font.

/s/ Deepak Gupta
Deepak Gupta
*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit by using the CM/ECF system. All participants have consented to service by electronic mail:

Alisa Klein, *alisa.klein@usdoj.gov*
Brian Field, *brian.field@usdoj.gov*
W. Mark Nebeker, *mark.nebeker@usdoj.gov*

*Counsel for Cross-Appellant*

*/s/ Deepak Gupta*
Deepak Gupta

**Addendum**

Order on motions for summary judgment (March 31, 2018)................... Appx3146

Memorandum opinion on motions for summary judgment
(March 31, 2018) .............................................................................. Appx3147

Order certifying district court decision for interlocutory appeal
(August 13, 2018)............................................................................. Appx3391

Memorandum opinion for order certifying district court decision for
interlocutory appeal (August 13, 2018)................................................ Appx3393

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM,** *et al.*,<br>　　　　　　**Plaintiffs,**<br><br>　　　　v.<br><br>**UNITED STATES OF AMERICA,**<br><br>　　　　　　**Defendant.** | **Civil Action No. 16-745 (ESH)** |

## ORDER

For the reasons stated in an accompanying Memorandum Opinion, ECF No. 89, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment as to liability, ECF No. 52, is **DENIED**; and it is further

**ORDERED** that defendant's cross-motion for summary judgment as to liability, ECF No. 73, is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that the parties shall confer and file a Joint Status Report with a proposed schedule for further proceedings by **April 16, 2018**; and it is further

**ORDERED** that a Status Conference is scheduled for **April 18, 2018, at 3:00 p.m.** in Courtroom 23A.

　　　　　　　　　　　　　　　　　　　/s/   *Ellen Segal Huvelle*
　　　　　　　　　　　　　　　　　　　ELLEN SEGAL HUVELLE
　　　　　　　　　　　　　　　　　　　United States District Judge

Date:　March 31, 2018

Appx3146

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM**, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>**UNITED STATES OF AMERICA**,<br><br>        Defendant*.* |     Civil Action No. 16-745 (ESH) |

<u>**MEMORANDUM OPINION**</u>

The federal judiciary's Public Access to Court Electronic Records ("PACER") system, which is managed by the Administrative Office of the United States Courts ("AO"), provides the public with online access to the electronic records of federal court cases. The fees for using PACER are established by the Judicial Conference of the United States Courts and set forth in the judiciary's Electronic Public Access ("EPA") Fee Schedule. In this class action, users of the PACER system contend that the fees charged from 2010 to 2016 violated federal law, *see* 28 U.S.C. § 1913 note (enacted as § 404 of the Judiciary Appropriations Act, 1991, Pub. L. 101-515, 104 Stat. 2101 (Nov. 5, 1990) and amended by § 205(e) of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002)). Before the Court are the parties' cross-motions for summary judgment as to liability. (*See* Pls.' Mot. Summ. J., ECF No. 52; Def.'s Cross-Mot. Summ. J., ECF No. 73.) For the reasons stated herein, the Court will deny plaintiffs' motion and grant in part and deny in part defendant's motion.

# BACKGROUND

## I.   FACTUAL BACKGROUND

Although the present litigation is a dispute over whether, during the years 2010–2016, the PACER fees charged violated 28 U.S.C. § 1913 note, the relevant facts date back to PACER's creation.[1]

### A.   Origins of PACER and the Judiciary's Electronic Public Access ("EPA") Fee Schedule

In September 1988, the Judicial Conference "authorized an experimental *program of electronic access for the public to court information* in one or more district, bankruptcy, or appellate courts in which the experiment can be conducted at nominal cost, and delegated to the Committee [on Judicial Improvements] the authority to establish access fees during the pendency of the program." (Rep. of Proceedings of the Jud. Conf. of the U.S. ("Jud. Conf. Rep.") at 83 (Sept. 18, 1988) (emphasis added) (Ex. A to the Decl. of Wendell Skidgel, Nov. 11, 2017, ECF No. 73-2 ("Skidgel Decl.")); *see also* Def.'s Statement Facts ¶¶ 1-2, ECF No. 73-3 ("Def.'s Facts")). The following year, the Federal Judicial Center initiated pilot PACER programs in several bankruptcy and district courts. (*See* Chronology of the Fed. Judiciary's Elec. Pub. Access (EPA) Program at 1 ("EPA Chronology") (Ex. C to the Decl. of Jonathan Taylor, Aug. 28, 2017, ECF No. 52-1 ("Taylor Decl.")).)

In February 1990, during a hearing on judiciary appropriations for 1991, a subcommittee of the House Committee on Appropriations took up the judiciary's "request[] [for] authority to collect fees for access to information obtained through automation." *Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1991: Hearing Before*

---

[1] The facts set forth herein are undisputed.

Appx3148

*a Subcomm. of the H. Comm. on Appropriations*, 101st Cong. 323 (1990) ("1990 Hrg.").  It

asked a representative for the judiciary whether there were "any estimates on how much you will

collect and will this fee help offset some of your automation costs." *Id*. at 324.  The response

from the judiciary was that "estimates of the revenue that will be generated from these fees are

not possible due to the lack of information on the number of attorneys and individuals who have

the capability of electronic access," but that there "ha[d] been a great deal of interest expressed"

and it was "anticipated that the revenue generated will offset a portion of the Judiciary's cost of

automation." *Id*.  The Senate Report on 1991 appropriations bill noted that it "included language

which authorizes the Judicial Conference to prescribe reasonable fees for public access to case

information, *to reimburse the courts for automating the collection of the information*."  S. Rep.

No. 101-515, at 86 (1990) ("1990 S. Rep.") (emphasis added).

In March 1990, "barring congressional objection," the Judicial Conference "approved an

initial rate schedule for electronic public access to court data [in the district and bankruptcy

courts] via the PACER system."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990) (Skidgel Decl. Ex. C);

Def.'s Facts ¶ 5.)[2]

Then, in November 1990, Congress included the following language in the Judiciary

Appropriations Act of 1991:

> (a) The Judicial Conference shall prescribe reasonable fees, pursuant to sections
> 1913, 1914, 1926, and 1930 of title 28, United States Code, for collection by the
> courts under those sections for access to information available through automatic
> data processing equipment.  These fees may distinguish between classes of
> persons, and shall provide for exempting persons or classes of persons from the

---

[2] At that time, "PACER allow[ed] a law firm, or other organization or individual, to use a
personal computer to access a court's computer and extract public data in the form of docket
sheets, calendars, and other records."  (Jud. Conf. Rep. at 21 (Mar. 13, 1990).)  The initial fee
schedule included a Yearly Subscription Rate ($60 per court for commercial users; $30 per court
for non-profits) and a Per Minute Charge ($1 per minute for commercial users; 50 cents per
minute for non-profits).  (*Id*.)

Appx3149

fees, in order to avoid unreasonable burdens and to promote public access to such information.  The Director, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.

(b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective.  All fees hereafter collected by the Judiciary under paragraph (a) as a charge for services rendered shall be deposited as offsetting collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A) to reimburse expenses incurred in providing these services.

Pub. L. 101-515, § 404, 104 Stat. 2101 (Nov. 5, 1990) (codified at 28 U.S.C. § 1913 note).[3]

Three aspects of this law are relevant to this litigation: (1) the Judicial Conference was given the authority (indeed, it was required) to charge reasonable fees for "access to information available through automatic data processing equipment,"[4] which covered its newly-developed PACER

---

[3]  The statutory sections referenced authorize the federal courts to charge certain fees. *See* 28 U.S.C. § 1913 (fees for courts of appeals); *id* § 1914 (fees for district courts); *id*. § 1926 (fees for Court of Federal Claims); *id*. § 1930 (fees for bankruptcy courts).

[4]  The term "automatic data processing equipment" is not defined in 28 U.S.C. § 1913 note, but it was defined in 28 U.S.C. § 612 as having "the meaning given that term in section 111(a)(2)(A) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(a)(2)(A))," which at that time defined it as:

. . . any equipment or interconnected system or subsystems of equipment that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching interchange, transmission, or reception, of data or information—

. . .

(B) Such term includes—

(i)       computers;
(ii)      ancillary equipment;
(iii)     software, firmware, and similar procedures;
(iv)     services, including support services; and
(v)      related resources as defined by regulations issued by the Administrator for General Services.

Appx3150

system; (2) the Director of the AO was required to publish a "schedule of reasonable fees for electronic access to information"; and (3) the fees collected by the judiciary pursuant to that fee schedule were to be deposited in the Judiciary Automation Fund[5] "to reimburse expenses incurred in providing these services." *Id*.

In the summer of 1992, the House Committee on Appropriations issued a report that "note[d] that the Judiciary's investments in automation have resulted in enhanced service to the public and to other Government agencies in making court records relating to litigation available by electronic media" and "request[ed] that the Judiciary equip all courts, as rapidly as is feasible, with the capability for making such records available electronically and for collecting fees for doing so." H.R. Rep. No. 102-709, at 58 (July 23, 1992) ("1992 H.R. Rep.") (report accompanying appropriations bill for the judiciary for fiscal year ("FY") 1993).[6]

---

[5]  Congress had established the Judiciary Automation Fund ("JAF") in 1989 to be "available to the Director [of the AO] without fiscal year limitation for the procurement (by lease, purchase, exchange, transfer, or otherwise) of automatic data processing equipment for the judicial branch of the United States" and "for expenses, including personal services and other costs, for the effective management, coordination, operation, and use of automatic data processing equipment in the judicial branch." *See* Pub. L. 101-162, 103 Stat 988 (1989) (codified at 28 U.S.C. § 612(a)). Before 28 U.S.C. § 1913 note was enacted, PACER fees were required to be deposited in the U.S. Treasury. (*See* Jud. Conf. Rep. at 20 (Mar. 14, 1989) (Skidgel Decl. Ex. B).) In 1989, the Judicial Conference, "[o]bserving that such fees could provide significant levels of new revenues at a time when the judiciary face[d] severe funding shortages," had "voted to recommend that Congress credit to the judiciary's appropriations account any fees generated by providing public access to court records"; determined that it would try to change that. (*See id.*; Def.'s Facts ¶ 3; *see also* Jud. Conf. Rep. at 21 (Mar. 13, 1990) (noting that the FY 1990 appropriations act provided that the judiciary was "entitled to retain the fees collected for PACER services in the bankruptcy courts," and that the Conference would "seek similar legislative language to permit the judiciary to retain the fees collected for district court PACER services").)

[6]  According to this report, the Committee believed that "more than 75 courts are providing this service, most of them at no charge to subscribers"; that "approximately a third of current access to court records is by non-Judiciary, governmental agencies" and that "fees for access in these instances are desirable"; and that it was "aware that a pilot program for the collection of fees ha[d] been successfully implemented in the Courts and encourage[d] the Judiciary to assess charges in all courts, in accordance with the provisions of section 404(a) of P.L. 101-515[.]"

Appx3151

In 1993, the Judicial Conference amended the fee schedules for the Courts of Appeals to include a "fee for usage of electronic access to court data" for "users of PACER and other similar electronic access systems," while deciding not to impose fees for another "very different electronic access system" then in use by the appellate courts.  (Jud. Conf. Rep. at 44–45 (Sept. 20, 1993) (Skidgel Decl. Ex. D).)[7]  In 1994, the Judicial Conference approved a "fee for usage of electronic access to court data" for the Court of Federal Claims.  (Jud. Conf. Rep. at 16 (Mar. 15, 1994) (Skidgel Decl. Ex. E).)  Finally, in March 1997, it did the same for the Judicial Panel on Multidistrict Litigation.  (Jud. Conf. Rep. at 20 (Mar. 11, 1997)[8]; Def.'s Facts ¶ 13.)

