**No. 19-1081**

IN THE

# United States Court of Appeals for the Federal Circuit

NATIONAL VETERANS LEGAL SERVICES PROGRAM, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Columbia
No. 1:16-cv-00745, District Judge Ellen S. Huvelle

**BRIEF OF RETIRED FEDERAL JUDGES
AS AMICI CURIAE IN SUPPORT OF NEITHER PARTY**

SEAN MAROTTA
CLAUDIA PARE
STEPHEN SCHULTZE*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
(202) 637-5910 (Fax)
sean.marotta@hoganlovells.com

*Not admitted in the District of
Columbia.  Practice supervised by
firm partners admitted in the
District of Columbia.*

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

National Veterans Legal Services Program, et al.     **v.**     United States

Case No. 19-1081

### CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☐ (appellant) ☐ (respondent) ☐ (appellee) ■ (amicus) ☐ (name of party)

## Retired Federal Judges

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| W. Royal Furgeson, Jr. | n/a | n/a |
| Nancy Gertner | n/a | n/a |
| Brian L. Owsley | n/a | n/a |
| Viktor V. Pohorelsky | n/a | n/a |
| Richard Posner | n/a | n/a |
| Shira A. Scheindlin | n/a | n/a |
| Stephen Wm. Smith | n/a | n/a |

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

HOGAN LOVELLS US LLP
Sean Marotta
Claudia Pare
Stephen Schultze

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b).  (The parties should attach continuation pages as necessary).

| | |
|---|---|
| 1/23/2019 | /s/ Sean Marotta |
| Date | Signature of counsel |
| Please Note: All questions must be answered | Sean Marotta |
| | Printed name of counsel |

cc:  All counsel of record via CM/ECF

**Reset Fields**

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................1

ARGUMENT ......................................................................................4

    I.    FREE ELECTRONIC ACCESS TO FEDERAL COURT RECORDS WOULD PROMOTE THE INSTITUTIONAL INTERESTS OF THE JUDICIARY. ...........................................................................5

        A.    Access Fees Reduce Judicial Transparency and the Legitimacy of the Courts. ...........................................5

        B.    Access Fees Impede the Judiciary's Understanding of Its Own Systemic Well-Functioning. ...................8

        C.    Access Fees Disadvantage *Pro Se* Litigants. ...........................14

    II.    GIVEN PACER'S MINIMAL ACTUAL COSTS, THE JUDICIARY CAN AND SHOULD FUND PACER THROUGH APPROPRIATIONS. ...............................................................17

CONCLUSION ....................................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

<u>Page</u>

**CASES:**

*Bearden v. Georgia*,
  461 U.S. 660 (1983).........................................................................17

*Beer v. United States*,
  696 F.3d 1174 (Fed. Cir. 2012) .......................................................22

*Bounds v. Smith*,
  430 U.S. 817 (1977).........................................................................16

*Chambers v. Florida*,
  309 U.S. 227 (1940).........................................................................17

*Coppedge v. United States*,
  369 U.S. 438 (1962).........................................................................17

*Globe Newspaper Co. v. Fenton*,
  819 F. Supp. 89 (D. Mass. 1993)..................................................7, 11

*Globe Newspaper Co. v. Pokaski*,
  868 F.2d 497 (1st Cir. 1989).............................................................5

*Griffin v. Illinois*,
  351 U.S. 12 (1956)...........................................................................17

*Houser v. United States*,
  114 Fed. Cl. 576 (Fed. Cl. 2014) .....................................................22

*In re Oliver*,
  333 U.S. 257 (1948)...........................................................................5

*Johnson v. United States*,
  135 S. Ct. 2551 (2015).....................................................................16

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986)...............................................................................5

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980).......................................................................5, 8

# TABLE OF AUTHORITIES—Continued

<u>Page</u>

*Williams v. Oklahoma City*,
    395 U.S. 458 (1969)...........................................................................17

**STATUTES:**

28 U.S.C. § 453...................................................................................4

28 U.S.C. § 620................................................................................8, 9

28 U.S.C. § 1913 note.......................................................................23

31 U.S.C. § 1304...............................................................................22

**OTHER AUTHORITIES:**

Admin. Office of the United States Courts, *FY 2018 Judiciary Report
    Requirement on PACER July 2018*, attached to Letter from Dir.
    Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19,
    2018) ...............................................................................................22

Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. of Pol. 591
    (2017)...............................................................................................13

Lois Bloom & Helen Hershkoff, *Federal Courts, Magistrate Judges,
    and the Pro Se Plaintiff*, 16 Notre Dame J.L. Ethics & Pub. Pol'y
    475 (2014).......................................................................................14

Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim
    After* Iqbal*: Report to the Judicial Conference Advisory Committee
    on Civil Rules*, Fed. Judicial Ctr. (Mar. 2011)...................................9

Vivian S. Chu & Brian T. Yeh, Cong. Research Serv., R42835, *The
    Judgment Fund: History, Administration, and Common Usage*
    (Mar. 7, 2013) .................................................................................23

Columbia Human Rights Law Review, *A Jailhouse Lawyer's Manual*,
    Chapter 3, Your Right to Learn the Law and Go to Court (11th ed.
    2017) ...............................................................................................15

