Nos. 19-1081 (L) & 19-1083

# In the United States Court of Appeals for the Federal Circuit

———————

NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL.

v.

UNITED STATES

———————

Appeal from the United States District Court for the District of Columbia,
No. 16-cv-745

———————

**BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION, AMERICAN ASSOCIATION OF LAW LIBRARIES, AMERICAN LIBRARY ASSOCIATION, CATO INSTITUTE, & KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AS AMICI CURIAE IN SUPPORT OF CROSS-APPELLEES NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL.**

———————

Brett Max Kaufman
Ben Wizner
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212.549.2500
bkaufman@aclu.org
bwizner@aclu.org

*Counsel for Amici Curiae*

**Nos. 19-1081 (L) & 19-1083**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

————————

NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL.

v.

UNITED STATES

————————

### CERTIFICATE OF INTEREST

————————

Counsel for amici curiae certifies the following:

1. The full names of all amici curiae represented by me are: **American Civil Liberties Union; American Association of Law Libraries; American Library Association; Cato Institute; and Knight First Amendment Institute at Columbia University.**

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: **N/A.**

3. All parent companies and any publicly held companies that own 10 percent or more of the stock of the amici curiae represented by me are: **None.**

4. The names of all law firms and the partners or associates that appeared for the amici curiae now represented by me in the trial court or agency, or

are expected to appear in this court are: **Relman, Dane & Colfax PLLC (by Sasha Samberg-Champion and Stephen M. Dane) for Amicus Curiae American Association of Law Libraries in the District Court for the District of Columbia.**


Date: January 23, 2019                    /s/ Brett Max Kaufman

                                         Brett Max Kaufman
                                         American Civil Liberties Union
                                             Foundation
                                         125 Broad Street, 18th Floor
                                         New York, NY 10004
                                         212.549.2500
                                         bkaufman@aclu.org

                                         *Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................... ii

TABLE OF AUTHORITIES ........................................................................ v

INTERESTS OF AMICI CURIAE ............................................................... 1

INTRODUCTION ...................................................................................... 3

ARGUMENT .............................................................................................. 4

I. The First Amendment guarantees the public a right of access to judicial records .................................................................................................. 4

II. The First Amendment right of access attaches to PACER ............... 11

    A. PACER is a digital index of and platform for obtaining more than one billion judicial records that are themselves subject to the First Amendment right of access. ....................................................... 11

    B. PACER satisfies the "experience and logic" tests. ................... 14

    C. Restrictions on meaningful public access to judicial records through PACER—including through excessive fees—are subject to narrow tailoring. ..................................................................... 20

III. The Court should reject the government's interpretation of the E-Government Act because accepting it would, at the least, raise a substantial constitutional question. .................................................................. 25

CONCLUSION ........................................................................................ 28

CERTIFICATE OF COMPLIANCE ........................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Application of Storer Commcn's, Inc.*,
  828 F.2d 330 (6th Cir. 1987) ................................................................8

*Associated Press v. U.S. Dist. Ct.*,
  705 F.2d 1143 (9th Cir. 1983) ............................................................10

*Bridges v. California*,
  314 U.S. 252 (1941) ............................................................................25

*Brown v. Advantage Eng'g Inc.*,
  960 F.2d 1013 (11th Cir. 1992) ............................................................9

*Cal. First Amendment Coal. v. Woodford*,
  299 F.3d 868 (9th Cir. 2002) ................................................................9

*CBS, Inc. v. U.S. Dist. Ct.*,
  765 F.2d 823 (9th Cir. 1985) ................................................................8

*Cervase v. Off. of Fed. Register*,
  580 F.2d 1166 (3d Cir. 1978) ............................................................15

*Clark v. Martinez*,
  543 U.S. 371 (2005).............................................................................27

*Courthouse News Serv. v. Planet*,
  750 F.3d 776 (9th Cir. 2014) ................................................................9

*Cox v. New Hampshire*,
  312 U.S. 569 (1941) ............................................................................23

*Doe v. Pub. Citizen*,
  749 F.3d 246 (4th Cir. 2014) .........................................................9, 14

*E. Conn. Citizens Action Grp. v. Powers*,
  723 F.2d 1050 (2d Cir. 1983)..............................................................23

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988).............................................................................27

*El Vocero de P.R. v. Puerto Rico*,
  508 U.S. 147 (1993) ..........................................................................7, 16

*Fernandes v. Limmer*,
  663 F.2d 619 (5th Cir. 1981) ...............................................................23

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) ............................................................................24

*Globe Newspaper Co. v. Fenton*,
  819 F. Supp. 89 (D. Mass. 1993) .......................................... 18, 19, 20

*Globe Newspaper Co. v. Super. Ct.*,
  457 U.S. 596 (1982) ..................................................................... 5, 6, 7

*Hartford Courant Co. v. Pellegrino*,
  380 F.3d 83 (2d Cir. 2004) ....................................................... passim

*Herald Co. v. Klepfer*,
  734 F.2d 93 (2d Cir. 1984) ....................................................................8

*Ibrahim v. DHS*,
  62 F. Supp. 3d 909 (N.D. Cal. 2014) ...................................................10

*In re Bos. Herald, Inc.*,
  321 F.3d 174 (1st Cir. 2003) ..................................................................8

*In re Continental Ill. Secs. Litig.*,
  732 F.2d 1302 (7th Cir. 1984) ...............................................................9

*In re Copley Press, Inc.*,
  518 F.3d 1022 (9th Cir. 2008) ...............................................................8

*In re Iowa Freedom of Info. Council*,
  724 F.2d 658 (8th Cir. 1983) ..................................................................8

*In re N.Y. Times Co.*,
  828 F.2d 110 (2d Cir. 1987) ...................................................................8

*In re Search Warrant*,
  855 F.2d 569 (8th Cir. 1988) ................................................................15

*In re Violation of Rule 28(D)*,
   635 F.3d 1352 (Fed. Cir. 2011) ............................................9

*In re Wash. Post*,
   807 F.2d 383 (4th Cir. 1986) ...............................................8

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ...........................................................24

*Kwong v. Bloomberg*,
   723 F.3d 160 (2d Cir. 2013) ...............................................23

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
   998 F.2d 157 (3d Cir. 1993) ...............................................10