### B.    EPA Fees Before the E-Government Act (1993–2002)

As the Judicial Conference was adding EPA fees to the fee schedules for additional courts, it became apparent that the "income accruing from the fee[s] w[ould] exceed the costs of providing the service."  (Jud. Conf. Rep. at 13–14 (Mar. 14, 1995).)  Accordingly, after noting that this revenue "is to be used to support and enhance the electronic public access systems," the Judicial Conference reduced the fee from $1.00 to 75 cents per minute in 1995.  (*Id.*)  In 1996, after noting that the previous reduction had been "to avoid an ongoing surplus," it "reduce[d] the

---

1992 H.R. Rep. at 58.

[7]  The Judicial Conference Report explained that:

> Some appellate courts utilize a very different electronic access system called Appellate Court Electronic Services (ACES) (formerly known as Electronic Dissemination of Opinions System (EDOS)).  The Committee determined that, at this time, the costs of implementing and operating a billing and fee collection system for electronic access to the ACES/EDOS system would outweigh the benefit of the revenues to be generated.

(Jud. Conf. Rep. at 44 (Sept. 20, 1993).)

[8]  Legislation authorizing the Judicial Conference to establish a fee schedule for the Judicial Panel on Multidistrict Litigation was enacted in 1996.  *See* Pub. L. No. 104-317 (1996) § 403(b), Oct. 19, 1996, 110 Stat. 3854 (codified at 28 U.S.C. § 1932).

Appx3152

fee for electronic public access further," from 75 to 60 cents per minute.  (Jud. Conf. Rep. at 16

(Mar. 13, 1996) (Skidgel Decl. Ex. F); *see also* EPA Chronology at 1; Def.'s Facts ¶ 14.)

Shortly after the 1996 fee reduction, the House and Senate Appropriations Committees

issued reports that included commentary on the judiciary's EPA fees.  The House Report stated:

> The Committee supports the ongoing efforts of the Judiciary to improve and
> expand information made available in electronic form to the public.  Accordingly,
> the Committee expects the Judiciary to utilize available balances derived from
> electronic public access fees in the Judiciary Automation Fund to make
> information and services more accessible to the public through improvements to
> enhance the availability of electronic information.  *The overall quality of service*
> *to the public will be improved with the availability of enhancements such as*
> *electronic case documents, electronic filings, enhanced use of the Internet, and*
> *electronic bankruptcy noticing.*

H.R. Rep. No. 104-676, at 89 (July 16, 1996) (emphasis added) ("1996 H.R. Rep.").  The Senate

Report stated that:

> The Committee supports efforts of the judiciary to make electronic information
> available to the public, and expects that available balances from public access fees
> in the judiciary automation fund will be used to enhance availability of public
> access.

S. Rep. No. 104-353, at 88 (Aug. 27, 1996) ("1996 S. Rep.").

Soon thereafter, "the judiciary started planning for a new e-filing system called ECF

[Electronic Case Filing]." (Pls.' Statement Facts ¶ 9, ECF No. 52-16 ("Pls.' Facts").)  In March

1997, the staff of the AO prepared a paper, entitled "Electronic Case Files in the Federal Courts:

A Preliminary Examination of Goals, Issues and the Road Ahead," "to aid the deliberations of

the Judicial Conference in this endeavor," which would allow courts to maintain complete

electronic case files.  (Taylor Decl. Ex. B, at 36 ("1997 AO Paper").)  In discussing how the ECF

system could be funded, the paper discussed the possibility of charging a separate fee for ECF,

but also opined that "[s]tarting with fiscal year 1997, the judiciary has greater freedom in the use

of revenues generated from electronic public access fees" because "the [1996] House and Senate

Appx3153

appropriations committee reports . . . include[d] language expressly approving use of these monies for electronic filings, electronic documents, use of the Internet, etc." (1997 AO Paper at 36; *see* Pls.' Facts ¶ 9; *see also* Second Decl. of Wendell Skidgel, March 14, 2018, ECF 81-1 ("2d Skidgel Decl."), Tab 1 ("FY 2002 Budget Request") ("Fiscal year 1997 appropriations report language expanded the judiciary's authority to use these funds to finance automation enhancements that improve the availability of electronic information to the public.").) In the summer of 1998, the Senate Appropriations Committee reiterated its view that it "support[ed] efforts of the judiciary to make information available to the public electronically, and expect[ed] that available balances from public access fees in the judiciary automation fund will be used to enhance the availability of public access." S. Rep. No. 105-235, at 114 (July 2, 1998) ("1998 S. Rep.").

At some point, "a web interface was created for PACER" and the Judicial Conference prescribed the first Internet Fee for Electronic Access to Court Information, charging 7 cents per page "for public users obtaining PACER information through a federal judiciary Internet site." (Jud. Conf. Rep. at 64 (Sept. 15, 1998) (Skidgel Decl. Ex. G); *see* EPA Chronology at 1.) The Judicial Conference stated in its report that

> The revenue from these fees is used exclusively to fund the full range of electronic public access (EPA) services. With the introduction of Internet technology to the judiciary's current public access program, the Committee on Court Administration and Case Management recommended that a new Internet PACER fee be established to maintain the current public access revenue while introducing new technologies to expand public accessibility to PACER information.

(Jud. Conf. Rep. at 64 (Sept. 15, 1998).)[9]

---

[9] At the same time, the Judicial Conference "addressed the issue of what types of data or information made available for electronic public access should have an associated fee and what types of data should be provided at no cost." (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998).) It concluded that while it "prescribed a fee for access to court data obtained electronically from the

Appx3154

In March 2001, the Judicial Conference eliminated the EPA fees from the court-specific miscellaneous fee schedules and replaced them with "an independent miscellaneous EPA fee schedule that would apply to all court types." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001) (Skidgel Decl. Ex. H); *see also* EPA Chronology at 1.)  At the same time, it amended the EPA fee schedule to provide: (1) that attorneys of record and parties in a case would receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer, which could then be printed and saved to the recipient's own computer or network; (2) that no fee is owed by a PACER user until charges of more than $10 in a calendar year are accrued; (3) a new fee of 10 cents per page for printing paper copies of documents through public access terminals at clerks' offices; and (4) a new PACER Service Center search fee of $20.[10] (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).)  In 2002, the Judicial Conference further amended the EPA fee schedule "to cap the charge for accessing any single document via the Internet at the fee for 30 pages."[11] (Jud. Conf. Rep. at 11 (Mar. 13, 2002) (Skidgel Decl. Ex. I).)

Starting no later than fiscal year 2000,[12] the judiciary was using its EPA fees to pay for

---

public dockets of individual case records in the court," courts should be allowed to "provide other local court information at no cost," such as local rules, court forms, news items, court calendars, opinions designated by the court for publication, and other information—such as court hours, court location, telephone listings—determined locally to benefit the public and the court." (*Id.*)

[10]  At the time, "[t]he PACER Service Center provide[d]s registration, billing, and technical support for the judiciary's EPA systems and receive[d] numerous requests daily for particular docket sheets from individuals who d[id] not have PACER accounts." (Jud. Conf. Rep. at 12–13 (Mar. 14, 2001).)

[11]  The Judicial Conference took this step because otherwise "the fee is based upon the total number of pages in a document, even if only one page is viewed, because the case management/electronic case files system (CM/ECF) software cannot accommodate a request for a specific range of pages from a document," which "can result in a relatively high charge for a small usage." (Jud. Conf. Rep. at 11 (Mar. 13, 2002).)

[12]  The record does not include any specifics as to the use of EPA fees prior to FY 2000.

Appx3155

PACER-related costs, CM/ECF-related costs, and Electronic Bankruptcy Noticing ("EBN").[13]

(*See* 2d Skidgel Decl. ¶¶ 31–33 & Tabs 30–32 ("expenditures relating to the Judiciary's

Electronic Public Access Program" for FY 2000–2002).)

## C.     E-Government Act of 2002

In December 2002, Congress passed the E-Government Act of 2002.  Section 205

pertained to the "Federal Courts.  Subsection (a) required all courts to have "individual court

websites" containing certain specified information or links to websites that include such

information (e.g., courthouse location, contact information, local rules, general orders, docket

information for all cases, access to electronically filed documents, written opinions, and any

other information useful to the public)"; subsection (b) provided that "[t]he information and rules

on each website shall be updated regularly and kept reasonably current; subsection (c), entitled

"Electronic Filings," provided that, with certain exceptions for sealed documents and privacy and

security concerns, "each court shall make any document that is filed electronically publicly

available online"; subsection (d), entitled "Dockets with links to documents" provided that "[t]he

Judicial Conference of the United States shall explore the feasibility of technology to post online

dockets with links allowing all filings, decisions, and rulings in each case to be obtained from the

docket sheet of that case"; and subsections (f) and (g) address the time limits for courts to

comply with the above requirements.  E-Government Act of 2002, § 205(a)–(d), (f), and (g)

(codified at 44 U.S.C. § 3501 note).  Subsection (e), entitled Cost of Providing Electronic

Docketing Information, "amend[ed] existing law regarding the fees that the Judicial Conference

prescribes for access to electronic information" by amending the first sentence of 28 U.S.C. §

---

[13]  A line item amount expended from EPA fees for Electronic Bankruptcy Noticing appears in AO's accounting of EPA fees for FY 2000, but not for 2001 or 2002.  (*See* 2d Skidgel Decl. Tabs 30–32.)

Appx3156

1913 note to replace the words "shall hereafter" with "may, only to the extent necessary."  E-Government Act of 2002, § 205(e).  The E-Government Act left the remainder of 28 U.S.C. § 1913 note unchanged.

The Senate Governmental Affairs Committee Report describes Section 205 as follows:

> Section 205 requires federal courts to provide greater access to judicial information over the Internet. Greater access to judicial information enhances opportunities for the public to become educated about their legal system and to research case-law, and it improves access to the court system. The mandates contained in section 205 are not absolute, however.  Any court is authorized to defer compliance with the requirements of this section, and the Judicial Conference of the United States is authorized to promulgate rules to protect privacy and security concerns.

S. Rep. No. 107-174, at 23 (June 24, 2002) ("2002 S. Rep.") (Taylor Decl. Ex. D).  As to the amending language in subsection 205(e), the report stated:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible.  For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index.  Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

2002 S. Rep. at 23.

### D.     EPA Fees After the E-Government Act

#### 1.     2003–2006

After the passage of the E-Government Act, the judiciary continued to use EPA fees for the development of its CM/ECF system.  (*See* Taylor Decl. Ex. F (FY 2006 Annual Report for the Judiciary Information Technology Fund ("JITF") (formerly the "Judiciary Automation Fund")[14] ("The entire development costs for the Case Management/Electronic Case Files

---

[14] In 2005, 28 U.S.C. § 612 had been amended to substitute "Judiciary Information Technology

Appx3157

(CM/ECF) project have been funded solely through EPA collections.").)