## TABLE OF AUTHORITIES—Continued

Page

Caryn Devins, *Lessons Learned from Retroactive Sentencing After Johnson and Amendment 782*, 10 Fed. Ct. L. Rev. 37 (2018)...............10, 11, 16

*Electronic Public Access at 10*, The Third Branch, Sept. 2000 ...............................6

*Financial Services and General Government Appropriations for 2018 (Part 2): Hearing Before the Subcomm. on Fin. Servs. & Gen. Gov't Appropriations of the H. Comm. on Appropriations*, 115th Cong. 605 (2018) ...............................................21

Nancy Gertner, *Against These Guidelines*, 87 UMKC L. Rev. 49 (2018)...............................................12

Sara S. Greene, Parina Patel, & Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 Minn. L. Rev. 1031 (2017) ...............................20

Jeff Hecht, *Great Leaps of Light*, 53 IEEE Spectrum 28 (2016)...........................18

Lonny Hoffman, Twombly *and* Iqbal*'s Measure: An Assessment of the Federal Judicial Center's Study of Motions to Dismiss*, 6 Fed. Cts. L. Rev. 1 (2011)...............................10

Nina Ingwer Van Wormer, *Help at Your Fingertips: A Twenty-First Century Response to the Pro Se Phenomenon*, 60 Vand. L. Rev. 983 (2007)...............................15

Interview with FJC Director, Judge Jeremy Fogel, United States Courts (Dec. 20, 2017)...............................9

Jon Kleinberg et al., *Human Decisions and Machine Predictions*, 133 Q. J. Econ. 237 (2018) ...............................12

Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach to Inconsistency in Adjudication* (Dec. 6, 2017) ...............................12

William M. Landes & Richard A. Posner, *An Economic Analysis of Copyright Law*, 18 J. Legal Stud. 325 (1989) ...............................18

# TABLE OF AUTHORITIES—Continued

Page

William M. Landes & Richard A. Posner, *Legal Precedent: A Theoretical and Empirical Analysis*, 19 J.L. & Econ. 249 (1976) ...................13

Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788 (2018) ..................................................................13

Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Hon. Reps. Issa and Nadler, H. Subcomm. on Courts, Intellectual Property and the Internet, of the H. Comm. on the Judiciary (Feb. 10, 2017) ...............................................................19

Letter from James Madison to W.T. Barry (Aug. 4, 1822) ......................4

*Looking for the Next Generation of the CM/ECF System*, The Third Branch, May 2009...................................................................6

Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 Texas L. Rev. 2161 (2002) ...............................................20

Carl R. Lounsbury, The Courthouses of Early Virginia: An Architectural History (Univ. of Virginia Press ed., 2005) ...............5, 7

Peter W. Martin, *District Court Opinions That Remain Hidden Despite a Long-standing Congressional Mandate of Transparency—The Result of Judicial Autonomy and Systemic Indifference*, 110 Law Libr. J. 305 (2018)..........................................15

Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to Patterns*, 53 Vill. L. Rev. 855 (2008) ............8

Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016)................................................................................15

Richard A. Posner, Reforming the Federal Judiciary (2017) ..................14

Press Release, Supreme Court of the United States (Aug. 3, 2017).........8

# TABLE OF AUTHORITIES—Continued

Page

David Rauma & Charles P. Sutelan, *Analysis of Pro Se Case Filings in Ten U.S. District Courts Yields New Information*, 9 FJC Directions 5 (1996) ............................................................................14

David Robinson et al., *Government Data and the Invisible Hand*, 11 Yale J.L. & Tech. 160 (2009) ...........................................................13

Rory K. Schneider, *Illiberal Construction of Pro Se Pleadings*, 159 U. Pa. L. Rev. 585 (2011) .........................................................................14

Fabrizio Sebastiani, *Machine Learning in Automated Text Categorization*, 34 ACM Computing Surveys 1 (2002) ....................................11

Carl Shapiro & Hal R. Varian, Information Rules: A Strategic Guide to the Network Economy (Harvard Business School Press ed.,1999) ................................................................................................18

Stephen Wm. Smith, *Kudzu in the Courthouse: Judgments Made in the Shade*, 3 Fed. Ct. L. Rev. 177 (2009) ...............................................6

Joseph Stiglitz, *Transparency in Government*, *in* The Right to Tell 27 (World Bank ed., 2002) ...........................................................17, 19

Teresa A. Sullivan, Elizabeth Warren, & Jay Lawrence Westbrook, *As We Forgive Our Debtors: Bankruptcy and Consumer Credit in America* (Beard Books ed., 1999)......................................................20

United States Courts, *Electronic Public Access Fee Schedule* (Aug. 2, 2017) .......................................................................................................6

United States Courts, *U.S. District Courts—Civil Pro Se and Non-Pro Se Filings, by District, During the 12- Month Period Ending September 30, 2017*............................................................................14

United States Department of the Treasury, *Judgment Fund Payment Search* ...............................................................................................22

Chip Walter, *Kryder's Law*, 293 Scientific American 20 (2005)............................18

## TABLE OF AUTHORITIES—Continued

Page

David Weinberger, Everything is Miscellaneous: The Power of the
New Digital Disorder (Times Books ed., 2007) ............................................ 7, 11

Jay Lawrence Westbrook, *Empirical Research in Consumer
Bankruptcy*, 80 Tex. L. Rev. 2123 (2002) ........................................................ 20

Douglas P. Woodlock, *Communities and the Courthouses They
Deserve, And Vice Versa*, 24 Yale J.L. & Human. 271 (2012) ........................... 7

Jonathan Zittrain, et al., *Interventions over Predictions: Reframing the
Ethical Debate for Actuarial Risk Assessment*, 81 Proceedings of
Machine Learning Research 62 (2018) .............................................................. 12

No. 19-1081

———————————

IN THE

# United States Court of Appeals
# for the Federal Circuit

———————————

NATIONAL VETERANS LEGAL SERVICES PROGRAM, et al.,

*Plaintiffs-Appellants*,

v.