*Lugosch v. Pyramid Co. of Onondaga*,
   435 F.3d 110 (2d Cir. 2006) .................................................9

*Marbury v. Madison*,
   1 Cranch 137 (1803) .............................................................5

*Murdock v. Pennsylvania*,
   319 U.S. 105 (1943)....................................................... 22, 24

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012) .............................................8, 9

*Ne. Ohio Coal. for the Homeless v. Cleveland*,
   105 F.3d 1107 (6th Cir. 1997) ...........................................23

*Newman v. Graddick*,
   696 F.2d 796 (11th Cir. 1983) .............................................8

*Nixon v. Warner Commc'ns, Inc.*,
   435 U.S. 589 (1978)..............................................................6

*Packingham v. N. Carolina*,
   137 S. Ct. 1730 (2017)........................................................16

*Peretz v. United States*,
   501 U.S. 923 (1991)............................................................27

*Phila. Newspapers v. Hepps*,
    475 U.S. 767 (1986) ........................................................................20

*Press-Enterprise Co. v. Super. Ct.* (*Press-Enterprise I*),
    464 U.S. 50 (1984) ...................................................................7, 11

*Press-Enterprise Co. v. Super. Ct.* (*Press-Enterprise II*),
    478 U.S. 1 (1986) ............................................................ 7, 11, 16

*Publicker Indus., Inc. v. Cohen*,
    733 F.2d 1059 (3d Cir. 1984) ........................................................9

*Reno v. Am. Civil Liberties Union*,
    521 U.S. 844 (1997) ........................................................................16

*Rep. of Phil. v. Westinghouse Elec. Corp.*,
    949 F.2d 653 (3d Cir. 1991) ........................................................10

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ................................................................ passim

*Rushford v. The New Yorker Magazine, Inc.*,
    846 F.2d 249 (4th Cir. 1988) ........................................................9

*S. Or. Barter Fair v. Jackson Cty.*,
    372 F.3d 1128 (9th Cir. 2004) ......................................................23

*Seattle Times Co. v. U.S. Dist. Ct.*,
    845 F.2d 1513 (9th Cir. 1988) ........................................................8

*Sullivan v. City of Augusta*,
    511 F.3d 16 (1st Cir. 2007) ................................................... 22, 25

*United States v. Brooklier*,
    685 F.2d 1162 (9th Cir. 1982) ........................................................8

*United States v. Chagra*,
    701 F.2d 354 (5th Cir. 1983) ........................................................8

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) ....................................................23

*United States v. Mendoza*,
    698 F.3d 1303 (10th Cir. 2012) .........................................................15

*United States v. Simone*,
    14 F.3d 833 (3d Cir. 1994) ...............................................................8

*United States v. Smith*,
    787 F.2d 111 (3d Cir. 1986) ..............................................................8

*United States v. Suarez*,
    880 F.2d 626 (2d Cir. 1989) ..............................................................8

*United States v. Valenti*,
    987 F.2d 708 (11th Cir. 1993) .........................................................15

## **Statutes**

28 U.S.C. § 1913 ................................................................... 12, 25

44 U.S.C. § 4102 ...........................................................................26

5 U.S.C. § 552 ..................................................................... 15, 26

Dep't's of Commerce, Justice, and State, the Judiciary, and Related Agencies
    Appropriations Act, Pub. L. No. 101-515, 104 Stat. 2101 (1990) .....................12

E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (2002) ...................25

## **Other Authorities**

Adrian Vermeule, *Saving Constructions*,
    85 Geo. L.J. 1945 (1997) .................................................................27

Brian Browdie, *Why Pacer Should (and Should Not) Be Like Edgar*,
    Quartz, Nov. 24, 2014....................................................................13

*Electronic Public Access at 10*,
    Third Branch, Sept. 2000 ...............................................................12

Erika Wayne, *PACER Spending Survey*,
    Legal Research Plus Blog (Aug. 28, 2009) .........................................22

H. Rep. No. 94-880 (1975) ...............................................................26

Letter from Alan D. Sugarman, HyperLaw, to James C. Duff, Director,
    Administrative Office of the U.S. Courts (May 7, 2008) ....................................12

Letter from James Madison to W.T. Barry (Aug. 4, 1822),
    in 9 *Writings of James Madison* (Gaillard Hunt ed. 1910)....................................6

Nicole J. Dulude, *Unlocking America's Courthouse Doors: Restoring a
    Presumption of First Amendment Access as a Means of Reviving Public
    Faith in the Judiciary*, 11 Roger Williams U. L. Rev. 193 (2005) .......................8

Peter W. Martin, *Online Access to Court Records: From Documents to Data,
    Particulars to Patterns* (Cornell Law School Legal Studies Research Paper
    Series, No. 08-003) (Mar. 14, 2008).....................................................................11

Press Release, U.S. Courts, Pilot Project: Free Access to Federal Court
    Records at 16 Libraries (Nov. 8, 2007) ...............................................................21

S. Rep. No. 104-8 (1995) ...........................................................................................26

S. Rep. No. 93-854 (1974) .........................................................................................26

Stephen J. Schultze, *The Price of Ignorance: The Constitutional Cost of Fees
    for Access to Electronic Public Court Records*,106 Geo. L.J. 1197 (2018).........17

Supreme Court of the U.S., *2014 Year-End Report on the Federal
    Judiciary* (Dec. 2014) ..........................................................................................13

U.S. Courts, *Electronic Public Access Program Summary December 2012* ..........13

U.S. Courts, *25 Years Later, PACER, Electronic Filing Continue to Change
    Courts*, Dec. 9, 2013 .............................................................................................11

# INTERESTS OF AMICI CURIAE[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with more than two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. It has vast experience as an amicus party in First Amendment cases, including in this Court. *See, e.g.*, *In re Tam*, 808 F.3d 1321 (Fed. Cir. 2016).

The American Association of Law Libraries ("AALL") is the only national association dedicated to the legal information profession and its professionals. Founded in 1906 on the belief that people—lawyers, judges, students, and the public—need timely access to relevant legal information to make sound legal arguments and wise legal decisions, its more than 4,100 members are problem solvers of the highest order. AALL fosters the profession by offering its members knowledge, leadership, and community that make the whole legal system stronger.