In 2003, a report from the House Appropriations Committee stated that: "The Committee expects the fee for the Electronic Public Access program to provide for Case Management/Electronic Case Files system enhancements and operational costs."  H.R. Rep. No. 108-221, at 116 (July 21, 2003) ("2003 H.R. Rep.").  The Senate Appropriations Committee also expressed its enthusiasm for CM/ECF:

> The Committee fully supports the Judiciary's budget request for the Judiciary Information Technology Fund [JITF]. The Committee would like to see an even greater emphasis on automation in the local courts. To this end, the Committee expects the full recommended appropriation for the JITF, as reflected in the budget request, be deposited into this account. The Committee lauds the Judicial Committee on Information Technology (IT Committee) and their Chairman for their successes helping the Courts run more efficiently through the use of new automation. Of particular note, the Committee is impressed and encouraged by the new Case Management/Electronic Case File system [CM/ECF]. This new and innovative system allows judges, their staffs, the bar and the general public to work within the judicial system with greater efficiency. This new system is currently implemented in many bankruptcy and district courts and will soon begin implementation in the appellate courts. The CM/ECF system is already showing its potential to revolutionize the management and handling of case files and within the next few years should show significant cost savings throughout the Judiciary. The Committee on Appropriations expects a report on the savings generated by this program at the earliest possible date.

S. Rep. No. 108-144, at 118 (Sept. 5, 2003) ("2003 S. Rep.").  The associated Conference Committee report "adopt[ed] by reference the House report language concerning Electronic Public Access fees."  *See* 149 Cong Rec. H12323, at H12515 (Nov. 23, 2003) ("2003 Conf. Rep.").

In September 2004, the Judicial Conference, "[i]n order to provide sufficient revenue to fully fund currently identified case management/electronic case files system costs," "increase[d]

---

Fund" for "Judiciary Automation Fund" and "information technology" for "automatic data processing."

the fee for public users obtaining information through a federal judiciary Internet site from seven

to eight cents per page." (Jud. Conf. Rep. at 12 (Sept. 21, 2004) (Skidgel Decl. Ex. J); *see also*

EPA Chronology at 2; Taylor Decl. Ex. E (Oct. 21, 2004 AO memorandum) ("This increase is

predicated upon Congressional guidance that the judiciary is expected to use PACER fee revenue

to fund CM/ECF operations and maintenance.  The fee increase will enable the judiciary to

continue to fully fund the EPA Program, in addition to CM/ECF implementation costs until the

system is fully deployed throughout the judiciary and its currently defined operations and

maintenance costs thereafter.").)

> The judiciary's Financial Plan for fiscal year 2006 described its EPA program at the time:

> The judiciary's Electronic Public Access (EPA) program provides for the
> development, implementation and enhancement of electronic public access
> systems in the federal judiciary.  The EPA program provides centralized billing,
> registration and technical support services for PACER (Public Access to Court
> Electronic Records), which facilitates Internet access to data from case files in all
> court types, in accordance with policies set by the Judicial Conference.  The
> increase in fiscal year 2006 EPA program operations includes one-time costs
> associated with renegotiation of the Federal Telephone System (FTS) 2001
> telecommunications contract.

> Pursuant to congressional directives, the program is self-funded and collections
> are used to fund information technology initiatives in the judiciary related to
> public access.  Fee revenue from electronic access is deposited into the Judiciary
> Information Technology Fund.  Funds are used first to pay the expenses of the
> PACER program. Funds collected above the level needed for the PACER
> program are then used to fund other initiatives related to public access.  The
> development and implementation costs for the CM/ECF project have been funded
> through EPA collections.  Beginning last year, in accordance with congressional
> direction, EPA collections were used to support CM/ECF operations and
> maintenance as well.  In fiscal year 200[6], the judiciary plans to use EPA
> collections to continue PACER operations, complete CM/ECF development and
> implementation, and operate and maintain the installed CM/ECF systems in the
> various courts across the country.

(2d Skidgel Decl. Tab 9 (FY 2006 Financial Plan at 45).)

### 2.    2006–2009

In July 2006, the Senate Appropriations Committee issued a report pertaining to the 2007

Appx3159

appropriations bill in which it stated: "The Committee supports the Federal judiciary sharing its case management electronic case filing system at the State level and urges the judiciary to undertake a study of whether sharing such technology, including electronic billing processes, is a viable option."  S. Rep. No. 109-293, at 176 (July 26, 2006) ("2006 S. Rep.") (2d Skidgel Decl. Tab 38).

By the end of 2006, "resulting from unanticipated revenue growth associated with public requests for case information," the judiciary found that its EPA fees fully covered the costs of its "EPA Program" and left it with an "unobligated balance" of $32.2 million from EPA fees in the JITF.  (FY 2006 JITF Annual Rep. at 8; Pls.' Facts ¶ 16.)  In light of this "unobligated balance," the judiciary reported that it was "examining expanded use of the fee revenue in accordance with the authorizing legislation."  (FY 2006 JITF Annual Rep. at 8.)

In March 2007, the judiciary submitted its financial plan for fiscal year 2007 to the House and Senate Appropriations Committees.  (Def.'s Facts ¶ 27.)  In the section of the plan that covered the JITF, it proposed using EPA fees "first to pay the expenses of the PACER program" and then "to fund other initiatives related to public access."  (Skidgel Decl. Ex. K (FY 2007 Financial Plan at 45).)  It identified the "public access initiatives" that it planned to fund with EPA fees as CM/ECF Infrastructure and Allotments; EBN; Internet Gateways; and Courtroom Technology Allotments for Maintenance/Technology Refreshment.  (Id.)  With respect to Courtroom Technology, the plan requested "expanded authority" to use EPA fees for that purpose:

> Via this financial plan submission, the Judiciary seeks authority to expand use of Electronic Public Access (EPA) receipts to support courtroom technology allotments for installation, cyclical replacement of equipment, and infrastructure maintenance.  The Judiciary seeks this expanded authority as an appropriate use of EPA receipts to improve the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically

Appx3160

through electronic public access services when it is presented electronically and
becomes an electronic court record.

(FY 2007 Financial Plan at 43, 46.)  With no specific reference to EPA fees, the plan also sought

> spending authority to implement a Memorandum of Agreement with the State of
> Mississippi to undertake a three-year study of the feasibility of sharing the
> Judiciary's case management electronic case filing system at the state level, to
> include electronic billing processes. The estimated cost of this three year pilot will
> not exceed $1.4 million.

(*Id*. at 41.)  In May 2007, the FY 2007 Financial Plan was approved by the House and Senate

Appropriations Committees, with the approval letter signed on May 2, 2007, by the Chairman

and the Ranking Member of the Subcommittee on Financial Services and General Government,

stating that there was no objection to "the expanded use of Electronic Public Access Receipts" or

"a feasibility study for sharing the Judiciary's case management system with the State of

Mississippi."  (Skidgel Decl. Ex. L ("FY 2007 Senate Approval Letter"); *id*. Ex. M ("FY 2007

House Approval Letter").)

The judiciary began using EPA fees to pay for courtroom technology expenses in 2007,

"to offset some costs in [its] information technology program that would otherwise have to be

funded with appropriated funds."  (Pls.' Facts ¶ 18; 2d Skidgel Decl. Tab 35 (FY 2007–08 EPA

Expenditures); *Hearings Before a Subcomm. of the Sen. Comm. on Appropriations on*

*H.R. 7323/S. 3260*, 110th Cong. 51 (2008) (testimony of the chair of the Judicial Conference's

Comm. on the Budget) ("[t]he Judiciary's fiscal year 2009 budget request assumes $68 million in

PACER fees will be available to finance information technology requirements in the courts'

Salaries and Expenses account, thereby reducing our need for appropriated funds").)

In its fiscal year 2008 financial plan, the judiciary indicated that it intended to use EPA

fees for Courtroom Technology ($24.8 million) and two new programs: a Jury Management

System ("JMS") Web Page ($2.0 million) and a Violent Crime Control Act ("VCCA")

Appx3161

Notification.  (2d Skidgel Decl. Tab 11 (FY 2008 Financial Plan at 11).)  Actual expenditures for

fiscal year 2008 included spending on those programs.  (*Id.* Tab 35 (FY 2008 EPA Expenditures)

($24.7 million spent on Courtroom Technology; $1.5 million spent on the JMS Web Page; $1.1

million spent on the VCCA Notification).)  Its fiscal year 2009 financial plan included a third

new expense category: a CM/ECF state feasibility study ($1.4 million)—this was previously

described in the 2007 financial plan as the State of Mississippi study, albeit not in the section

related to EPA fee use.  (*Id.* Tab 12 (FY 2009 Financial Plan at 45).)  The judiciary also

projected spending $25.8 million on Courtroom Technology; $200,000 on the JMS Public Web

Page; and $1 million on VCCA Notification.  (*Id.*)  Again, actual expenditures for fiscal year

2009 included each of these programs.  *(Id.* Tab 36 (FY 2009 EPA Expenditures) ($160,000

spent on the State of Mississippi study; $24.6 million spent on Courtroom Technology; $260,000

spent on Web-Based Juror Services (replacing line item for JMS); and $69,000 spent on VCCA

Notification).)

      In February 2009, Senator Lieberman, in his capacity as Chair of the Senate Committee

on Homeland Security and Government Affairs, sent a letter to the Chair of the Judicial

Conference Committee on Rules of Practice and Procedure, inquiring whether the judiciary was

complying with the E-Government Act.  (*See* Taylor Decl. Ex. H.)  According to Senator

Lieberman, the "goal of this provision . . . was to increase free public access to [court] records."

(*Id.*)  Given that PACER fees had increased since 2002, and that "the funds generated by these

fees [were] still well higher than the cost of dissemination," he asked the Judicial Conference to

"explain whether the Judicial Conference is complying with Section 205(e) of the E-Government

Act, how PACER fees are determined, and whether the Judicial Conference is only charging 'to

the extent necessary' for records using the PACER system."  (*Id.*)

Appx3162

On behalf of the Judicial Conference and its Rules Committee, the Committee Chair and the Director of the AO responded that the judiciary was complying with the law because EPA fees are "used only to fund public access initiatives," such as "CM/ECF, the primary source of electronic information on PACER," and the "EBN system, which "provides access to bankruptcy case information to parties listed in the case by eliminating the production and mailing of traditional paper notices and associated postage costs, while speeding public service." (Taylor Decl. Ex. I ("3/26/2009 AO Letter").)

In March 2010, Senator Lieberman raised his concerns in a letter to the Senate Appropriations Committee.  (*See* Taylor Decl. Ex. G.)  In addition, he specifically questioned the use of EPA receipts for courtroom technology, acknowledging that the Appropriations Committees had approved this use in 2007, but expressing his opinion that this was "an initiative that [was] unrelated to providing public access via PACER and against the requirement of the E-Government Act." (*Id*. at 3.)

In 2011, the Judicial Conference, "[n]oting that . . . for the past three fiscal years the EPA program's obligations have exceeded its revenue," again amended the PACER fee schedule, raising the per-page cost from 8 to 10 cents.  (Jud. Conf. Rep. at 16 (Sept. 13, 2011) (Skidgel Decl. Ex. N).)  At the same time, it increased the fee waiver amount from $10 to $15 per quarter. (*Id*.)

### 3.     2010–2016[15]

From the beginning of fiscal year 2010 to the end of fiscal year 2016, the judiciary collected more than $920 million in PACER fees; the total amount collected annually increased

---

[15]  These are the years that are relevant to the present litigation because there is a six-year statute of limitation on plaintiffs' claims.