UNITED STATES,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the District of Columbia
No. 1:16-cv-00745, District Judge Ellen S. Huvelle

———————————

**BRIEF OF RETIRED FEDERAL JUDGES
AS AMICI CURIAE IN SUPPORT OF NEITHER PARTY**

———————————

**STATEMENT OF INTEREST OF *AMICI CURIAE***

The following former federal judges respectfully submit this brief as *amici curiae* in support of neither party.[1] *Amici* are interested in this case because of their years of service to the federal judiciary and their ongoing commitment to fairness for all litigants, preserving the public's positive perception of the judiciary,

---

[1]    All parties have consented to the filing of this brief.  No person other than the *amici* or their counsel authored this brief or contributed money intended to fund its preparation or filing.

1

and the systemic well-functioning of the justice system. They do not urge a particular legal outcome. They instead emphasize policy concerns the Court should keep in mind when deciding the case.

As former judges, they have experienced both sides of the system. From the inside, access to the Public Access to Court Electronic Records (PACER) system was free and unlimited. From the outside, *amici* must carefully consider whether each click is worth the cost. Some find it difficult to follow cases of interest. Some find the whole regime—credit cards, login credentials, outdated search mechanisms—too burdensome to be worth it. All believe that judicial records should be as widely available as possible.

**The Honorable W. Royal Furgeson, Jr.** served as a District Judge of the United States District Court for the Western District of Texas from 1994 to 2008, and for the Northern District of Texas from 2008 to 2013. He was President of the Federal Judges Association and Chair of the Judicial Resources Committee of the Judicial Conference of the United States. After retiring from the bench in 2013, he became the founding dean of the University of North Texas at Dallas College of Law.

**The Honorable Nancy Gertner** served as a District Judge of the United States District Court for the District of Massachusetts from 1994 to 2011. Judge Gertner is currently a Professor of Practice at Harvard Law School.

**The Honorable Brian L. Owsley** served as a United States Magistrate Judge for the Southern District of Texas from 2005 to 2013. He is currently Assistant Professor of Law at UNT at Dallas College of Law.

**The Honorable Viktor V. Pohorelsky** served as a United States Magistrate Judge for the Eastern District of New York from 1995 to 2018.

**The Honorable Richard A. Posner** served as a Circuit Judge for the United States Court of Appeals for the Seventh Circuit from 1981 to 2017. He was the Chief Judge of the Court from 1993 to 2000. He then founded the Posner Center of Justice for Pro Se's, a national pro bono legal-services organization. He is also a Senior Lecturer in Law at the University of Chicago Law School.

**The Honorable Shira A. Scheindlin** served as a United States District Judge for the Southern District of New York from 1994 to 2016. She served on the Administrative Office of U.S. Courts' Task Force on Electronic Public Access from 2009 to 2012. She is the Chair of the Federal Courts Subcommittee of the ABA's Standing Committee on the American Judicial System. She is also an adjunct professor at NYU Law School.

**The Honorable Stephen Wm. Smith** served as a United States Magistrate Judge for the Southern District of Texas, Houston Division, from 2004 to 2018. He is currently Director for Fourth Amendment & Open Courts at Stanford Law School's Center for Internet and Society.

# ARGUMENT

The Judiciary derives its legitimacy from the public's perception that all judges do their level best to "do equal right to the poor and to the rich." 28 U.S.C. § 453. And the Judiciary's institutional integrity depends on its systemic well-functioning. The quality of public access to the raw materials of the Judiciary—court records—affects both whether a judge is seen as doing right in a specific dispute and whether the Judiciary is structurally fair and operationally efficient.

"A popular Government, without popular information, *or the means of acquiring it*, is but a Prologue to a Farce or a Tragedy; or perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822) (emphasis added).[2] The only way to obtain more than a handful of PACER's public records is to pay. The tragedy of PACER's paywall is that the courts appear less legitimate, that neither the Judiciary nor outside researchers can effectively identify or address certain systemic problems in our justice system, and that *pro se* litigants are disadvantaged.

The best policy is to make PACER free. The economics of electronic information make that easy.

---

[2] *Available at* https://www.loc.gov/item/mjm018999/.