---

[1] Both parties have consented to the filing of this brief. No party has authored this brief in whole or in part, and no one other than amici, their members, or counsel has paid for the preparation or submission of this brief. *See* Fed. R. App. P. 29. In the interest of transparency, amici make clear that while they presumptively fall within the definition of the certified class in this case, they have had no role in bringing this litigation and their views are not motivated by any financial interest in the outcome.

The American Library Association ("ALA") is the foremost national organization providing resources to inspire library and information professionals to transform their communities through essential programs and services. For more than 140 years, the ALA has been the trusted voice for academic, public, school, government and special libraries, advocating for the profession and the library's role in enhancing learning and ensuring access to information for all.

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established to restore the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences and forums, and produces the annual *Cato Supreme Court Review*.

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute is particularly committed to ensuring meaningful public access to the information necessary for effective self-government, such as judicial records.

## INTRODUCTION

The public's right of meaningful access to judicial proceedings has a pedigree that predates the First Amendment, one that has suffused not only the law itself but the culture of the American judicial system since the Founding. The logic that animates the right is both simple and fundamental: Public scrutiny of judicial proceedings enhances their quality, ensures their fairness, and safeguards their integrity. That logic has endured, and today, the right of access is enshrined in the First Amendment. This right, which originated from a fear of replicating the Star Chamber in criminal trials, is now understood to cover all manner of judicial matters—from pre-trial motions filed in capital-murder trials, to summary-judgment motions in civil suits, to administrative appeals of New York City subway fines. In the twenty-first century, the First Amendment right of public access applies to the government's PACER system, both a digital index of and a platform for obtaining the hundreds of millions of federal court documents that are themselves subject to the access right. Like docket sheets, which courts have widely held are subject to the right of access, PACER is an integral part of the public's access to and oversight of the workings of the judiciary.

In this case, the government urges an interpretation of a federal statute that, if accepted by this Court, would dive headlong into these First Amendment waters. As a result, the Court should employ the canon of constitutional avoidance and

reject the government's interpretation of the statute. By arguing that it may use PACER fees for purposes entirely unrelated to the upkeep of the system, the government at least raises a substantial constitutional question. Numerous Supreme Court and appellate cases have held that the government may not impose fees that condition the free exercise of First Amendment rights unless they are reasonably related to the maintenance and administration of the platform and conditions that allow for the enjoyment of those rights. Though it would be inappropriate for this Court to decide the question here, the government almost certainly cannot justify the fees it has imposed on users of PACER to enjoy meaningful public access to work of the nation's courts.

## ARGUMENT

### I.    The First Amendment guarantees the public a right of access to judicial records.

While an "unbroken, uncontradicted history" of public access to judicial proceedings had traditionally been buttressed with reference to the traditions and reasoning of the common law, the Supreme Court first recognized its constitutional roots in a landmark 1980 decision, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573, 575–81 (1980) (plurality op.). There, the Court traced the development of the modern criminal trial "back beyond reliable historical records," concluding that "throughout its evolution, the trial has been open to all who care to observe." *Id.* at 564. This was "no quirk of history," the Court explained, but an

4

"indispensable attribute" of American justice. *Id.* at 569. Courts are instruments of democracy, and as such they are subordinate to, and ultimately supervised by, the public. As the Court explained: "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.* at 572. And the First Amendment's various strains—the freedoms of speech, press, and assembly—converged in the context of public access to the workings of the judiciary, "giv[ing] meaning to those explicit guarantees." *Id.* at 575. "The explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could, as it was here, be foreclosed arbitrarily." *Id.* at 576–77.

In a remarkable concurrence—one whose approach to deciding First Amendment right-of-access questions would become the full Court's less than two years later—Justice Brennan highlighted the First Amendment's "specific structural significance." *Id.* at 594 (Brennan, J., concurring); *see Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 605–06 (1982). As he explained, the First Amendment "has a *structural* role to play in securing and fostering our republican system of self-government." *Richmond Newspapers*, 448 U.S. at 587. "[P]ublic access," he concluded, "is an indispensable element of the trial process itself," and it "assumes structural importance in our 'government of laws.'" *Id.* at 597 (quoting *Marbury v. Madison*, 1 Cranch 137, 163 (1803)). As the full Court would soon

5

emphasize, the right of access "ensure[s] that the constitutionally protected discussion of governmental affairs is an informed one." *Globe Newspaper*, 457 U.S. at 596 (quotation marks omitted).

Far from announcing a brand new constitutional rule, the Court's decision in *Richmond Newspapers* effectively gave form to what had largely been an assumed one. Centuries of practice had solidified the nation's commitment to a presumption of judicial openness. Arriving in that context, the ruling echoed Madison's famous quip that "[a] popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 *Writings of James Madison* at 103 (Gaillard Hunt ed. 1910). And it gave constitutional vigor to the Court's own ruling, made just two years prior to *Richmond*, that even in the face of the weighty institutional objections of the president himself, American courts are presumptively open to the public based on "the citizen's desire to keep a watchful eye on the workings of public agencies . . . and in a newspaper publisher's intention to publish information concerning the operation of government." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).

While *Richmond Newspapers* applied the First Amendment right of access to the specific context of a criminal trial, courts quickly made clear that its reach was much broader. Two years later, the Supreme Court adopted the rubric

elucidated in Justice Brennan's *Richmond* concurrence as the governing framework for right-of-access claims. *See Globe Newspaper*, 457 U.S. at 605–06. Elaborated more fully in subsequent cases, the approach asks courts to apply what are commonly known as the twin tests of "experience and logic" to determine whether the right of access applies to a particular type of judicial proceeding—or, critically, a proceeding's associated records. *See Press-Enterprise Co. v. Super. Ct.* (*Press-Enterprise I*), 464 U.S. 501, 505–11 (1984) (applying right of access to transcript of closed jury *voir dire*); *Press-Enterprise Co. v. Super. Ct.* (*Press-Enterprise II*), 478 U.S. 1, 10–13 (1986) (same as to transcript of closed preliminary hearing). Under the "experience" test, courts ask whether there is a historical "tradition of access[]" to the particular type of governmental process or record to which the public seeks access. *See Press-Enterprise II*, 478 U.S. at 10; *El Vocero de P.R. v. Puerto Rico*, 508 U.S. 147, 150–51 (1993) (per curiam). The "logic" test asks whether public access to such proceedings or records plays a "significant positive role" in the functioning of the governmental process at issue. *See Press-Enterprise II*, 478 U.S. at 11–13.[2]

---

[2] While some courts apply these tests as independent requirements, several courts have "broken ground by recognizing the right [of access] when only one prong is satisfied"—"a recent trend [that] may reflect some courts' final recognition that the history prong often cannot be satisfied when modern forms of adjudication and innovative judicial devices are utilized." Nicole J. Dulude, *Unlocking America's Courthouse Doors: Restoring a Presumption of First Amendment Access as a Means of Reviving Public Faith in the Judiciary*, 11 Roger Williams U. L. Rev.