Appx3163

from about $102.5 million in 2010 to $146.4 million in 2016. [16]  (*See* Pls.' Facts ¶¶ 28, 46, 62,

80, 98, 116, 134; Taylor Decl. Ex. L; *see also* Attachment 1 hereto.[17])

During that time, PACER fees were used to pay for the costs of PACER, CM/ECF, EBN,

the State of Mississippi study, Web-Based Juror Services, VCCA Notification, and Courtroom

Technology.  In its internal accounting, the judiciary divided these costs into Program

Requirements and Congressional Priorities.  (Taylor Decl. Ex. L.)

Under Program Requirements, there are five categories: (1) Public Access Services;

(2) CM/ECF System; (3) Telecommunications (2010–11) or Communications Infrastructure,

Services and Security (2012–16); (4) Court Allotments; and (5) EBN.  (*Id.*)  The Public Access

Services category includes only expenses that relate directly to PACER.  (*See* Taylor Decl. Ex.

M, at 22-23 ("Def.'s Resp. to Pls.' Interrogs."); 3/23/18 Tr. at __.)  From 2010 to 2016, the

judiciary spent nearly $129.9 million on Public Access Services.  (*Id.*)  The next three categories,

CM/ECF System, Telecommunications/Communications Infrastructure, and Court Allotments,

include only expenses that relate to CM/ECF or PACER.  (*See* 3/23/18 Tr. at __[18]; *see also*

Def.'s Resp. to Pls.' Interrogs. at 22–26.)  From 2010 to 2016, the judiciary spent $217.9 million

on the CM/ECF System; $229.4 million on Telecommunications/ Communications

Infrastructure; and $74.9 million on Court Allotments.  (Taylor Decl. Ex. L (FY 2010-2016 EPA

---

[16]  This number does not include print fee revenues, which are also collected pursuant to the EPA fee schedule.

[17]  The document submitted to the Court as Exhibit L to the Taylor Declaration is defendant's internal accounting of PACER revenues and the use of PACER fees from FY 2010 through FY 2016.  (*See* Taylor Decl. Ex. L; 3/23/18 Tr. at __.)  While the contents of this document are described in this Memorandum Opinion, for the reader's benefit, an example of this internal accounting for the year 2010 is appended hereto as Attachment 1 in order to demonstrate how the judiciary has described and categorized the expenditures that were paid for by PACER fees.

[18]  The official transcript from the March 23, 2018 motions hearing is not yet available.  The Court will add page citations once it is.

Appx3164

Expenditures).)  The final category, Electronic Bankruptcy Noticing, refers to the system which

"produces and sends court documents (bankruptcy notices, including notices of 341 meetings)

electronically to creditors in bankruptcy cases."  (Def.'s Resp. to Pls.' Interrogs. at 10.)  From

2010 to 2016, the judiciary spent a total of $73.3 million on EBN.  (Taylor Decl. Ex. L.)

 Under Congressional Priorities, there are four categories: (1) State of Mississippi;

(2) VCCA Victim Notification; (3) Web-Based Juror Services; and (4) Courtroom Technology.

(*Id*.)  The State of Mississippi category refers to a study which "provided software, and court

documents to the State of Mississippi, which allowed the State of Mississippi to provide the

public with electronic access to its documents."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  In 2010—

the only year this category appears between 2010 and 2016—the judiciary spent a total of

$120,988 for the State of Mississippi study.  (Taylor Decl. Ex. L.)  The next category is Victim

Notification (Violent Crime Control Act), which refers to "[c]osts associated with the program

that electronically notifies local law enforcement agencies of changes to the case history of

offenders under supervision."  (Def.'s Resp. to Pls.' Interrogs. at 5.)  Via this program, "[l]aw

enforcement officers receive electronic notification of court documents that were previously sent

to them through the mail."  (*Id*.)  From 2010 to 2016, the judiciary spent $3.7 million on the

VCCA victim notification program.  The third category, Web-Based Juror Services, refers to

"[c]osts associated with E-Juror software maintenance, escrow services, and scanner support."

(*Id*. at 26.)  "E-Juror provides prospective jurors with electronic copies of courts documents

regarding jury service."  (*Id*.)  From 2010 to 2016, the judiciary spent $9.4 million on Web-

Based Juror Services.  (Taylor Decl. Ex. L.)  Finally, the category labeled Courtroom

Technology funds "the maintenance, cyclical replacement, and upgrade of courtroom technology

in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 26.)  From 2010 to 2016, the judiciary spent

Appx3165

$185 million on courtroom technology.  (Taylor Decl. Ex. L.)

## II.   PROCEDURAL HISTORY

On April 21, 2016, three national nonprofit organizations, National Veterans Legal

Services Program, National Consumer Law Center, and Alliance for Justice, on behalf of

themselves and a nationwide class of similarly-situated PACER users, filed suit against the

United States under the Little Tucker Act, 28 U.S.C. § 1346(a), claiming that the PACER fees

charged by the Administrative Office of the United States Courts "exceeded the amount that

could be lawfully charged, under the E-Government Act of 2002" and seeking "the return or

refund of the excessive PACER fees."  (Compl. ¶¶ 33–34.)

After denying defendant's motion to dismiss (*see* Mem. Op. & Order, Dec. 5, 2016, ECF

Nos. 24, 25), the Court granted plaintiffs' motion for class certification (*see* Mem. Op. & Order,

Jan. 24, 2017, ECF Nos. 32, 33).  Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court

certified a class consisting of: "[a]ll individuals and entities who have paid fees for the use of

PACER between April 21, 2010, and April 21, 2016, excluding class counsel in this case and

federal government entities" and "certifie[d] one class claim: that the fees charged for accessing

court records through the PACER system are higher than necessary to operate PACER and thus

violate the E-Government Act, entitling plaintiffs to monetary relief from the excessive fees

under the Little Tucker Act."  (Order, Jan. 24, 2017, ECF No. 32.)

On August 28, 2017, plaintiffs filed a motion seeking "summary adjudication of the

defendant's liability," while "reserving the damages determination for after formal discovery."

(Pls.' Mot. at 1.)  On November 17, 2017, defendant filed a cross-motion for summary judgment

as to liability.  The Court permitted the filing of three amicus briefs.[19]  The cross-motions for

---

[19] Amicus briefs were filed by the Reporters Committee for Freedom of the Press, *et al.*, ECF
No. 59, the American Association of Law Libraries, *et al.*, ECF No. 61, and Senator Joseph

Appx3166

summary judgment on liability are fully-briefed and a hearing on the motions was held on March

23, 2018.

## ANALYSIS

The parties' cross-motions for summary judgment on liability present the following

question of statutory interpretation:  what restrictions does 28 U.S.C. § 1913 note place on the

amount the judiciary may charge in PACER fees?

In relevant part, 28 U.S.C. § 1913 note reads:

Court Fees for Electronic Access to Information

(a) The Judicial Conference may, only to the extent necessary, prescribe
reasonable fees . . . for collection by the courts . . . for access to information
available through automatic data processing equipment.

. . .

The Director, under the direction of the Judicial Conference of the United States,
shall prescribe a schedule of reasonable fees for electronic access to information
which the Director is required to maintain and make available to the public.

(b) . . .  All fees hereafter collected by the Judiciary under paragraph (a) as a
charge for services rendered shall be deposited as offsetting collections to the
Judiciary Automation Fund . . . to reimburse expenses incurred in providing these
services.

28 U.S.C. § 1913 note.

## I.    LEGAL STANDARD

Statutory interpretation "begins with the language of the statute."  *Esquivel-Quintana v.*

*Sessions*, 137 S. Ct. 1562, 1569 (2017).  This means examining "'the language itself, the specific

context in which that language is used, and the broader context of the statute as a whole'" to

determine if it has a "'plain and unambiguous meaning with regard to the particular dispute in

the case.'"  *United States v. Wilson*, 290 F.3d 347, 352–53 (D.C. Cir. 2002) (quoting *Robinson v.*

Lieberman and Congressman Darrell Issa, ECF No. 63.

Appx3167

*Shell Oil Co.*, 519 U.S. 337, 340 (1997)); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) (statutory interpretation "requires examination of the statute's text in light of context, structure, and related statutory provisions").  A statutory term that is neither a term of art nor statutorily defined is customarily "construe[d] . . . in accordance with its ordinary or natural meaning," frequently derived from the dictionary.  *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

Where statutory language does not compel either side's interpretation, the Court may "look to the statute's legislative history to determine its plain meaning."  *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 146 (D.D.C. 2015) (citing *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text.").  The fact that a statute can be read in more than one way does not demonstrate that it lacks "plain meaning."  *United States v. Hite*, 896 F. Supp. 2d 17, 25 (D.D.C. 2012); *see, e.g., Abbott v. United States,* 562 U.S. 8, 23 (2010).

A statute's legislative history includes its "statutory history," a comparison of the current statute to its predecessors and differences between their language and structure, *see, e.g.*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 231–32 (2007), along with relevant committee reports, hearings, or floor debates.  In general, "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'"  *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1289 n.26 (D.C. Cir. 1983) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)).  But even though, "[t]he view of a later Congress cannot control the interpretation of an earlier enacted statute," *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996), in certain narrow circumstances, "'congressional

Appx3168

acquiescence to administrative interpretations of a statute'" may "inform the meaning of an

earlier enacted statute." *U.S. Ass'n of Reptile Keepers*, 103 F. Supp. 3d at 153 & 154 n.7

(D.D.C. 2015) (quoting *O'Gilvie*, 519 U.S. at 90); *Solid Waste Agency v. U.S. Army Corps of*

*Eng'rs*, 531 U.S. 159, 169 (2001)).  Such a situation may be where Congress has amended the

relevant provisions without making any other changes.  *See, e.g.*, *Barnhart v. Walton*, 535 U.S.

212, 220 (2002).  However, "[e]xpressions of committees dealing with requests for

appropriations cannot be equated with statutes enacted by Congress."  *Tenn. Valley Auth. v. Hill*,

437 U.S. 153, 191 (1978).

## II.   APPLICATION

Applying the "ordinary principles of statutory construction," the parties arrive at starkly

different interpretations of this statute.  Plaintiffs take the position that the statute "prohibits the

AO from charging more in PACER fees than is necessary to recoup the total marginal cost of

operating PACER."  (Pls.' Mot. at 12.)  Under plaintiffs' interpretation, defendant's liability is

established because with the exception of the category of expenditures labeled Public Access

Services (*see* Attachment 1), most, if not all, of the other expenditures covered by PACER fees

are not part of the "'marginal cost of disseminating records' through PACER."  (*See* Pls.' Mot.

at 17; *see also*, *e.g.*, Pls.' Facts ¶¶ 32, 34, 36, 38, 41, 43, 45 (fiscal year 2010).)  Defendant

readily admits that PACER fees are being used to cover expenses that are not part of the

"marginal cost" of operating PACER (*see, e.g.*, Def.'s Resp. to Pls.' Facts ¶¶ 32, 34, 36, 38, 41,

43, 45), but it rejects plaintiffs' interpretation of the statute.  Instead, defendant reads the statute

broadly to mean that the Judicial Conference "may charge [PACER] fees in order to fund the

dissemination of information through electronic means."  (3/23/18 Tr. at __; *see also* Def.'s Mot.

at 11 (Judicial Conference may "charge fees, as it deems necessary, for the provision of

Appx3169

information to the public through electronic means").)  Under defendant's interpretation, it is not liable because "every single expenditure . . . [is] tied to disseminating information through electronic means."  (3/23/18 Tr. at __.)