4

I.    **FREE ELECTRONIC ACCESS TO FEDERAL COURT RECORDS WOULD PROMOTE THE INSTITUTIONAL INTERESTS OF THE JUDICIARY.**

A.    **Access Fees Reduce Judicial Transparency and the Legitimacy of the Courts.**

From the start, American court proceedings were as open as possible.  The Star Chamber was a cautionary tale for the Founders:  judicial legitimacy derived not from a holy sovereign but from review in the forum of public opinion.  *See, e.g.*, *In re Oliver*, 333 U.S. 257, 266, 270 (1948).  Public attendance had to be practical, so the States built courthouses at the county seat.  *See, e.g.*, Carl R. Lounsbury, The Courthouses of Early Virginia: An Architectural History 3 (Univ. of Virginia Press ed., 2005).  Centuries later, the Supreme Court confirmed that judges must not close the courtroom doors without compelling reason.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).  Openness serves a "*structural* role" in "our republican system of self-government."  *Id*. at 587 (Brennan, J., concurring).  There is a "right of access."  *Id*. at 583 (Stevens, J., concurring).

Likewise, access to the *written* record is "essential to the proper functioning" of the justice system.  *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 12 (1986); *see also Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 502, 507 (1st Cir. 1989) (requiring the same for records in cases resolved without a trial). Historically, the public would review proceedings by attending court, but written

records allowed anyone to come to the clerk's office during business hours and access proceedings for free. The fact that written records were an innovation, as compared to solely oral proceedings, made them no less open to public review. *See* Stephen Wm. Smith, *Kudzu in the Courthouse: Judgments Made in the Shade*, 3 Fed. Ct. L. Rev. 177, 190–197, 214–15 (2009).

More recently, computer innovation has ushered in new efficiencies for judicial management and attorney filing. The Internet made it possible to "surf to the courthouse door." *Electronic Public Access at 10*, The Third Branch, Sept. 2000, at 3.[3] And "CM/ECF essentially opens the clerk of court's office 24/7 to everyone, down the street or around the world." *Looking for the Next Generation of the CM/ECF System*, The Third Branch, May 2009, at 6.[4] But opening that door is not free. And even though the Administrative Office of the United States Courts notes that anyone can still travel to a courthouse to view that court's records for free, printing still costs $0.10 per page.[5]

The means of accessing public information should be *meaningful*— measured by contemporary standards. New innovations create opportunities to provide more-perfect access to popular information. For example, paper records

---

[3] *Available at* https://perma.cc/Y9VN-RXCT.

[4] *Available at* https://perma.cc/948T-KS5W.

[5] United States Courts, *Electronic Public Access Fee Schedule* (Aug. 2, 2017) a*vailable at* https://www.uscourts.gov/services-forms/fees/electronic-public-access-fee-schedule.

led to specialized bookshelves where clerks would index cases for access by the court and public. *See* Lounsbury at 297–299. By the early 1990s, the clerks' written indexes had become essential tools for finding records—the "card catalogue" of the courts. *Globe Newspaper Co. v. Fenton*, 819 F. Supp. 89, 94 (D. Mass. 1993). Without access to the clerks' index, the public would be "left without a meaningful mechanism by which to find the documents necessary to learn what actually transpired in the courts." *Id.* Thus, *Boston Globe* investigative reporters could not be forced to comply with a burdensome and fee-laden "clearance" regime. *Id.* at 97, 100.

Judge Douglas Woodlock's opinion in *Fenton* both drew on the rich past of public access and pointed to the future, including PACER.[6] PACER is both the index and the repository of public federal-court records. Today, the public rightly expects to be able to "google" public information; a card catalogue is comparably quaint.[7] Nothing about PACER, other than its paywall, stands in the way.

---

[6] Judge Woodlock's scholarship traces historical principles of judicial transparency to their natural conclusions today. He notes that the Virginia courthouse where Patrick Henry argued *Parson's Cause* is the same courthouse where, two centuries later, a judge closed the doors to the public—setting *Richmond Newspapers* in motion. *See* Douglas P. Woodlock, *Communities and the Courthouses They Deserve, And Vice Versa*, 24 Yale J.L. & Human. 271, 271–272 (2012), *available at* https://perma.cc/V9EL-9YSS.

[7] *See* David Weinberger, Everything is Miscellaneous: The Power of the New Digital Disorder 17–23 (Times Books ed., 2007), pages available at https://perma.cc/7G4W-VWXW.

Opening up judicial records by removing the PACER paywall would be consistent with the best traditions of judicial transparency. And with greater judicial transparency comes more legitimacy in the public's eyes. *See Richmond Newspapers*, 448 U.S. at 571 (explaining how, throughout history, judicial openness has ensured that courts had the necessary "support derived from public acceptance of both the process and its results"); *see also* Peter W. Martin, *Online Access to Court Records—From Documents to Data, Particulars to Patterns*, 53 Vill. L. Rev. 855 (2008) (tracing this transparency legacy to PACER, documenting PACER's history, and lamenting PACER's fees).

The lower federal courts should take their lead from the Supreme Court's electronic-filing system. The Supreme Court recently developed and deployed a mandatory electronic-filing system. *See* Press Release, Supreme Court of the United States (Aug. 3, 2017).[8] Unlike PACER and its fees, the Court is able to make "virtually all new filings . . . accessible without cost to the public and legal community." *Id*. The lower courts should do the same.

### B.    Access Fees Impede the Judiciary's Understanding of Its Own Systemic Well-Functioning.

A well-functioning Judiciary must understand how it is operating as a system. That is why Congress created the Federal Judicial Center ("FJC") in 1967, 28 U.S.C. § 620, instructing it "to conduct research and study of the operation of

---

[8] *Available at* https://supremecourt.gov/publicinfo/press/pressreleases/pr_08-03-17.

the courts of the United States, and to stimulate and coordinate such research and study on the part of other public and private persons and agencies." *Id.* at § 620(b)(1). The FJC produces invaluable research and guidance for judges.