7

Taking cues from the rationales expounded in this trio of Supreme Court decisions, lower courts quickly began to apply the First Amendment right of access to contexts beyond the criminal trial. Within years, federal courts of appeals had applied the right to proceedings and related documents to all manner of criminal contexts, including pretrial suppression hearings,[3] bail hearings,[4] parole hearings,[5] contempt proceedings,[6] post-conviction proceedings,[7] transcripts of chambers and sidebar conferences,[8] plea and sentencing hearings,[9] pretrial motions,[10] and documents concerning judicial recusals.[11] And over time, "the federal courts of appeals have widely agreed"—and no circuit has categorically rejected—that the

---

193, 206 (2005); *see, e.g.*, *In re Copley Press, Inc.*, 518 F.3d 1022, 1026 (9th Cir. 2008); *In re Bos. Herald, Inc.*, 321 F.3d 174, 182 (1st Cir. 2003); *United States v. Simone*, 14 F.3d 833 (3d Cir. 1994); *United States v. Suarez*, 880 F.2d 626, 631 (2d Cir. 1989). As the Ninth Circuit has explained, "[t]hough our cases refer to this as the 'experience and logic' test, it's clear that these are not separate inquiries." *In re Copley Press*, 518 F.3d at 1026 n.2; *accord Seattle Times Co. v. U.S. Dist. Ct.*, 845 F.2d 1513, 1516, 1517 (9th Cir. 1988); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 299 (2d Cir. 2012).

[3] *United States v. Brooklier*, 685 F.2d 1162 (9th Cir. 1982).

[4] *United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983).

[5] *Newman v. Graddick*, 696 F.2d 796 (11th Cir. 1983).

[6] *In re Iowa Freedom of Info. Council*, 724 F.2d 658 (8th Cir. 1983).

[7] *CBS, Inc. v. U.S. Dist. Ct.*, 765 F.2d 823 (9th Cir. 1985).

[8] *United States v. Smith*, 787 F.2d 111 (3d Cir. 1986).

[9] *In re Wash. Post*, 807 F.2d 383 (4th Cir. 1986).

[10] *In re N.Y. Times Co.*, 828 F.2d 110 (2d Cir. 1987).

[11] *Application of Storer Commc'n's, Inc.*, 828 F.2d 330 (6th Cir. 1987).

First Amendment right of access applies to a panoply of civil (and even non-judicial administrative) matters and records, as well. *Courthouse News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014).[12]

All of these courts have taken the logic of *Richmond Newspapers* and its progeny to heart, concluding that what is true of physical access to courtrooms to observe criminal trials is also true of access to proceedings and records throughout

---

[12] *See, e.g.*, *N.Y.C. Transit Auth.*, 684 F.3d at 305 (administrative civil infraction hearings); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006) (documents submitted with summary-judgment motion); *Pellegrino*, 380 F.3d at 93 (docket sheets); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1067–75 (3d Cir. 1984) (transcript of preliminary-injunction hearing); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252–54 (4th Cir. 1988) (exhibits to summary-judgment motion); *Doe v. Pub. Citizen*, 749 F.3d 246, 265–66 (4th Cir. 2014) (summary-judgment opinion and docket sheet); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1176–81 (6th Cir. 1983) (agency documents filed in administrative and civil matters); *In re Continental Ill. Secs. Litig.*, 732 F.2d 1302, 1308-09 (7th Cir. 1984) (evidence admitted during civil trial); *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 874 (9th Cir. 2002) (viewing executions); *Courthouse News Serv.*, 750 F.3d at 786–88 (civil complaint); *Brown v. Advantage Eng'g Inc.*, 960 F.2d 1013, 1015–16 (11th Cir. 1992) (settlement agreement).

This Court has apparently never squarely addressed a First Amendment right-of-access claim, making it unique among the federal circuit courts. However, in a 2011 case addressing the Court's rules concerning confidentiality markings, the Court explained as "background" that the First Amendment guarantees a "right of public access to court proceedings." *In re Violation of Rule 28(D)*, 635 F.3d 1352, 1356 (Fed. Cir. 2011) (Dyk, J.) (citing *Richmond Newspapers*, 448 U.S. at 579). Given that this Court lacks jurisdiction over criminal matters, this background discussion strongly suggests that it would agree with the seven circuits to have explicitly recognized the First Amendment right of access to civil matters.

the criminal and civil justice system. *See, e.g.*, *Associated Press v. U.S. Dist. Ct.*, 705 F.2d 1143, 1145 (9th Cir. 1983). As the Third Circuit has explained:

> As with other branches of government, the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness.

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 161 (3d Cir. 1993) (quoting *Rep. of Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 660 (3d Cir. 1991)). Likewise, courts have recognized that not only is "[p]ublic oversight of courts and therefore public access to judicial operation . . . foundational to the functioning of government," but that "[w]ithout such oversight, the government can become an instrument for injustice." *Ibrahim v. DHS*, 62 F. Supp. 3d 909, 934–35 (N.D. Cal. 2014).

To be sure, where the First Amendment right of access applies to create a right of access to judicial proceedings and records, that right is not absolute. Instead, it is a qualified one that grants the public and its "surrogates," the news media, *Richmond Newspapers*, 448 U.S. at 572 (plurality op.), *presumptive* access to court records and documents. That presumption, though, is a weighty one. Proceedings and records to which the First Amendment right of access attaches "cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve

10

that interest.'" *Press-Enterprise II*, 478 U.S. at 13–14 (quoting *Press-Enterprise I*, 464 U.S. at 510).