If the Court agreed with either proposed interpretation, the ultimate question of defendant's liability would be relatively straightforward.  If PACER fees can only be spent to cover the "marginal cost" of operating PACER, defendant is liable most expenditures.[20]  If PACER fees can be spent on any expenditure that involves "the dissemination of information through electronic means," defendant is not liable.  But the Court rejects the parties' polar opposite views of the statute, and finds the defendant liable for certain costs that post-date the passage of the E-Government Act, even though these expenses involve dissemination of information via the Internet.

### A.     Does the E-Government Act Limit PACER Fees to the Marginal Cost of Operating PACER?

As noted, plaintiffs interpret the statute as prohibiting the AO "from charging more in

---

[20]  The Court would still have to determine the meaning of "marginal cost" and whether any of the expenditures beyond those in the category of Public Access Services are part of that cost, since plaintiffs only expressly challenged "some" of the expenditures in several important categories, and defendant has only admitted that "some" of the expenditures in those categories are not part of the marginal cost.  (See, e.g., Pls.' Facts ¶¶ 41 (CM/ECF), 43 (Telecommunications), 45 (Court Allotments); Def.'s Resp. to Pls.' Facts ¶¶ 41, 43, 45.)  The categories that plaintiffs argue should be examined as part of a determination of damages (as opposed to liability), since they may include PACER-related costs, are CM/ECF, Telecommunications/Communications Infrastructure, and Court Allotments.  (Pls.' Mot. at 19; see also Attachment 1.)

Defendant, on the other hand, responds that even though only some of the costs associated with these categories involve PACER-related expenses, all of the expenses related to PACER and/or CM/ECF.  (3/23/18 Tr. at __.)

However these costs are categorized, the Court rejects plaintiffs' suggestion that the issue is one to be decided as part of a determination of damages, for the issue as to liability necessarily requires a determination of whether these costs are proper expenditures under the E-Government Act.

Appx3170

PACER fees than is necessary to recoup the total marginal cost of operating PACER." (Pls.' Mot. at 12.)  Plaintiffs concede, as they must, that this is not what the text of the statute actually says.  But they argue that this is the best reading of the statutory language in light of its "plain language," its "history," and the need to "avoid[] two serious constitutional concerns that would be triggered by a broader reading."  (*See* Pls.' Reply at 1.)

Plaintiffs first argue that it is clear from the text that the words "these services" in the last sentence of subparagraph (b), where it provides that the fees collected must be used "to reimburse expenses incurred in providing *these* services," include only the services that the AO is actually charging fees for as set forth in the EPA Fee Schedule, i.e., the PACER system, the PACER Service Center, and the provision of printed copies of documents "accessed electronically at a public terminal in a courthouse." (Pls.' Reply at 3–4; 3/23/18 Tr. at __.)  The Court does not agree that the text dictates this constraint.  The term "these services" could also mean any service that provides "access to information available through automatic data processing equipment," whether or not it is expressly part of the EPA fee schedule.

Plaintiffs' next argument is based on the legislative history of the 2002 amendment, which consists of the following single paragraph in a Senate Committee Report:

> The Committee intends to encourage the Judicial Conference to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible.  For example, the Administrative Office of the United States Courts operates an electronic public access service, known as PACER, that allows users to obtain case and docket information from Federal Appellate, District and Bankruptcy courts, and from the U.S. Party/Case Index.  Pursuant to existing law, users of PACER are charged fees that are higher than the marginal cost of disseminating the information.

2002 S. Rep. at 23.  Plaintiffs argue that this paragraph "makes clear that Congress added this language because it sought to prevent the AO from 'charg[ing] fees that are higher than the marginal cost of disseminating the information,'" as it had been doing for several years, and that

Appx3171

"although the E-Government Act does not refer to PACER by name, Congress clearly had PACER in mind when it passed the Act."  (Pls.' Mot. at 11 (quoting 2002 S. Rep. at 23).)

The Court finds this argument unconvincing for several reasons.  First, there is no mention in the statute of PACER or its "marginal cost," and in the 2002 Senate Report, the reference to PACER and "marginal cost" follows the words "For example," suggesting that the amendment was not intended to apply only to PACER.  *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 649 (1990) ("[T]he language of a statute—particularly language expressly granting an agency broad authority—is not to be regarded as modified by examples set forth in the legislative history.").  And, in fact, the 2002 Senate Report recognizes that PACER is only a subset of a larger system when it stated: "[t]he Committee intends to encourage the Judicial Conference to move from a structure in which *electronic docketing systems* are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible."  2002 S. Rep. at 23 (emphasis added).  The use of the phrase "electronic docketing systems" appears to envision more than just PACER, and to at least encompass CM/ECF, given that it, unlike PACER, is an electronic docketing system.

Second, a single committee's report reflects only what the committee members might have agreed to, not the "intent" of Congress in passing the law.  As the Supreme Court observed, "[u]nenacted approvals, beliefs, and desires are not laws."  *P.R. Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988).  As the Supreme Court observed in rejecting reliance on "excerpts" said to reflect congressional intent to preempt state law, "we have never [looked for] congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text."  *Id*.

Perhaps most tellingly, the E-Government Act changed only one phrase in the first

Appx3172

sentence of the first paragraph—replacing "shall hereafter" with "may, only to the extent

necessary."  It did not alter the third sentence of paragraph (b), which is the part of the statute

that governs what expenses can be reimbursed by PACER fees.  Thus, even though the 2002

Senate Report correctly observes that PACER fees exceeded the marginal cost of operating

PACER, the amendment to the statute did not address which services could be reimbursed, but

only the amount of fees for services that could be charged.  In addition, at the time the E-

Government Act was passed, CM/ECF had been in operation for at least four years, PACER fees

were already being used to pay for non-PACER costs, such as EBN and CM/ECF (*see* 2d

Skidgel Decl. Tabs 30–32), and there is nothing in the statute's text or legislative history to

suggest that Congress intended to disallow the use of PACER fees for those services.  In the end,

a single sentence in a committee report, which has been taken out of context, is not enough to

persuade the Court that Congress intended the E-Government Act to impose a specific limitation

on the judiciary's collection and use of EPA fees to the operation of only PACER.

Plaintiffs also point to "[p]ost-enactment history"—the letters from the E-Government

Act's sponsor, Senator Joseph Lieberman, in 2009 and 2010.  (Pls.' Mot. at 11–12 ("The Act's

sponsor has repeatedly expressed his view, in correspondence with the AO's Director, that the

law permits the AO to charge fees 'only to recover the direct cost of distributing documents via

PACER,' and that the AO is violating the Act by charging more in PACER fees than is necessary

for providing access to 'records using the PACER system.'").)  But, as plaintiffs essentially

conceded during the motions hearing, the post-enactment statements of a single legislator carry

no legal weight when it comes to discerning the meaning of a statute.  (3/23/18 Tr. at __); *see*

*Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J. concurring) ("the views of a

legislator concerning a statute already enacted are entitled to no more weight than the views of a

Appx3173

judge concerning a statute not yet passed"); *see also Consumer Prod. Safety Comm'n*, 447 U.S.

at 117–18 ("even the contemporaneous remarks of a single legislator who sponsors a bill are not

controlling in analyzing legislative history").

      Plaintiffs' final argument is that the "constitutional doubt" canon of construction requires

their interpretation because any other interpretation would raise a question as to whether

Congress had unconstitutionally delegated its taxing authority because the statute does not

clearly state its intention to do so.  *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989)

("Congress must indicate clearly its intention to delegate to the Executive the discretionary

authority to recover administrative costs not inuring directly to the benefit of regulated parties by

imposing additional financial burdens, whether characterized as 'fees' or 'taxes,' on those

parties.").  Assuming *arguendo* that this doctrine applies with equal force to unregulated parties,

an issue not addressed by the parties, the Court does not find plaintiffs' argument persuasive.

First, this canon of construction has a role only where the statute is ambiguous, which, as

explained herein, the Court concludes is not the case.  *See FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 516 (2009) ("The so-called canon of constitutional avoidance is an interpretive

tool, counseling that ambiguous statutory language be construed to avoid serious constitutional

doubts.").  Second, the canon can only be applied where there is a "reasonable alternative

interpretation," *Gomez v. United States*, 490 U.S. 858, 864 (1989), but the Court has already

explained that it does not find plaintiffs' proposed interpretation to be a reasonable alternative

interpretation.  Finally, as will be discussed in Section C, *infra*, the Court finds that the statute

does clearly state that the judiciary has the authority to use its PACER fees for services that may

not directly benefit a particular PACER user.  *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S.

145, 153–54 (2013) ("This is not to say that Congress must incant magic words in order to speak

Appx3174

clearly.  We consider context . . . as probative of [Congress' intent].").

For these reasons, the Court will not adopt plaintiffs' interpretation of the statute as limiting PACER fees to the total marginal cost of operating PACER.

**B.     Does the E-Government Act Allow PACER Fees to Fund Any "Dissemination of Information Through Electronic Means"?**

Defendant's interpretation of the statute embraces the other extreme, positing that the statute allows PACER fees to be used for any expenditure that is related to "disseminating information through electronic means."  (3/23/18 Tr. at __; *see* Def.'s Mot. at 11.)  It is not entirely clear to the Court how the defendant arrived at this definition.  Most of the reasons defendant gives to justify its interpretation are really just arguments against plaintiffs' interpretation, such as (1) the authority to charge EPA fees and use them to reimburse "services" predated the E-Government Act and that language was not changed by the Act; (2) there is no mention of PACER or "marginal cost" in the 2002 amendment; and (3) the legislative history discussed PACER only as an "example."  As for defendant's affirmative arguments, addressed below, none demonstrates that defendant's conclusion is correct.

Defendant's first argument is based on the fact that the text of the statute requires that EPA fees be deposited in the JITF, which is the fund that the judiciary is allowed to use for "broad range of information technology expenditures."  (Def.'s Mot. at 10.)  According to defendant, the fact that EPA fees are deposited in this fund "informs how Congress intended the fees received from PACER access to be spent."  (*Id*.)  However, while the statute provides that PACER fees are to be deposited in the JITF, it also directs that they are to be used to "reimburse expenses incurred" in providing "access to information available through data processing equipment."  That statutory language cannot be ignored as defendant attempts to do.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous, void or insignificant.").  Notably, it is clear that the judiciary has never treated its EPA fees in the JITF as fungible with the rest of the money in the JAF.   (*See* FY 2006 JITF Annual Report; FY 2007 Financial Plan; 3/26/2009 AO Letter at 3-4 ("While fee collections from the EPA program are also deposited into the JITF, they are used only to fund electronic public access initiatives and account for only a small portion of its balance.").)