But PACER fees impede "study on the part of other public and private persons and agencies," *id.*, who seek to research how to make the courts work better. As excellent as the FJC is, there remains untapped potential beyond its walls because the raw research data is inaccessible. As a former FJC Director explained, digital court records have transformed what the FJC does, and it is hard to overstate how technology has affected the way that the public processes information. Interview with FJC Director, Judge Jeremy Fogel, United States Courts (Dec. 20, 2017).[9]

A prime example of this shortcoming involves the study of the effect of heightened pleading standards under *Twombly* and *Iqbal*. The Judicial Conference commissioned an FJC study on the decisions' empirical effects. *See* Joe S. Cecil, et al., *Motion To Dismiss for Failure to State a Claim After* Iqbal*: Report to the Judicial Conference Advisory Committee on Civil Rules*, Fed. Judicial Ctr. (Mar. 2011).[10] At the same time, independent researchers also looked into this question. But while the FJC had access to the full PACER database, outside scholars did not.

---

[9] *Available at* https://www.uscourts.gov/news/2017/12/20/federal-judicial-center-marks-50th-anniversary.

[10] *Available at* https://www.uscourts.gov/sites/default/files/motioniqbal_1.pdf.

As *amici* below put it, "the FJC had monopoly access to the best information about the most important evolution to federal trial practice in recent history."  Br. *Amici Curiae* by The Am. Ass'n of Law Libraries, et al. In Supp. of Pls.' Mot. for Summ. J. at 12, *Nat'l Veterans Legal Servs. Program v. United States*, No. 1:16-cv-745 (D.D.C. Sept. 5, 2017), ECF No. 55-1 (AALL Br.).[11]  After the FJC released its results, scholar Lonny Hoffman identified some potentially significant methodological issues.  Lonny Hoffman, Twombly *and* Iqbal*'s Measure: An Assessment of the Federal Judicial Center's Study of Motions to Dismiss*, 6 Fed. Cts. L. Rev. 1, 31–36 (2011).  And Hoffman, who had studied the same question from the outside, noted that the FJC's results differed from his own.  But Hoffman was unable to pinpoint why: thorough empirical study of the issue was impossible because he could not get the data.  *Id.* at 9 n.18 (noting that PACER fees often hamper research in this way).

The problem is widespread.  Rigorous empirical study is lacking in several areas that would inform judges' decision-making on key issues.  For instance, as Caryn Devins, the Supreme Court Fellow at the Administrative Office of the United States Courts, observed, "only one prior empirical study has been conducted regarding the administrative implementation of retroactive Sentencing Guidelines amendments."  Caryn Devins, *Lessons Learned from Retroactive*

---

[11] *Available at* https://perma.cc/3P8F-SRAE.

*Sentencing After* Johnson *and Amendment 782*, 10 Fed. Ct. L. Rev. 37, 63 n.126 (2018).

Even when the Judiciary does study an issue, its efforts may be hampered by outdated methodologies that fail to overcome inherently imperfect cataloging by each court.  As Devins noted, "[d]uring the 2008 crack cocaine sentence reduction, the Administrative Office of the United States Courts provided a uniform code for courts to use.  Stakeholders reported that application of these codes was open to interpretation and the codes were often not applied consistently, which led to problems with case data reporting."  *Id*. at 77 n.145.  Computer scientists long ago solved this kind of problem.  *See* Fabrizio Sebastiani, *Machine Learning in Automated Text Categorization*, 34 ACM Computing Surveys 1 (2002).  To approach the problem by relying on manual coding is like using a card catalog in the era of artificial intelligence.[12]  Empiricists should not be left to throw up their hands.  They should have access to the underlying records so that they may categorize themselves, with the aid of modern technology.

---

[12] David Weinberger explains what he calls the transition to the "third order of order."  Weinberger, *supra* n.6 at 19.  Humans first ordered things by grouping them physically, like files in an 18th Century clerk's bookshelf.  We then migrated to "metadata"—human-created indexes such as those created by the Massachusetts clerks in *Fenton*.  But *digital records* can be searched, categorized, and analyzed with ease.  This is the "third order of order."

This is no abstract discussion of institutional administration or information theory. It is about providing the data needed for legislators and judges to make informed decisions about core questions of liberty and fairness. *See, e.g.*, Nancy Gertner, *Against These Guidelines*, 87 UMKC L. Rev. 49, 50 n.3 (2018) (describing the flawed data and analyses used to advocate for the Federal Sentencing Guidelines). And as Judiciary-wide policies are imposed, judges may not recognize that they often have the ability—indeed, the obligation—to exercise fair and just case-by-case discretion. *Id*. at 50–51.

Researchers have demonstrated, for example, methods for detecting possible problems of inconsistency and bias, using data from the California Board of Parole. *See* Hannah Laqueur & Ryan Copus, *Synthetic Crowdsourcing: A Machine-Learning Approach to Inconsistency in Adjudication* (Dec. 6, 2017) (working paper).[13] This type of "machine learning" might yield tremendous insights for bail reform. *See* Jon Kleinberg et al., *Human Decisions and Machine Predictions*, 133 Q. J. Econ. 237 (2018). Machine learning could also help to build a "causal model for understanding the social, structural and psychological drivers of crime." *See* Jonathan Zittrain, et al., *Interventions over Predictions: Reframing the Ethical Debate for Actuarial Risk Assessment*, 81 Proceedings of Machine Learning Research 62, 62 (2018).