## II.   The First Amendment right of access attaches to PACER.

### A.   PACER is a digital index of and platform for obtaining more than one billion judicial records that are themselves subject to the First Amendment right of access.

Until the late 1980s, the only access Americans had to court records was physical. To inspect records, a private individual, journalist, or lawyer had to line up at a window in a courthouse clerk's office and physically mark the papers she wished to inspect or copy. While clerks were not authorized to charge visitors to review documents, many courthouses did charge for the ability to copy them.[13] But in 1988, the fast adoption of personal computers and the nascent internet made possible a new method of access involving dial-up access to an assortment of judicial documents in six different federal courts.[14] Initially, only thumbnail case summaries were available; actual case documents remained available only at the courthouses that housed them.[15] Other pilot efforts in the U.S. Supreme Court and several courts of appeals followed, making opinions available through online

---

[13] Peter W. Martin, *Online Access to Court Records: From Documents to Data, Particulars to Patterns*, at 10 (Cornell Law School Legal Studies Research Paper Series, No. 08-003) (Mar. 14, 2008), http://ssrn.com/abstract=1107412.

[14] *See* U.S. Courts, *25 Years Later, PACER, Electronic Filing Continue to Change Courts*, Dec. 9, 2013, https://www.uscourts.gov/news/2013/12/09/25-years-later-pacer-electronic-filing-continue-change-courts.

[15] *See id.*

11

bulletin boards.[16] Two years later, Congress authorized the judiciary to expand the program throughout the nation through an omnibus appropriations bill.[17] The program was such a success that, three years later, Congress called for its rapid expansion.[18] By the mid-1990s, a new, web-based, government-operated system called "PACER" (and a court-filing system called "CM/ECF") made court documents from across the country, in nearly every jurisdiction, available electronically to the public. The public's response was immense: PACER's user base grew from 9,000 in 1994, to 30,000 in 1999, and to 67,000 in 2000.[19]

Today, PACER is the principal index of and gateway to judicial records in almost all criminal and civil matters—records that, as discussed above, are almost universally subject to the qualified First Amendment right of access. By 2012, there were more than 1.4 million registered PACER accounts used to conduct

---

[16] Letter from Alan D. Sugarman, HyperLaw, to James C. Duff, Director, Administrative Office of the U.S. Courts, at 9 (May 7, 2008), http://www.hyperlaw.com/topics/2008/2008-05-07-HL-to-AO-lower-court-opinion-access-1.pdf.

[17] *See* Dep'ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Pub. L. No. 101-515, 104 Stat. 2101 (1990) (codified in 28 U.S.C. § 1913 note).

[18] *See* JA3151 & n.6 (quoting from H.R. Rep. No. 102-709, at 58 (1992)).

[19] *See Electronic Public Access at 10*, Third Branch, Sept. 2000, at 3, 4, *available at* https://archive.org/details/thirdbranch32332200001fede/page/n139.

roughly 500 million requests for information annually,[20] across approximately 43 million cases.[21] By 2014, PACER housed "more than one billion retrievable documents spread among the 13 courts of appeals, 94 district courts, 90 bankruptcy courts, and other specialized tribunals."[22] Using the government's 2012 estimated rate of account creation, there are by now 2.5 million PACER users,[23] comprised of "lawyers; pro se filers; government agencies; trustees; bulk collectors; researchers; educational institutions; commercial enterprises; financial institutions; the media; and the general public."[24] As Chief Justice Roberts recently observed, "PACER has enabled thousands of reporters, academics, and members of the public to find court records in a way that would have been impossible before the advent of" PACER and CM/ECF.[25] Indeed, PACER has made the right of access a meaningful one in the digital age.

---

[20] *See* U.S. Courts, *Electronic Public Access Program Summary December 2012*, at 1, https://www.pacer.gov/documents/epasum2012.pdf ("2012 Access Summary").

[21] *See* Brian Browdie, *Why Pacer Should (and Should Not) Be Like Edgar*, Quartz, Nov. 24, 2014, http://qz.com/283772.

[22] Supreme Court of the U.S., *2014 Year-End Report on the Federal Judiciary*, at 6 (Dec. 2014), https://www.supremecourt.gov/publicinfo/year-end/2014year-endreport.pdf ("2014 Year-End Report").

[23] *See* 2012 Access Summary at 1 (estimating "approximately 13,000 new accounts added each month").

[24] *See id.* at 5.

[25] 2014 Year-End Report at 6.

**B.    PACER satisfies the "experience and logic" tests.**

PACER is subject to the First Amendment right of access and, accordingly, restrictions this records system places on public access are subject to *Press-Enterprise II*'s narrow tailoring requirement.

As discussed above, PACER is effectively a digital-age, all-case, super–docket sheet that both indexes and permits access to more than a billion judicial records. As many courts have held, docket sheets are among the quintessential judicial documents to which the public has a right of access. The docket sheet offers a window into the activities of the court, providing various categories of pertinent information to the public. It is thus an "integral part" of a judicial proceeding, "acting as both an index and a publication":

> As an index, the docket catalogues all the proceedings and information taken before a court in that case. It permits both the court and observers to locate documents and proceedings that otherwise would be lost within the court's vast record collections. It also allows one to quickly determine the status of a case, the actions of the parties, and the determinations of the judge, without requiring the inspection of every item in the case file. As a publication, the docket sheet provides the public and press with notice of case developments. This role assumes particular importance when the court is considering sealing a proceeding or judicial record.

*Ochoa-Vasquez*, 428 F.3d at 1029 n.15 (citations omitted).