Defendant's main argument is that its interpretation of the statute has been accepted by Congress because the Appropriations Committees, either explicitly or implicitly, endorsed, mandated, or approved every request pertaining to the use of EPA fees.  For example, defendant points out that the 1996 House Report stated that the Committee "expect[ed] available balances from public access fees" to be used for electronic bankruptcy noticing and electronic case filing, 1996 H.R. Rep. at 89; the 2003 House and Senate Committee Reports "expressly directed the AO to use PACER fees to update the CM/ECF system," 2003 H.R. Rep. at 116; 2003 S. Rep. at 118; those same Committees endorsed the Judiciary's FY 2007 Financial Plan, which set forth the AO's plan "to use receipts from PACER fees to fund courtroom technology and to perform infrastructure maintenance consistent with Congressional actions" (FY 2007 Financial Plan at 45; FY 2007 Senate Approval Letter; FY 2007 House Approval Letter); and the 2006 Senate Report, which urged the judiciary to undertake a study about the feasibility of sharing CM/ECF technology with states, *see* 2006 S. Rep. at 176, which the judiciary then did via its State of Mississippi study (FY 2009 EPA Expenditures).   (*See* Def.'s Mot. at 17–18.)  More generally, and applicable at least as to the expenditures that post-date the passage of the E-Government Act, congressional approval is reflected by the fact that after the judiciary submitted its proposed budget to Congress and Congress appropriated money to the judiciary, the judiciary was then

Appx3176

required to submit its proposed financial plan, which included its intended use of EPA fees, to the House and Senate Appropriations Committees for approval.  (Def.'s Reply at 3; 3/23/18 Tr. at__.)  Looking at this entire process as a "totality," defendant argues, establishes that by implicitly approving certain expenditures, Congress agreed with the Judicial Conference's interpretation of the statute.  (3/23/18 Tr. at __ ("[W]e have 26 years where the only legislative history that has gone to the judicial conference, but for Senator Lieberman's  letter, says the judicial conference's interpretation is correct.  The judicial conference's interpretation of that language that PACER fees may be used more broadly is correct.").)

For a number of reasons, defendant's argument is flawed.  First, the record does not reflect meaningful congressional approval of each category of expenditures.  Each so-called "approval" came from congressional committees, which is not the same as approval by Congress "as a whole."  *See Tenn. Valley Auth.*, 437 U.S. at 192.[21]  Moreover, the Court questions whether it is even possible to infer approval of a specific expenditure based solely on committee-approval of the judiciary's financial plans, where the record does not show any particular attention was paid to this itemization of intended uses of EPA fees.  For almost of all the years for which defendant has included copies of approvals, the "approvals" consist of a mere line in an email or letter that indicates, without any elaboration or specification, that the Appropriations Committee has "no objection."[22]  (*See, e.g.*, 2d Skidgel Decl. Tab 16 (2010); *see also id.* Tabs 15, 17, 20–27

---

[21]  Despite having the opportunity to respond to the holding of *Tennessee Valley Authority v. Hill*, defendant has failed to cite any legal support for its use of approvals by the Committee on Appropriations.

[22]  The one exception was courtroom technology.  In response to the judiciary's request in its FY 2007 Financial Plan to use PACER fees for Courtroom Technology, the Chairman and Ranking Member of the Subcommittee on Financial Services and General Government wrote on May 2, 2007: "We have reviewed the information included and have no objection to the financial plan including . . . the expanded use of Electronic Public Access Receipts."  (2007 Senate Approval Lettter; *see also id*. 2007 House Approval Letter.)

Appx3177

(2011, 2013–2016).)  In 2009 and 2012, there are letters from the Appropriations Committees which reflect a closer analysis of some parts of the financial plan, but neither mentions the judiciary's planned uses of PACER fees.  (*Id*. Tabs 14, 18–19.)  By contrast, in July 2013, the AO sent an email to the Senate Appropriation Committee at 1:02 p.m. noting that "[i]n looking through our records we don't seem to have approval of our FY 2013 financial plan.  Would you be able to send us an email or something approving the plan?  The auditors ask for it so we like to have the House and Senate approvals on file."  (2d Skidgel Decl. Tab 20.)  Less than an hour later, at 1:47 p.m., an email came from a staff member on the Senate Appropriations Committee stating "Sorry about that and thanks for the reminder.  We have no objection."  (*Id*.)

Second, even if the record established approval of the various uses of EPA fees, there is nothing to support the leap from approval of specific expenditures to defendant's contention that the Appropriations Committees were cognizant and approved of the Judicial Conference's "interpretation."  (*See* 3/23/18 Tr. at __).  In fact, the AO never used the definition defendant now urges the Court to adopt—the "dissemination of information through electronic means"—to explain its use of EPA fees for more than PACER.  Rather, it used terms like "public access initiatives" to describe these expenditures.  (*See* FY 2007 Financial Plan ("collections are used to fund information technology initiatives in the judiciary related to public access"); 2d Skidgel Decl. Tab 12 (FY 2009 Financial Plan at 45) (EPA revenues "are used to fund IT projects related to public access"); Taylor Decl. Ex. J at 10 (AO document, entitled Electronic Public Access Program Summary, December 2012, stating that EPA revenue "is dedicated solely to promoting and enhancing public access").)

Finally, as defendant acknowledges, the post-enactment action of an appropriations committee cannot alter the meaning of the statute, which is what controls what expenditures are

Appx3178

permissible.  *See Tenn. Valley Auth.*, 437 U.S. at 191 ("Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress.").[23]  Thus, the fact that appropriations committees expressly or implicitly endorsed the use of EPA fees for certain expenditures cannot establish that those expenditures are permissible uses of EPA fees.

For these reasons, the Court is not persuaded that the statute permits the collection of EPA fees to fund any expense that involves the "dissemination of information through electronic means."

**C.     What Limitation Did the E-Government Act Place on the Use of PACER Fees?**

Having rejected the parties' diametrically opposed interpretations, the Court must embark on its own analysis to determine whether defendant's use of PACER fees between 2010 and 2016 violated the E-Government Act.  The Court concludes that defendant properly used PACER fees to pay for CM/ECF[24] and EBN, but should not have used PACER fees to pay for the State of Mississippi Study, VCCA, Web-Juror, and most of the expenditures for Courtroom

---

[23]  Even an appropriations Act passed by Congress cannot alter the meaning of statute.  *See Tenn. Valley Auth.*, 437 U.S. at 190–91 ("We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs.  When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden.  Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure.  [This] would lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation . . . .").

[24]  It is undisputed that the expenses in the categories now labeled CM/ECF, Court Allotments and Telecommunication/Communications Infrastructure include only expenses that are directly related to PACER or CM/ECF.  (*See* 3/23/18 Tr. at __; *see also* Skidgel Decl. ¶ 19 ("through court allotments, "courts are able to determine the best ways to improve electronic public access services (such as by adding a public printer or upgrading to a more robust internet web server)" and "[f]unding court staff to work on EPA projects, such as CM/ECF, utilizes existing expertise and reduces training time and associated costs compared to that of hiring contractors"; Def.'s Resp. to Pls.' Interrogs. at 22–26.)

Appx3179

Technology.  (*See* Attachment 1.)

The statutory language in 28 U.S.C. § 1913 note is clear that, to be paid for with PACER fees, a "service" must be one that provides the public with "access to information available through automatic data processing equipment."  An examination of this statutory provision's history—dating from its enactment in 1990 and culminating in its amendment by the E-Government Act in 2002—resolves any ambiguity in its meaning and allows the Court to determine which expenditures between 2010 and 2016 were properly funded by PACER fees.

When the 28 U.S.C. § 1913 note was first enacted in 1989, s*ee* Pub. L. 101-515, § 404, PACER was in its infancy, but it was operational, and the statute clearly applied to it.  (*See* Jud. Conf. Rep. at 83 (Sept. 14, 1988); EPA Chronology at 1; Jud. Conf. Rep. at 19 (Mar. 14, 1989); Jud. Conf. Rep. at 21 (Mar. 13, 1990); 1990 S. Rep. at 86.)  Yet, there was no mention of PACER in the statute, nor was there any suggestion that the judiciary was precluded from recouping expenses beyond the cost of operating PACER.  In fact, it is apparent that Congress recognized the possibility that fees would cover the costs of making court records available to the public electronically.  *See* 1990 S. Rep. at 86 ("language  . . .  authorizes the Judicial Conference to prescribe reasonable fees for public access to case information, to reimburse the courts for automating the collection of the information"); *see also* 1992 H.R. Rep. at 58 (noting that "the Judiciary's investments in automation have resulted in enhanced service to the public and to other Government agencies in making court records relating to litigation available by electronic media" and "request[ing] that the Judiciary equip all courts, as rapidly as is feasible, with the capability for making such records available electronically and for collecting fees for doing so").

The first federal court experiment with electronic case filing began in the Northern

Appx3180

District of Ohio in 1996.  (1997 AO Paper at 4.)  Later that year, both the House and Senate

Appropriations Committees made clear that they expected the judiciary to use its EPA fee

collections for more than just paying for the cost of PACER.  (1996 H.R. Rep. at 89 ("The

Committee supports the ongoing efforts of the Judiciary to improve and expand information

made available in electronic form to the public. Accordingly, the Committee expects the

Judiciary to utilize available balances derived from electronic public access fees in the Judiciary

Automation Fund to make information and services more accessible to the public through

improvements to enhance the availability of electronic information.  The overall quality of

service to the public will be improved with the availability of enhancements such as *electronic*

*case documents, electronic filings, enhanced use of the Internet, and electronic bankruptcy*

*noticing*.") (emphasis added); 1996 S. Rep. at 88 ("The Committee supports efforts of the

judiciary to make electronic information available to the public, and expects that available

balances from public access fees in the judiciary automation fund will be used to enhance

availability of public access.").)

　　　　While these statements in the reports of the Committee on Appropriations predated the

passage of the E-Government Act, they are not dispositive in terms of discerning what Congress

intended the statute to mean.  They are part of a bigger picture and an important backdrop to the

passage of the E-Government Act.  Contemporaneously with Congress's prompting the judiciary

to use EPA fees to pay for public access to electronically-stored case documents "[t]he transition

towards electronic case files ("ECF") in the federal courts [wa]s underway" by March 1997.

(1997 AO Paper at v.)  Over the next few years, relying expressly on the 1996 House and Senate

Reports relating to fiscal year 1997 appropriations, the judiciary began using EPA fees to fund

the development of a national case management and electronic case filing system, CM/ECF,

Appx3181

which would allow federal courts to maintain complete electronic files.  (*See, e.g.*, FY 2002

Budget Request ("Fiscal year 1997 appropriations report language expanded the Judiciary's

authority to use these funds to finance automation enhancements that improve the availability of

electronic information to the public.").)  The judiciary anticipated that CM/ECF would "produce

an impressive range of benefits . . . including . . . public access to case file information."  (1997

AO Paper at v.)  For instance, in 1998, the Judicial Conference created a web interface for

PACER and added a per page fee for accessing case dockets and electronic filings via the

Internet.  (Jud. Conf. Rep. at 64–65 (Sept. 15, 1998); EPA Chronology at 1.)  At that time, the

Judicial Conference noted in its report that

> The revenue from these fees is used exclusively to fund the full range of
> electronic public access (EPA) services.  With the introduction of Internet
> technology to the judiciary's current public access program, the Committee on
> Court Administration and Case Management recommended that a new Internet
> PACER fee be established to maintain the current public access revenue *while
> introducing new technologies to expand public accessibility to PACER
> information*.

(Jud. Conf. Rep. at 64–65 (Sept. 15, 1998) (emphasis added).)  By no later than fiscal year 2000,

the judiciary was spending substantial sums of money, derived from EPA fees, on CM/ECF and

EBN.  (2d Skidgel Decl. Tab 30 (FY 2000 EPA Expenditures)).)  In fact, over $10 million was

spent on case management/electronic case files, infrastructure and electronic bankruptcy noticing

in 2000.  (*Id.*)

Then in 2002, Congress passed the E-Government Act.  This Act encompassed far more

than § 205(e)'s limitation on the charging of fees.  The overall purpose of the section pertaining

to the judiciary was to "require federal courts to provide greater access to judicial information

over the Internet."  2002 S. Rep. at 23.  To that end, the Act mandated that the judiciary expand

the public's access to electronically stored information that was accessible via PACER:

- § 205(a), "Individual Court Websites," "require[d] the Supreme Court, each circuit court,

36

each district court, and each bankruptcy court of a district to establish a website that would include public information such as location and contact information for courthouses, local rules and standing orders of the court, docket information for each case, and access to written opinions issued by the court, in a text searchable format." 2002 S. Rep. at 22.