---

[13] *Available at* https://ssrn.com/abstract=2694326.

"Big data" approaches to studying electronic court records also promise to inform the way that judges understand and create precedent.  We have known for decades that precedent can be viewed as "capital stock that yields a flow of information services."  *See* William M. Landes & Richard A. Posner, *Legal Precedent: A Theoretical and Empirical Analysis*, 19 J.L. & Econ. 249, 250–251 (1976).  And, if innovators outside of the government have access, they can glean even more insights from the data.  *See, e.g.*, David Robinson et al., *Government Data and the Invisible Hand*, 11 Yale J.L. & Tech. 160 (2009).  The Judiciary's precedent exists not just in formally binding decisions but also unreported decisions, orders, dockets, and data.  Transaction costs in this legal-information economy serve only to devalue the commodity and reduce efficiency—efficiency measured by the rate of fair outcomes for litigants.

Some judges have suggested that a technique called "corpus linguistics" could produce insights well beyond what citation analysis offers.  *See, e.g.*, Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788 (2018).  Corpus linguistics analyzes the meaning of language by studying how it is actually used in a large body of writing over time.  And, of course, judges learn from each other through the body of writing of other judges—not just from who cites whom.  *See, e.g.*, Deborah Beim, *Learning in the Judicial Hierarchy*, 79 J. of Pol. 591 (2017).  But corpus linguistics fails without a corpus.

## C.    Access Fees Disadvantage *Pro Se* Litigants.

Charging high fees for PACER documents also harms *pro se* litigants.

Although *pro se* filings constitute a large portion of the federal courts' docket—

and their papers generally exhibit less sophistication (and sometimes less

coherence) than counseled cases—courts often see this "litigation explosion" as a

problem to be remedied by relegating review of the cases to a less-rigorous

process.    *See generally* Lois Bloom & Helen Hershkoff, *Federal Courts,*

*Magistrate Judges, and the Pro Se Plaintiff*, 16 Notre Dame J.L. Ethics & Pub.

Pol'y 475, 479–484 (2014); David Rauma & Charles P. Sutelan, *Analysis of Pro Se*

*Case Filings in Ten U.S. District Courts Yields New Information*, 9 FJC Directions

5 (1996); Richard A. Posner, Reforming the Federal Judiciary (2017); United

States Courts, *U.S. District Courts—Civil Pro Se and Non-Pro Se Filings, by*

*District, During the 12- Month Period Ending September 30, 2017.*[14]

And while judges hold *pro se* pleadings to less stringent standards, they are

also told that *pro se* litigants must comply with the relevant rules and that they

must not read into the pleadings arguments that are not presented.    *See* Rory K.

Schneider, *Illiberal Construction of Pro Se Pleadings*, 159 U. Pa. L. Rev. 585

(2011) (describing how *Twombly* and *Iqbal* constrain the leniency urged by

---

[14] *Available at*
http://www.uscourts.gov/sites/default/files/data_tables/jb_c13_0930.2017.pdf
(last visited Jan. 16, 2019).

*Erickson v. Pardus*).  Free access to PACER alone cannot bridge the representation gap.  *See, e.g.*, Nina Ingwer Van Wormer, *Help at Your Fingertips: A Twenty-First Century Response to the Pro Se Phenomenon*, 60 Vand. L. Rev. 983 (2007).  But one of the best ways for a *pro se* litigant to comply with the rules and to present relevant arguments is to look at what others have done successfully.  Lawyers routinely use "form banks" based on prior filings.  If PACER fees were lifted and the system was searchable using modern services, it would constitute a tremendously valuable form bank available to anyone.

This would be particularly helpful for *pro se* prisoners.  Access to someone else's successful petition is more valuable than the order or opinion granting it.[15] Free access to PACER can help these petitioners—and their friends and family who are often helping from the outside—to prepare a meaningful case.[16]  And it can help court efficiency: they could hone their case and forego frivolous claims.

---

[15] And even opinions are often not meaningfully or freely accessible via PACER. *See* Elizabeth Y. McCuskey, *Submerged Precedent*, 16 Nev. L.J. 515 (2016). Opinions are theoretically free, but searching for them is not—and each judge's determination of what constitutes an opinion is discretionary.  *See* Peter W. Martin, *District Court Opinions That Remain Hidden Despite a Long-standing Congressional Mandate of Transparency—The Result of Judicial Autonomy and Systemic Indifference*, 110 Law Libr. J. 305, 308 (2018) (documenting the problem and noting how district court records can provide "tested templates for lines of legal argument").  The result is wildly inconsistent publication, useless for most *pro se* litigants.

[16] *See, e.g.*, Columbia Human Rights Law Review, *A Jailhouse Lawyer's Manual*, Chapter 3, Your Right to Learn the Law and Go to Court 42 (11th ed. 2017) ("In

Access to the *courts* implies meaningful access to court *records*.  For example, if a *pro se* prisoner's access to the court is to be "adequate, effective, and meaningful," the government must provide *some* access to a "law library."  *Bounds v. Smith*, 430 U.S. 817, 822, 825, 829 (1977).  The most comprehensive "law library" of raw source material is PACER.  But unless the records in PACER are easily searchable, they might as well not exist for a *pro se* prisoner.