As many courts have found, civil and criminal docket sheets easily satisfy both prongs of *Press-Enterprise II. See, e.g.*, *Pub. Citizen*, 749 F.3d at 268; *Ochoa-Vasquez,* 428 F.3d at 1029 n.15; *Pellegrino*, 380 F.3d at 96; *United States v.*

*Valenti*, 987 F.2d 708, 715 (11th Cir. 1993); *In re Search Warrant*, 855 F.2d 569, 575 (8th Cir. 1988). As to the first prong—"experience"—this country has a "centuries-long history of public access to dockets." *United States v. Mendoza*, 698 F.3d 1303, 1304 (10th Cir. 2012). That tradition is deeply embedded in both the legislative and judicial branches. "Since the first years of the Republic, state statutes have mandated that clerks maintain records of judicial proceedings in the form of docket books, which were presumed open either by common law or in accordance with particular legislation." *Pellegrino*, 380 F.3d at 94; *see also Cervase v. Off. of Fed. Register*, 580 F.2d 1166, 1170 (3d Cir. 1978) (discussing indexing requirement under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(2)). And as to the second prong—"logic"—docket sheets are essential to ensuring that the public and the news media have "meaningful access" to judicial proceedings and the judicial system writ large. *Ochoa-Vasquez*, 428 F.3d at 1029 (quotation marks omitted). Indeed, without them, "the public and press" would not have "the capacity to exercise their rights guaranteed by the First Amendment," and those rights would be "merely theoretical." *Pellegrino*, 380 F.3d at 93.

The same analysis forcefully applies to an online digital index of and gateway to judicial records, like PACER.

First, although PACER is a relatively recent innovation, the Supreme Court has made clear that the proper focus of the "experience" analysis is the *type* of

governmental process or record to which the public seeks access, not the past practice of a specific forum or technology. *See El Vocero de P.R.*, 508 U.S. at 150–51. And the aforementioned history of public access to docket sheets is more than sufficient to satisfy *Press-Enterprise II*—to the extent that is even necessary.[26] Moreover, that PACER has no analog-era predecessor (largely due to practical limitations on file distribution and organization) is irrelevant to this analysis. As courts have made clear in other contexts, the scope of constitutional rights does not freeze in time but finds new application as society changes. *See, e.g.*, *Packingham v. N. Carolina*, 137 S. Ct. 1730, 1737 (2017) (explaining that social media websites "allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox'" (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)).

Second, the "logic" of public access to PACER—that it plays a "significant positive role" in the functioning of the judicial system, *Press-Enterprise II*, 478 U.S. at 11—is indisputable. In the digital age, an index like PACER is a "necessary corollary," *Pellegrino*, 380 F.3d at 93, to physical access to all kinds of judicial proceedings and records that are themselves subject to the First Amendment right of access. As such, PACER is a both a gateway and a prerequisite to the exercise

---

[26] As explained above, courts have begun to recognize that proceedings or records which, as a matter of "logic," should be open to the public, must be so, even if there is little or no "experience" of their being so. *See supra* note 2.

of the public's and the press's democratic oversight functions. PACER permits the public to remotely access proceedings held all across the country, from one's home, the local library, or even on a subway car. And further, it enables the news media to inform the public about matters of public concern. *See generally* Br. of Amici Curiae Reporters Committee for Freedom of the Press, et al. § I ("RCFP Br."). Moreover, with a bevy of digital tools now available to analyze large sets of data, PACER has the potential to vastly improve public oversight of the courts through sophisticated computer analysis that could potentially detect significant patterns in judicial decision making, various forms of bias, and important legal trends, among many other applications. *See, e.g.*, Stephen J. Schultze, *The Price of Ignorance: The Constitutional Cost of Fees for Access to Electronic Public Court Records*, 106 Geo. L.J. 1197, 1214–17 (2018). Finally, that PACER plays a "significant positive role" in judicial oversight is buttressed by the Supreme Court's own understanding that while the evolution of both society and technology may alter the *means* by which the public flexes its right of access, the right itself remains intact. *See Richmond Newspapers*, 448 U.S. at 577 n.12 (plurality op.).

The conclusion that PACER is subject to the First Amendment right of access is illuminated by a little-noticed, but vastly important, case in which a newspaper successfully challenged a state statute restricting access to court-maintained indices of criminal defendants in closed criminal trials. *See Globe*

*Newspaper Co. v. Fenton*, 819 F. Supp. 89 (D. Mass. 1993). *Fenton* involved an

attempt by reporters from the *Boston Globe*'s famed "Spotlight" reporting team to

utilize alphabetical indices of criminal defendants in closed criminal trials to

conduct investigative reporting on judicial topics of public concern including

"bribery, ex parte dealings, and judicial or other misconduct in connection with the

disposition of criminal cases." *See id.* at 95 (quotation marks omitted). While the

underlying records were available for public inspection at state trial-court clerks'

offices, a state statute aimed at protecting the privacy of criminal defendants had

restricted access to the index, which had been "a convenient—formerly public—

record which the Commonwealth ha[d] required trial court clerks to maintain since

before ratification of the United States Constitution." *Id.*

Judge Douglas P. Woodlock held that, based on both experience and logic,

the First Amendment access right applied to the case indices, and that the state's

denial of access could not be sustained. *See id.* at 91. Judge Woodlock's great

insight was that the Constitution requires public access to be not just literal but

meaningful, workable, and efficient. In *Fenton*, there was no dispute that the

records that were the ultimate object of the Spotlight team's investigations were

themselves subject to the First Amendment right of access. *See id.* at 93–94.

Therefore, conditioning or restricting access to the case index was, directly or

indirectly, a limitation on that constitutionally guaranteed access. The state statute

18

at issue "den[ied] *effective* access to the records of closed criminal proceedings,"
the court wrote. *Id.* at 93 (emphasis added); *id.* at 98 (describing the statute as
barring "meaningful access to the underlying records").

Critically, the *Fenton* court explained that in order for public access to be
meaningful, the Constitution requires a system of organization that enables
efficient searching through court records:

> It is not misleading to think of courthouse papers as comprising a vast
> library of volumes for which docket sheets are the tables of contents.
> Without the card catalogue provided by alphabetical indices, a reader
> is left without a meaningful mechanism by which to find the
> documents necessary to learn what actually transpired in the courts.
> The indices thus are a key to effective public access to court activity.

*Id.* at 94.

Equally important, *Fenton* focused on the importance of meaningful access
to the role of the public—and to the work of the news media, in particular—in
overseeing the work of the judiciary. The court explained that "[t]he role public
access to court records generally plays in the proper functioning of accountable
institutions, particularly the courts as institutions, is graphically illustrated by the
activities of the plaintiffs in dealing with such records"—i.e., large-scale
journalistic investigations into the courts. *Id.* at 95. And it concluded that, by
preventing the public's reliance on the most efficient means of gathering
information about the judiciary, the state had effectively stifled legitimate criticism
incompatibly with the First Amendment. *See id.* at 94.