- § 205(b), "Maintenance of Data Online," required that "[t]he information and rules on each website . . .  be updated regularly and kept reasonably current."

- § 205(c), "Electronic Filings," required, subject to certain specified exceptions, that courts provide public access to all electronically filed documents and all documents filed in paper that the court converts to electronic form.

   and

- § 205(d), "Dockets with Links to Documents," directed the Judicial Conference to "explore the feasibility of technology to post online dockets with links allowing all filing, decision, and rulings in each case to be obtained from the docket sheet of that case."

Subsection 205(e), entitled "Cost of Providing Electronic Docketing Information," changed the language that required the judiciary to charge fees ("shall, hereafter") to make its decision to charge fees discretionary and to limit those fees "to the extent necessary."  Even though the judiciary was already using EPA fees to pay for the costs of CM/ECF and EBN, no changes were made to the last sentence of subparagraph (b), which defined the scope of services that can be reimbursed with EPA fees.

As is clear from the E-Government Act, Congress intended in 2002 for the judiciary to expand its capability to provide access to court information, including public information relating to the specific court and docket information for each case, including filings and court opinions.  With certain exceptions, documents filed electronically were to be made available publicly, and the judiciary was to explore the possibility of providing access to the underlying contents of the docket sheets through links to filings, decisions and rulings.  This ambitious program of providing an electronic document case management system was mandated by Congress, although no funds were appropriated for these existing and future services, but

Appx3183

Congress did provide that fees could be charged even though the fees could be "only to the extent necessary."

Consistent with this view the Appropriations Committees reiterated their support for allowing EPA fees to be spent on CM/ECF in 2003.  2003 H.R. Rep. at 116; 2003 S. Rep. at 118; 2003 Conf. Rep. at H12515.

Although congressional "acquiescence" as an interpretative tool is to be viewed with caution, the Court is persuaded that when Congress enacted the E-Government Act, it effectively affirmed the judiciary's use of EPA fees for all expenditures being made prior to its passage, specifically expenses related to CM/ECF and EBN.  Accordingly, the Court concludes that the E-Government Act allows the judiciary to use EPA fees to pay for the categories of expenses listed under Program Requirements: CM/ECF, EBN, Court Allotments and Telecommunications/Communications Infrastructure.[25]  (*See* Attachment 1.)

However, Congress' endorsement of the expenditures being made in 2002, in conjunction with the statutory language, the evolution of the E-Government Act, and the judiciary's practices as of the date of the Act's passage, leads the Court to conclude that the E-Government Act and its predecessor statute imposed a limitation on the use of PACER fees to expenses incurred in providing services, such as CM/ECF and EBN, that are part of providing the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system.  This interpretation recognizes that PACER cannot be divorced from CM/ECF, since

---

[25]  Plaintiffs' recent supplemental filing after the motions hearing suggested for the first time that the CM/ECF category might require closer examination to determine whether the expenditures therein, in particular CM/ECF NextGen, were all appropriately treated as "public access services."  (*See* Pls.' Resp. to Def.'s Supp. Authority at 3, ECF No. 85.)  But plaintiffs made no such argument in response to defendant's motion for summary judgment.  (*See* Pls.' Reply at 6 (raising no challenge to CM/ECF if the statute authorizes "PACER fees to cover all costs necessary for providing PACER access and other public access services").)

Appx3184

PACER is merely the portal to the millions of electronically-filed documents that are housed by the judiciary on CM/ECF and are available to the public via the Internet only because of CM/ECF.

With this understanding, the Court will consider whether the judiciary properly used PACER fees for the remaining categories of expenses, which the judiciary now identifies as Congressional Priorities: Courtroom Technology, the State of Mississippi study, Web-Juror, and VCCA. (*See* Attachment 1.)

The judiciary only began using EPA fees for these expenses five or more years after the E-Government Act. Defendant's first attempt to justify the use of EPA fees for each of these categories focused almost exclusively on purported congressional approvals. As previously discussed, post-enactment legislative history as a general rule is of limited use in statutory interpretation, particularly when the action comes from a committee—especially an appropriations committee—rather than Congress as a whole. Compounding that problem here, also as previously noted (with the exception of courtroom technology, *see* supra note 22), is the questionable substance of the congressional approvals for several of these expenditures with the exception of courtroom technology.

Even if defendant could rely on congressional approvals, the Court would still have to decide whether the expenses fit within the definition of permissible expenses.

*State of Mississippi*: The category labeled "State of Mississippi" is described by defendant as a study that "provided software, and court documents to the State of Mississippi, which allowed the State of Mississippi to provide the public with electronic access to its documents." (Def.'s Resp. to Pls.' Interrogs. at 5.) It is apparent from this description that this study was not a permissible expenditure since it was unrelated to providing access to electronic

Appx3185

information on the federal courts' CM/ECF docketing system.

*VCCA*: The category labeled Victim Notification (Violent Crime Control Act) refers to "[c]osts associated with the program that electronically notifies local law enforcement agencies of changes to the case history of offenders under supervision." (Def.'s Resp. to Pls.' Interrogs. at 11.) Via this program, "[l]aw enforcement officers receive electronic notification of court documents that were previously sent to the through the mail." (*Id.*) Defendant first defended the use of EPA fees to pay for this program on the ground that it "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 34, 53, 69, 87, 105, 123, 141.) Defendant has also argued that this program benefits the public because by sharing this information electronically, the information gets to law enforcement agencies more quickly, and they in turn may be able to revoke supervision, if warranted, more quickly. (*See* 3/23/18 Tr. at __.) But neither of these justifications establishes that VCCA is a permissible expenditure of PACER funds. While this program disseminates federal criminal case information, and its outcome may indirectly have some benefit to the public, it does not give the public access to any electronically stored CM/ECF information.

*Web-Juror*: The category labeled Web-Based Juror Services refers to the costs associated with E-Juror, a juror management system. (Def.'s Resp. to Pls.' Interrogs. at 11.) It "provides prospective jurors with electronic copies of court documents regarding jury service." (*Id.*) Defendant's justification for using EPA fees to pay for these costs is that the E-Juror program "improves the overall quality of electronic service to the public via an enhanced use of the Internet." (Def.'s Resp. to Pls.' Facts ¶¶ 71, 89, 107, 125, 143.) Again, whether a program "improves the overall quality of electronic service to the public via an enhanced use of the Internet" does not establish that it is permissible use of EPA fees where there is no nexus to the

Appx3186

public's ability to access information on the federal court's CM/ECF docketing system.

*Courtroom Technology*:  The category labeled "Courtroom Technology" funds "the maintenance, cyclical replacement, and upgrade of courtroom technology in the courts."  (Def.'s Resp. to Pls.' Interrogs. at 11.)  The expenses in this category include "the costs of repairs and maintenance for end user IT equipment in the courtroom; obligations incurred for the acquisition and replacement of digital audio recording equipment in the courtroom; costs for audio equipment in the courtroom, including purchase, design, wiring and installation; and costs for video equipment in the courtroom, including purchase, design, wiring and installation."  (Def.'s Resp. to Pls.' Interrogs. at 32.)  Defendant argues that EPA fees are appropriately used for courtroom technology because "it improves the ability to share case evidence with the public in the courtroom during proceedings and to share case evidence electronically through electronic public access services when it is presented electronically and becomes an electronic court record."  (FY 2007 Financial Report at 46.)  Again, there is a lack of nexus with PACER or CM/ECF.  From the existing record, it would appear that the only courtroom technology expenditure that might be a permissible use of EPA fees is the "digital audio equipment" that allows digital audio recordings to be made during court proceedings and then made part of the electronic docket accessible through PACER.  (*See* Taylor Decl. Ex. A (2013 EPA Fee Schedule) (charging $2.40 "for electronic access to an audio file of a court hearing via PACER").)  But, the Court does not see how flat-screen TVs for jurors or those seated in the courtroom, which are used to display exhibits or other evidence during a court proceeding, fall within the statute as they do not provide the public with access to electronic information maintained and stored by the federal courts on its CM/ECF docketing system.

Accordingly, with the exception of expenses related to digital audio equipment that is

Appx3187

used to create electronic court records that are publicly accessible via PACER, the Court concludes that the expenses in the categories listed as Congressional Priorities are not a permissible use of EPA fees.[26]

## CONCLUSION

For the reasons stated above, the Court will deny plaintiffs' motion for summary judgment as to liability and will grant in part and deny in part defendant's cross-motion for summary judgment as to liability.  A separate Order, ECF No. 88, accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 31, 2018

---

[26]  The Court urges the parties to confer prior to the next status conference to determine for the years 2010 to 2016 the amount of courtroom technology expenditures that cannot be paid with PACER fees.

Appx3188

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL VETERANS LEGAL
SERVICES PROGRAM, *et al.*,

                Plaintiffs,

        v.

UNITED STATES OF AMERICA,

                Defendant.

Civil Action No. 16-745 (ESH)

---

### <u>ORDER</u>

Before the Court is defendant's Motion to Certify the Court's Orders of December 5, 2016, and March 31, 2018 for Interlocutory Appeal and to Stay Proceedings Pending Appeal (ECF No. 99). Plaintiffs advised the Court during a status conference on July 18, 2018, that they opposed certification of the December 5, 2016 Order, but otherwise consented to defendant's motion. Upon consideration of the motion, plaintiffs' partial consent thereto, and the entire record herein, and for the reasons stated in open court on July 18, 2018, and in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the defendant's motion is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) For the reasons stated in open court on July 18, 2018, the motion is **DENIED** as to the December 5, 2016 Order (ECF No. 24).

(2) For the reasons stated in an accompanying Memorandum Opinion, ECF No. 105, the motion is **GRANTED** as to the Court's Order of March 31, 2018 (ECF No. 88).

Appx3391

(3) The motion to stay further proceedings pending appeal is **GRANTED** and all

proceedings in this matter are hereby **STAYED** pending further order from this Court.

It is further **ORDERED** that the Court's Order of March 31, 2018 (ECF No. 88) is

**AMENDED** to add the following statement:

> It is further **ORDERED** that this Order is certified for interlocutory appeal
> pursuant to 28 U.S.C. § 1292(b) because it involves "a controlling question of law
> as to which there is substantial ground for difference of opinion" and because "an
> immediate appeal from the order may materially advance the ultimate termination
> of the litigation." 28 U.S.C. § 1292(b).  A separate Memorandum Opinion issued
> today sets out in greater detail the basis for the Court's decision to certify this
> Order.

**SO ORDERED**.

ELLEN S. HUVELLE
United States District Judge

DATE:  August 13, 2018

Appx3392

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **NATIONAL VETERANS LEGAL SERVICES PROGRAM,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | **Civil Action No. 16-745 (ESH)** |

## MEMORANDUM OPINION

The Court issues this Memorandum Opinion in further support of its Order granting defendant's Motion to Certify the Court's Order of March 31, 2018 for Interlocutory Appeal. (*See* Order, ECF No. 104; Defs.' Mot. to Certify, ECF No. 99; March 31, 2018 Order, ECF No 88.)