Consider an inmate who believes that he may be eligible for release under *Johnson*[17] resentencing.  In the wake of *Johnson*, each district court was presented with unresolved legal questions and permutations of fact.  The differences in courts' legal and administrative responses meant that similarly situated prisoners in different courts were sometimes treated differently.  *See* Devins at 91–106.  An inmate petitioning for habeas relief could have benefitted greatly from accessing successful petitions filed before that same court.  And that inmate could learn how this court's practices compared to others.[18]  Equal justice demands equal access to court records—especially when there is a Judiciary-wide system shock like *Johnson* that puts incarcerated individuals on a one-year habeas clock.

addition to opinions, PACER includes case docket information and may provide briefs and other filings from the parties.").

[17] *Johnson v. United States*, 135 S. Ct. 2551 (2015).

[18] One of the most significant—and prejudicial—differences between courts was whether the court appointed counsel.  *See* Devins at 108–109 ("Many eligible individuals might not have received relief because they did not present their claims properly").

Wealth should not control access to justice. There can be no financial barrier to criminal appeals. *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). Nor can there be fees for *in forma pauperis* applications. *Coppedge v. United States*, 369 U.S. 438, 448 (1962). Nor transcripts. *Williams v. Oklahoma City*, 395 U.S. 458, 459–460 (1969). Equal Protection and Due Process together require that incarceration not depend on wealth. *Bearden v. Georgia,* 461 U.S. 660, 665–666 (1983). "[A]ll people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'" *Griffin*, 351 U.S. at 17 (quoting *Chambers v. Florida*, 309 U.S. 227, 241 (1940)).

## II.    GIVEN PACER'S MINIMAL ACTUAL COSTS, THE JUDICIARY CAN AND SHOULD FUND PACER THROUGH APPROPRIATIONS.

The Judiciary's cost for providing electronic court records should be low. Storing and sending data is cheap—and getting cheaper.

The economics of information differs from the economics of traditional commodities because information is often a "public good." *See, e.g.*, Joseph Stiglitz, *Transparency in Government*, *in* The Right to Tell 27, 28 (World Bank ed., 2002). Information cannot be "used up" (it is non-rivalrous). And it is often impossible to keep others from having it (it is non-excludable). Although the government limits use of some information through intellectual-property law, access to government-held information like public electronic court records should not be subject to the ability to pay.

Two economic concepts are relevant to assessing the true cost of digital court records. One is the "first copy problem." The second is "marginal cost."

Copyright law exists to incentivize creators to create. If their "first copy" can be copied, that presents a potential problem—others will copy without paying a sufficiently high price and the creator is no longer incentivized to create in the first place. Copyright law helps to prevent the first copy problem by enabling the creator to stop others from copying her creations without sufficient compensation. William M. Landes & Richard A. Posner, *An Economic Analysis of Copyright Law*, 18 J. Legal Stud. 325, 330–332 (1989).

The actual cost of making a subsequent copy is referred to as the "marginal cost." Conventional wisdom is that the cost of storing and sending digital information continues to fall logarithmically. *See, e.g.*, Chip Walter, *Kryder's Law*, 293 Scientific American 20 (2005) (storage); Jeff Hecht, *Great Leaps of Light*, 53 IEEE Spectrum 28 (2016) (transmission). Indeed, economists have explained that "[i]nformation delivered over a network in digital form exhibits the first-copy problem in an extreme way: once the first copy of the information has been produced, additional copies cost essentially nothing." Carl Shapiro & Hal R. Varian, Information Rules: A Strategic Guide to the Network Economy 21 (Harvard Business School Press ed.,1999).

We are approaching zero marginal cost.  One non-profit has offered to host all current and future PACER content for free, forever.  *See* Letter from Brewster Kahle, Digital Librarian and Founder, Internet Archive, to Hon. Reps. Issa and Nadler, H. Subcomm. on Courts, Intellectual Property and the Internet, of the H. Comm. on the Judiciary (Feb. 10, 2017).[19]

But the first-copy "problem" is not really a problem when it comes to public court records.  In the language of technologists, near-zero marginal cost is a not a bug, but a feature.  Creators of these records need no incentive to create.  Judges do not write opinions or issue orders for profit.  Clerks do not get a bonus for each docket entry.  And litigants do not file papers because they expect royalties.  The system and the documents that it contains would exist regardless of any aftermarket.

Despite this, PACER prices have only gone up.  Pls.' Statement of Undisputed Material Facts at ¶152, *Nat'l Veterans Legal Servs. Program v. United States*, No. 1:16-cv-745 (D.D.C. Aug. 28, 2017), ECF No. 52-16.  One explanation for overpriced access is artificial scarcity.  When the government enjoys an information monopoly over the public, it has a perverse incentive to seek rents that exceed actual cost.  Stiglitz at 35.

---

[19] *Available at* https://perma.cc/BT6M-4J56.