19

Judge Woodlock's observations in *Fenton* concerning a hard-copy, alphabetical index to closed cases apply with exponentially more force here. PACER constitutes a modern, digital "card catalogue" that provides the "key to effective public access to court activity," *id.* at 94. It is, by congressional design, "the single most meaningful index to . . . documents in the courthouse" that are themselves subject to First Amendment–governed public access, *id.* at 91. And its use is essential to "learn what actually transpired in the courts," *id.* at 94. As a result, and for the reasons given above, PACER is subject to the First Amendment right of access.

C. **Restrictions on meaningful public access to judicial records through PACER—including through excessive fees—are subject to narrow tailoring.**

As explained above, encumbering the use of PACER to access judicial records is a restriction on First Amendment rights. Therefore, the government bears the burden of justifying any such restrictions. *See, e.g.*, *Phila. Newspapers v. Hepps*, 475 U.S. 767, 777 (1986). More precisely, the government must demonstrate that in the absence of the restriction, there would be a substantial probability of prejudice to a compelling government interest, and that the restriction on access is narrowly tailored to protect the threatened interest. *See, e.g.*, *Press-Enterprise II*, 478 U.S. at 13–14.

Any governmental regulation of public access to PACER, including the

imposition of fees, constitutes a restriction that must meet this test. In the district

court, the government argued that it is "misguided" to contend "that PACER fees

create a barrier to access." Def.'s Mem. in Supp. of Cross-Mot. for S.J. & in Opp.

to Pls.' Mot. for S.J. at 23, *Nat'l Veterans Legal Servs. Program v. United States*,

No. 16-cv-745 (D.D.C. Nov. 17, 2017), ECF No. 74-1 ("Gov't DDC Br.").

Astoundingly, the government's argument is that the First Amendment has no

bearing on the charging of fees to access PACER because Plaintiffs and the public

"are able to view all electronically filed records free of charge through terminals

available at the courthouse." *Id.* But this argument ignores reality, and its stilted

logic proves far too much.

Although some measure of free public access to PACER (and the documents

that reside on the platform) is available to those with means and time to travel to

federal courthouses during business hours, that fact does not end the inquiry.[27] It

can hardly be disputed that higher PACER fees diminish public access to judicial

---

[27] In the past, even the judiciary has acknowledged that access to PACER through
courthouses is insufficient to meet the needs of the public. *See* Press Release, U.S.
Courts, Pilot Project: Free Access to Federal Court Records at 16 Libraries (Nov.
8, 2007), *available at* https://web.archive.org/web/20071112035705/
http:/www.uscourts.gov/Press_Releases/libraries110807.html.

records subject to the right of access.[28] The government's burden is not to show

that some alternatives to paying fees exist, but rather that the current level of fees

is narrowly tailored to protect a compelling interest. Far from meeting this burden,

the government has hardly engaged it.[29]

The Supreme Court has repeatedly explained how courts must analyze the

government's imposition of fees as a condition of exercising First Amendment

rights. As Plaintiffs argued here and below, *see* Opening Br. of Pls.–Appellants at

30–32, ECF No. 20 ("Pls.' Fed. Cir. Br."); Pls.' Mot. for S.J. as to Liability at 14–

15, *Nat'l Veterans Legal Servs. Program v. United States*, No. 16-cv-745 (D.D.C.

Aug. 28, 2017), ECF No. 52, "[t]he Supreme Court has held that a government

cannot profit from imposing" a fee "on the exercise of a First Amendment right,"

*Sullivan v. City of Augusta*, 511 F.3d 16, 38 (1st Cir. 2007) (citing *Murdock v.

Pennsylvania*, 319 U.S. 105, 113–14 (1943)), and that the general rule is that "fees

---

[28] *See, e.g.*, Erika Wayne, *PACER Spending Survey*, Legal Research Plus Blog
(Aug. 28, 2009), http://legalresearchplus.com/2009/08/28/pacer-spending-survey
("The unknown/potential costs of using PACER hold back most law school
libraries from letting their patrons fully utilize PACER."); *see also* RCFP Br. § II.

[29] The same is true of the government's reference to the availability of time-
limited, district-by-district, discretionary fee waivers to access PACER. *See* Gov't
DDC Br. at 23 n.13. The process for obtaining fee waivers, and challenging denials
of them, is grossly inadequate to meet the access needs of the public. *See* Br. of
Amici Curiae AALL, *et al.* at 6–8 & n.8, 21 n.18, *Nat'l Veterans Legal Servs.
Program v. United States*, No. 16-cv-745 (D.D.C. Sept. 13, 2017), ECF No. 61. As
a result, the existence of fee waivers is unlikely to significantly impact the First
Amendment analysis here.

used to defray administrative expenses are permissible, but only to the extent necessary for that purpose," *E. Conn. Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983); *see Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir. 1981) (citing cases invalidating fees "in excess of costs of administration"). Those are not stray cases. In *Cox v. New Hampshire*, 312 U.S. 569 (1941), the Supreme Court approved a fee to obtain a license to march only because it was "not a revenue tax, but one to meet the expense incident to the administration of [the licensing statute at issue] and to the maintenance of public order in the matter licensed." *Id.* at 577 (quotation marks omitted). And more recently, circuit courts have applied that rationale to various fee-based impediments on First Amendment (and even other constitutional) rights. As one Court of Appeals recently put it, "Under *Murdock* and *Cox*, seminal cases in the [Supreme] Court's 'fee jurisprudence,' the government may collect a fee to defray administrative and maintenance costs associated with the exercise of a constitutional (usually First Amendment) right, but it can't impose a general revenue tax on the exercise of such a right." *United States v. Cox*, 906 F.3d 1170, 1187 (10th Cir. 2018); *see also, e.g.*, *Ne. Ohio Coal. for the Homeless v. Cleveland*, 105 F.3d 1107, 1110 (6th Cir. 1997); *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013); *S. Or. Barter Fair v. Jackson Cty.*, 372 F.3d 1128, 1139 (9th Cir. 2004).