## BACKGROUND

This case concerns the lawfulness of the fees charged by the federal judiciary for the use of its Public Access to Court Electronic Records (PACER) system.  Plaintiffs are PACER users who contend that the fees charged from 2010 to 2016 exceeded the amount allowed by federal law, *see* 28 U.S.C. § 1913 note (enacted as § 404 of the Judiciary Appropriations Act, 1991, Pub. L. 101-515, 104 Stat. 2101 (Nov. 5, 1990) and amended by § 205(e) of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002)).  They brought suit under the Little Tucker Act, seeking monetary relief from the excessive fees.

On December 5, 2016, the Court denied defendants' motion to dismiss (*see* Order, ECF

Appx3393

No. 24), and, on January 24, 2017, it granted plaintiffs' motion for class certification (*see* Order,

ECF No. 32).  Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), the Court certified a class

consisting of:

> All individuals and entities who have paid fees for the use of PACER between
> April 21, 2010, and April 21, 2016, excluding class counsel in this case and
> federal government entities.

The parties then filed cross-motions for summary judgment on liability, which, they

agreed, depended on a single and novel question of statutory interpretation: "what restrictions

does 28 U.S.C. § 1913 note place on the amount the judiciary may charge in PACER fees?"

*Nat'l Veterans Legal Servs. Program v. United States*, 291 F. Supp. 3d 123, 138 (D.D.C. 2018).

The parties advocated for starkly different interpretations of the statute, *id*. at 139-40, neither of

which the Court found persuasive.  In the end, it arrived at its own interpretation, which led to

the denial of plaintiffs' motion and the granting in part and denying in part of defendant's

motion.  (*See* Order, ECF No. 89.)

At the first status conference after deciding the cross-motions for summary judgment, the

Court asked the parties to consider whether the March 31, 2018 Order should be certified for

interlocutory appeal pursuant to 28 U.S.C. § 1292(b), given the fact that the exact determination

of damages would likely require a lengthy period of fact and expert discovery, additional

summary judgment briefing and potentially a bench trial.  (*See* Tr., Apr. 18, 2018, at 5, 6, 13, 20;

*see also* Joint Status Report Proposing a Schedule to Govern Further Proceedings, ECF No. 91

(proposing an additional five months of fact discovery, then five months for expert discovery, to

be followed by summary judgment briefing or a bench trial).)  Plaintiffs readily agreed that

certification would be appropriate and desirable.  (*Id*. at 21.)  The government indicated that it

needed additional time to respond in order to seek the necessary approval from the Solicitor

Appx3394

General.  (*Id*. at 20.)

On July 13, 2018, the parties filed a joint status report advising the Court that "the Solicitor General has authorized interlocutory appeal in this case."  (Joint Status Report at 2, ECF No. 98.)  That same day, defendant filed the pending motion to certify the March 31, 2018 Order.[1]  At the status conference on July 18, 2018, and in their written response filed on July 27, 2018, plaintiffs noted their continued belief that the March 2018 Order should be certified.  (*See* Pls.' Resp., ECF No. 102.)

## ANALYSIS

A district judge may certify a non-final order for appeal if it is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *see Z St. v. Koskinen*, 791 F.3d 24, 28 (D.C. Cir. 2015).  The decision whether to certify a case for interlocutory appeal is within the discretion of the district court.  *In re Kellogg Brown & Root, Inc*., 756 F.3d 754, 761 (D.C. Cir. 2014).  If the district court finds that each requirement is met, it "shall so state in writing in such order," and the party seeking to appeal must then file an application with the Court of Appeals "within ten days after the entry of the order."  28 U.S.C. § 1292(b).

Although the statute does not expressly require the Court to do anything more than state that each of these requirements is met in the order itself, the general rule is that "[a] district court order certifying a § 1292(b) appeal should state the reasons that warrant appeal," and "a

---

[1] Defendants' motion also sought certification of the December 5, 2016 Order denying their motion to dismiss.  The Court explained in open court during the status conference on July 18, 2018, why it would not certify that Order, but noted that defendant was free to raise a challenge to the Court's subject matter jurisdiction at any time.  (*See* Tr., July 18, 2018.)

Appx3395

thoroughly defective attempt may be found inadequate to support appeal." 16 Wright & Miller, Federal Practice & Procedure § 3929 (3d ed. 2008). Accordingly, the Court sets forth herein the basis for its conclusion that the March 31, 2018 Order satisfies each of the three requirements of § 1292(b).

### 1.    Controlling Question of Law

The first requirement for § 1292(b) certification is that the order involve a "controlling question of law." "[A] 'controlling question of law is one that would require reversal if decided incorrectly or that could materially affect the course of litigation with resulting savings of the court's or the parties' resources.'" *APCC Servs. v. Sprint Communs. Co.*, 297 F. Supp. 2d 90, 95– 96 (D.D.C. 2003) (quoting *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002)). The March 31, 2018 Order involves a controlling question of law under either prong.

The parties' cross-motions for summary judgment presented the Court with a pure legal issue -- the proper interpretation of 28 U.S.C. § 1913 note. That statute provides, in relevant part:

> The Judicial Conference may, only to the extent necessary, prescribe reasonable fees, pursuant to sections 1913, 1914, 1926, 1930, and 1932 of title 28, United States Code, for collection by the courts under those sections for access to information available through automatic data processing equipment. These fees may distinguish between classes of persons, and shall provide for exempting persons or classes of persons from the fees, in order to avoid unreasonable burdens and to promote public access to such information. The Director of the Administrative Office of the United States Courts, under the direction of the Judicial Conference of the United States, shall prescribe a schedule of reasonable fees for electronic access to information which the Director is required to maintain and make available to the public.
>
> (b) The Judicial Conference and the Director shall transmit each schedule of fees prescribed under paragraph (a) to the Congress at least 30 days before the schedule becomes effective. All fees hereafter collected by the Judiciary under paragraph as a charge for services rendered shall be deposited as offsetting

Appx3396

collections to the Judiciary Automation Fund pursuant to 28 U.S.C. 612(c)(1)(A)
to reimburse expenses incurred in providing these services.

Plaintiffs took the position that the statute prohibits the government from charging more in

PACER fees "than is necessary to recoup the total marginal cost of operating PACER,'" and that

the government is liable for fees it has charged in excess of this amount.   *Nat'l Veterans Legal*

*Servs. Program*, 291 F. Supp. 3d at 139.  The government "readily admit[ted] that PACER fees

are being used to cover expenses that are not part of the 'marginal cost' of operating PACER,"

but countered that the statute allows the government to "charge [PACER] fees in order to fund

the dissemination of information through electronic means," which was exactly what it had done.

*Id.* at 140.  The Court adopted neither view, concluding the statute did not preclude the use of

PACER fees to cover certain expenses beyond the marginal cost of operating PACER, but that

certain uses of PACER fees were impermissible.  *Id*. at 140-150.  Thus, if the Court's

interpretation is incorrect, the March 31, 2018 Order would require reversal – one of the prongs

of the definition of a "controlling question of law."

In addition, regardless of which of these three interpretations of the statute is correct, the

answer will "materially affect the course of [the] litigation."  If the Federal Circuit were to

reverse and adopt defendant's view, there would be no liability and the case would be over.  If it

were to reverse and adopt plaintiffs' view or affirm this Court, the case would continue, but the

nature of what would follow would differ significantly.  If the Circuit were to adopt plaintiffs'

interpretation, the government would be liable for the difference between the approximately

$923 million in PACER user fees collected from 2010 to 2016 and the "marginal cost" of

operating PACER.  Therefore, the main issue would be determining the marginal cost of

operating PACER.  Plaintiffs concede that at least $129 million was part of the "marginal cost"

Appx3397

of operating PACER, while defendant admits that at least $271 million was not,[2] and as to the remaining $522 million the parties agree "at least some" is not part of the "marginal cost," but there is no agreement as to how much of that $522 million is part of the marginal cost.[3]  On the other hand, if the Federal Circuit affirms this Court's Order, there will be no need to determine the marginal cost of operating PACER, for the only issue unresolved by the Court's opinion is the precise amount spent from PACER fees on impermissible expenditures.[4]  These vastly different possible outcomes lead to the conclusion that immediate review of the March 31, 2018 Order will materially affect the course of this litigation with resulting savings of time and resources.

Accordingly, the March 31, 2018 Order involves a "controlling question of law."

## 2.    Substantial ground for difference of opinion

The second requirement for § 1292(b) certification is that there must "exist a substantial ground for difference of opinion."  "A substantial ground for difference of opinion is often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits." *APCC Servs.*, 297 F. Supp. 2d at 97.  Here, there is a complete absence of any precedent from any jurisdiction.  In addition, although the Court ultimately found the arguments

---

[2] Defendant admits that none of the money spent on EBN, the State of Mississippi study, the VCCA Notification System, and Web-Based Juror Services was part of the "marginal cost" of operating PACER,

[3] Defendant admits that "at least some of the money" spent on CM/ECF, Telecommunications, Court Allotments, and Courtroom Technology is not part of the "marginal cost" of operating PACER.

[4] Based on the current record, that amount is approximately $192 million.  This number reflects the total expenditures from 2010 to 2016 for the State of Mississippi study ($120,998); the Violent Crime Control Act notification system ($3,650,979); Web-Based Juror Services ($9,443,628); and Courtroom Technology ($185,001,870), less the expenditures made for digital audio equipment, including software ($6,052,647).

Appx3398

in favor of each parties' position unpersuasive, this Court's opinion made clear that these arguments are not without merit and that "the issue is truly one on which there is a substantial ground for dispute." *APCC Servs.*, 297 F. Supp. 2d at 98; *see also Molock v. Whole Foods Mkt. Grp.*, 2018 WL 2926162, at *3 (D.D.C. June 11, 2018). Accordingly, the Court concludes that there exists a substantial ground for difference of opinion on the issue resolved by the March 31, 2018 Order.

### 3.    Materially advance the litigation

The third requirement for § 1292(b) certification is that an immediate appeal will "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "To satisfy this element a movant need not show that a reversal on appeal would actually end the litigation. Instead, the relevant inquiry is whether reversal would hasten or at least simplify the litigation in some material way, such as by significantly narrowing the issues, conserving judicial resources, or saving the parties from needless expense." *Molock*, 2018 WL 2926162, at *3 (citing *APCC Servs.*, 297 F. Supp. 2d at 100). Here, there is no question that this requirement is satisfied. As previously explained, if the Court's Order is reversed in the government's favor, the litigation will be over. If it is reversed in plaintiffs' favor, it would significantly alter the issues to be addressed. Either outcome now, instead of later, would conserve judicial resources and save the parties from needless expenses. Thus, before proceeding to a potentially lengthy and complicated damages phase based on an interpretation of the statute that could be later reversed on appeal, it is more efficient to allow the Federal Circuit an opportunity first to determine what the statute means. Accordingly, the Court concludes that an immediate appeal will "materially advance the ultimate termination of the litigation."

Appx3399

## CONCLUSION

Having concluded that the March 31, 2018 Order satisfies all three requirements for §1292(b) certification, the Court will exercise its discretion and certify that Order for immediate appeal.  A separate Order accompanies this Memorandum Opinion.



ELLEN S. HUVELLE
United States District Judge

DATE:  August 13, 2018

Appx3400