The Judiciary appears to have fallen prey to this incentive.  As *amici* below observed, PACER access fees seem to artificially promote print-era scarcity. *AALL* Br. at 6–9.  From the early 1980s to the early 2000s, researchers laboriously gathered bankruptcy court records to empirically study trends in lending and bankruptcy.  *See, e.g.*, Teresa A. Sullivan, Elizabeth Warren, & Jay Lawrence Westbrook, *As We Forgive Our Debtors: Bankruptcy and Consumer Credit in America* (Beard Books ed., 1999).  For their data gathering in the 1980s, the researchers "bought photocopy machines, flew the copiers air freight to the cities where they would collect the data, and rolled them into the clerks' offices on dollies."  *See* Lynn M. LoPucki, *The Politics of Research Access to Federal Court Data*, 80 Texas L. Rev. 2161, 2166 (2002).  By the early 2000s, much of the same data was available electronically.  Nevertheless, PACER fees forced the team to undertake essentially the same expensive and outmoded approach.  *Id.* at 2167. PACER fees were more expensive than buying photocopiers and shipping them across the country.

After that experience, one of the scholars expressed his hope that the courts would ultimately adopt an electronic-access policy that "permits the broadest possible access to data."  Jay Lawrence Westbrook, *Empirical Research in Consumer Bankruptcy*, 80 Tex. L. Rev. 2123, 2150 (2002).  But today's consumer bankruptcy empiricists are stuck working with decade-old data.  *See, e.g.*, Sara S.

20

Greene, Parina Patel, & Katherine Porter, *Cracking the Code: An Empirical Analysis of Consumer Bankruptcy Success*, 101 Minn. L. Rev. 1031 (2017).

This counterintuitive outcome might have something to do with the economics of PACER revenue. "The vast majority of PACER revenue (approximately eighty five percent) is attributable to less than three percent of 'power-users,' which are, for the most part, financial institutions or other major commercial enterprises that collect massive amounts of data for aggregation and resale." *Financial Services and General Government Appropriations for 2018 (Part 2): Hearing Before the Subcomm. on Fin. Servs. & Gen. Gov't Appropriations of the H. Comm. on Appropriations*, 115th Cong. 605 (2018).

In order to maintain revenue from the 3%, the Judiciary may have chosen to retain scarcity for the remaining 97%. After all, if just one user obtains free access and allows others to copy the records for free, few would pay the Judiciary. But researchers must be able to share the data that underlies their findings because the integrity of their research depends on independent validation of their results. The Judiciary has likely struck a bad bargain. The benefits of free access far outweigh the cost.

Given the public's strong interest in accessing court records, the Judiciary should bear the cost of PACER's operations. This is consistent with the courts' longstanding tradition of providing free access for all who come into the courtroom

or to the clerk's office. And it appears that, through appropriations, the Judiciary can bear the cost of changing its practices to comply with the judgment below. The Administrative Office of the United States Courts recently told appropriators that as a result of the decision below, it will "seek appropriated funds for [the categories deemed illegal], as needed, through the FY 2019 budget re-estimate process." Admin. Office of the United States Courts, *FY 2018 Judiciary Report Requirement on PACER July 2018* at 4, attached to Letter from Dir. Duff to Hons. Frelinghuysen, Graves, Lowey, & Quigley (July 19, 2018).[20] And there is no suggestion that Congress would decline to fund these programs should PACER fees no longer be available as a funding source.

It also seems likely that the Judiciary is not directly on the hook for reimbursing any past over-charging that the Court may find. For example, when federal judges sued for back-pay in *Beer v. United States*, 696 F.3d 1174 (Fed. Cir. 2012) and *Houser v. United States*, 114 Fed. Cl. 576 (Fed. Cl. 2014), the Treasury paid out of the Judgment Fund, not the Judiciary's appropriations. *See* U.S. Department of the Treasury, *Judgment Fund Payment Search*[21]; *see also* 31 U.S.C. § 1304 (the Judgment Fund is a permanent, indefinite appropriation used to pay

---

[20] *Available at* https://perma.cc/KMP4-CSQT.

[21] *Available at* https://jfund.fiscal.treasury.gov/jfradSearchWeb/JFPymtSearchAction.do (search for "Defendant Agency Name" of "Adm Ofc of US Courts" dates 2012–present).

judgments against the United States); Vivian S. Chu & Brian T. Yeh, Cong. Research Serv., R42835, *The Judgment Fund: History, Administration, and Common Usage* (Mar. 7, 2013).[22]

Congress has given the courts latitude to charge—or to not charge—for PACER access under the E-Government Act.  28 U.S.C. § 1913 note.  As a policy matter, the Judiciary should seek appropriations to make PACER free.  That would not only be good for the Judiciary and for society, it would also be consistent with the economics of digital information.

---

[22] *Available at* https://perma.cc/RR72-V946.

## CONCLUSION

The Court should keep these principles in mind when deciding this appeal.

Respectfully submitted,

/s/ Sean Marotta
SEAN MAROTTA
CLAUDIA PARE
STEPHEN SCHULTZE*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
(202) 637-5910 (Fax)
sean.marotta@hoganlovells.com

*Not admitted in the District of Columbia. Practice supervised by firm partners admitted in the District of Columbia.*

January 23, 2019

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,120 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Office

Word in Times New Roman 14-point type.

/s/ Sean Marotta
Sean Marotta

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing on January 23, 2019.

I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.

<u>/s/ Sean Marotta</u>
Sean Marotta