23

Below, the government's only response to this precedent was that these cases "have no bearing here" because they "address only the collection of fees as a prerequisite to engaging in free speech." Gov't DDC Br. at 24. But while the precise contexts of those cases may differ from this one, the government failed to explain why that is a meaningful difference at all—likely because it cannot. Indeed, in *Murdock*, the Supreme Court explicitly characterized its analysis as applying to the charging of money "as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment"—no qualifier—specifically identifying the "constitutional liberties of press and religion." 319 U.S. at 114. The government's back-of-hand treatment of these cases is startling, not least because it ignores the foundational rationale of *Richmond Newspapers* itself, which homes in on the causal link between the right to public access and the rights of free expression and a free press:

> In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees. "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." [*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)]. Free speech carries with it some freedom to listen. "In a variety of contexts this Court has referred to a First Amendment right to 'receive information and ideas.'" [*Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)]. . . . "For the First Amendment does not speak equivocally. . . . It must be taken as a command of the broadest scope that explicit

language, read in the context of a liberty-loving society, will allow."
[*Bridges v. California*, 314 U.S. 252, 263 (1941)].

448 U.S. at 575–76.

In advocating for a statutory reading that permits it to charge PACER users

fees in excess of the costs necessary to maintain the system—the function and

purpose of which is to give the public access to judicial records that is guaranteed

by the First Amendment—the government has triggered narrow tailoring.

**III. The Court should reject the government's interpretation of the E-Government Act because accepting it would, at the least, raise a substantial constitutional question.**

In the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (2002),

Congress authorized the government to charge PACER fees "as a charge for

services rendered," but "only to the extent necessary" to "reimburse expenses

incurred in providing these services." 28 U.S.C. § 1913 note. Plaintiffs contend

that this statute prohibits the Administrative Office of the U.S. Courts "from

charging more in PACER fees than is necessary to recoup the total marginal cost

of operating PACER." Pls.' Fed. Cir. Br. at 23. As explained above, that

interpretation is harmonious with the First Amendment, which prohibits the

government from raising general revenues from charges "impos[ed] . . . on the

exercise of a First Amendment right." *Sullivan*, 511 F.3d at 38.

By contrast, accepting the government's interpretation would, at least, invite

a serious question about the statute's constitutionality. The government maintains

that the statute "allows PACER fees to be used for any expenditure that is related to disseminating information through electronic means." JA3175 (quotation marks omitted). As the district court found, PACER revenues are relied upon to fund items far afield from maintenance of the PACER system, rendering surplus PACER revenues a kind of generalized information-technology fund. JA3179–80. That kind of boundless authority risks allowing PACER fees to interfere with meaningful access to the courts—and that is precisely what the First Amendment prohibits. As the cases cited above make clear, while charging fees as a condition of allowing the free exercise of First Amendment rights is permissible, those fees must be reasonably related to the costs of administration and maintenance. The logic of those cases is that such limitations on fees are required by the First Amendment because they are essential to the meaningful exercise of the right.[30]

---

[30] Highly relevant here, *see* Pls.' Fed. Cir. Br. at 38 n.5, Congress has implemented this constitutional principal in various federal statutes. *See, e.g.*, S. Rep. No. 93-854, at 163 (1974) (in the FOIA, requiring that fees "be limited to reasonable standard charges for document search and duplication" to "prevent agencies from using fees as barriers to the disclosure of information which should otherwise be forthcoming" (codified in 5 U.S.C. § 552(a)(4)(A)(iv))); H. Rep. No. 94-880, pt. 1, at 16 (1975) (in the Government in the Sunshine Act, prohibiting the setting of fees "with the purpose of discouraging public requests for transcripts or transcriptions" because "their sole purpose is to permit recovery of some or all of the direct cost of providing them" (codified in 5 U.S.C. § 552b(f))); S. Rep. No. 104-8, at 48 (1995) (generally limiting user fees to access public information in excess of the cost of dissemination because such "restrictions are needed to promote First Amendment values" (codified in 44 U.S.C. § 4102)).

Against that backdrop, it is exceedingly doubtful that the government could justify its current fee arrangement and interpretation of the E-Government Act.

As a result, the canon of constitutional avoidance requires that this Court reject the government's statutory reading. The canon does not require the Court to determine that the government's interpretation of the E-Government Act *would* violate the First Amendment. *Clark v. Martinez*, 543 U.S. 371, 381 (2005); Adrian Vermeule, *Saving Constructions*, 85 Geo. L.J. 1945, 1959 (1997). Rather, the canon states that where a "construction of a statute would raise serious constitutional problems," courts should "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Thus, it kicks in where one statutory interpretation "raise[s] a substantial constitutional question." *Peretz v. United States*, 501 U.S. 923, 930 (1991).

The government's interpretation of the statute effectively places no limit on PACER fees, opening the door to what it has in fact done here: using PACER as a source of general revenue to fund initiatives entirely unrelated to the administrative and maintenance costs of the system. The result is a structure under which the government systematically charges the public a fee higher than the administrative cost of facilitating the public's and the press's enjoyment of their constitutional

rights. The government has not provided any justification why its current PACER fee structure even arguably meets the narrow tailoring the First Amendment requires of restrictions on public access—nor could it.

## CONCLUSION

For the above reasons, the Court should reject the government's interpretation of the E-Government Act.

Date: January 23, 2019

Respectfully submitted,

/s/ Brett Max Kaufman

Brett Max Kaufman
Ben Wizner
American Civil Liberties Union
   Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212.549.2500
bkaufman@aclu.org
bwizner@aclu.org

*Counsel for Amici Curiae*

Nos. 19-1081 (L) & 19-1083

---

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

————————

NATIONAL VETERANS LEGAL SERVICES PROGRAM, ET AL.

v.

UNITED STATES

————————

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

————————

This brief complies with the type-volume limitation of Fed. Cir. R. 28.1(b) and Fed. R. App. P. 32(e) because it contains 6,999 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

Date: January 23, 2019                    /s/ Brett Max Kaufman

                                          Brett Max Kaufman
                                          American Civil Liberties Union
                                            Foundation
                                          125 Broad Street, 18th Floor
                                          New York, NY 10004
                                          212.549.2500
                                          bkaufman@aclu.org

                                          *Counsel for Amici Curiae*