# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

National Veterans Legal Services Program,
National Consumer Law Center, & Alliance for Justice

*Plaintiffs-Appellants,*

v.

United States

*Defendant-Cross-Appellant.*

Appeal from the U.S. District Court for the District of Columbia in
*NVLSP v. United States*, No. 1:16-cv-00745-ESH

## CORRECTED BRIEF OF *AMICI CURIAE* THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 27 MEDIA ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLANTS

Bruce D. Brown, Esq.
*Counsel of Record*
THE REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
bbrown@rcfp.org

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

————————————

National Veterans Legal Services Program,
National Consumer Law Center, & Alliance for Justice

v.

United States

————————————

## CERTIFICATE OF INTEREST

Counsel for *amici curiae* certifies the following:

1. The full name of every party or *amicus* represented by me is: **Reporters Committee for Freedom of the Press, American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, Bay Area News Group, BuzzFeed, California News Publishers Association, First Amendment Coalition, First Look Media Works, Inc., Freedom of the Press Foundation, International Documentary Assn., Investigative Reporting Workshop at American University, The Media Institute, MPA – The Association of Magazine Media, The National Press Club, National Press Club Journalism Institute, National Press Photographers Association, The New York Times Company, Online News Association, PEN America, POLITICO LLC, Radio Television Digital News Association,**

**Reporters Without Borders, Reveal from The Center for Investigative Reporting, The Seattle Times Company, Sinclair Broadcast Group, Inc., Society of Professional Journalists, and Tully Center for Free Speech**.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: **N/A**.

3. All parent companies and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are: **Buzzfeed Inc. is a privately owned company, and National Broadcasting Company (NBC) owns 10% or more of its stock; The McClatchy Company owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company**.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are: **Fletcher, Heald & Hildreth, PLC (by Kevin M. Goldberg) for Amici Curiae American Society of News Editors and Association of Alternative Newsmedia in the District Court for the District of Columbia; David Snyder for Amicus Curiae First Amendment Coalition in the District Court for the District of Columbia; James Cregan for Amicus Curiae MPA –**

The Association of Magazine in the District Court for the District of Columbia; Mickey H. Osterreicher for Amicus Curiae National Press Photographers Association in the District Court for the District of Columbia; Davis Wright Tremaine LLP (by Laura R. Handman, Alison Schary, and Bruce E.H. Johnson) for Amici Curiae Online News Association and The Seattle Times Co. in the District Court for the District of Columbia; Wiley Rein LLP (by Kathleen A. Kirby) for Amicus Curiae Radio Television Digital News Association in the District Court for the District of Columbia; Baker & Hostetler LLP (by Bruce W. Sanford and Mark I. Bailen) for Amicus Curiae Society of Professional Journalists in the District Court for the District of Columbia, and Judy Alexander for Amicus Curiae Reveal from The Center for Investigative Reporting in the District Court for the District of Columbia.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are: **None.**

Dated: January 28, 2019

Respectfully submitted,

/s/ *Bruce D. Brown*

Bruce D. Brown
    *Counsel of Record*
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
(202) 795-9300
bbrown@rcfp.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................ 1

SOURCE OF AUTHORITY TO FILE .................................................... 4

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 5

ARGUMENT ........................................................................................ 6

I.    The public and the press benefit from access to electronic court records. ...... 6

    A.    The news media uses electronic court records to inform the public about matters of public concern .......................................................... 6

    B.    Ready access to electronic court records encourages accuracy in reporting ............................................................................ 10

II.    PACER fees in excess of those authorized by the E-Government Act of 2002 hinder journalists' ability to access court records. ................................. 12

III.    The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with the First Amendment and common law presumptions of public access to court records. .......................................... 17

CONCLUSION ................................................................................... 21

APPENDIX A ..................................................................................... 22

CERTIFICATE OF COMPLIANCE ........................................................ 30

CERTIFICATE OF SERVICE ............................................................... 31

# TABLE OF AUTHORITIES

**CASES**

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) .................................................. 11

*Ex parte Drawbaugh*, 2 App. D.C. 404 (1894) ..................................................... 17

*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) ............................ 18

*In re Gollan & Shifflet ex rel. Exemption from Electronic Public Access Fees*, 728 F.3d 1033 (9th Cir. 2013) ....................................................................... 16, 17, 20

*In re Hearst Newspapers, LLC*, 641 F.3d 168 (5th Cir. 2011) .............................. 18

*In re N.Y. Times Co. ex rel. Certain Sealed Court Records*, 585 F. Supp.2d 83 (D.D.C. 2008) ..................................................................................................... 19

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) ................................................................................................................. 19

*Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589 (1978) ......................................... 17

*Oregonian Publ'g Co. v. U.S. Dist. Ct.*, 920 F.2d 1462 (9th Cir. 1990) ............... 18

*Press-Enter. Co. v. Superior Court*, 464 U.S. 501 (1984) .................................... 19

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ....................... 19, 20

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) .......................................................... 19

*United States v. Haller*, 837 F.2d 84 (2d Cir. 1988) ............................................. 18

*United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) .............................. 17, 18

*United States v. Santarelli*, 778 F.2d 1388 (11th Cir. 1984) ................................ 18

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ...................................... 17

**STATUTES**

Pub. L. No. 107-347, § 205(e), 116 Stat. 3899 (Dec. 17, 2002) ............................. 3

**OTHER AUTHORITIES**

@big_cases, TWITTER, https://twitter.com/big_cases?lang=en .............................. 15

Amanda Hickman, *Scraping-for-Journalists*, GITHUB (March 14, 2017), https://perma.cc/ARN2-NZZR .......................................................................... 15

Carrie Johnson, *Michael Flynn Asks for No Prison Time, Cites Help He Gave Special Counsel*, NPR (Dec. 11, 2018, 10:22 PM), https://perma.cc/2PTB-X2E47

Chief Justice John G. Roberts, Remarks at 2018 Federal Judicial Conference of the Fourth Circuit (June 29, 2018) ........................................................................... 20

Christine Hauser, *Florida Police Chief Gets 3 Years for Plot to Frame Black People for Crimes*, N.Y. TIMES (Nov. 28, 2018), https://perma.cc/TK9W-S59A ............................................................................ 9

Craig Silverman, *Show the Reporting and Sources that Support Your Work*, AM. PRESS INST. (Sept. 24, 2014, 2:00 PM), https://perma.cc/M8UU-H6E5 ............. 12

David Voreacos & Stephanie Baker, *Mueller's Move on Ex-Skadden Lawyer Puts Heat on Manafort, Gates*, BLOOMBERG (Feb. 20, 2018), https://perma.cc/N2JG-QHME ................................................................................................................... 7

Electronic Public Access Fee Schedule, PACER, https://perma.cc/ZUH7-YG5L (effective Dec. 1, 2013).................................................................................... 16

Elizabeth Grieco et al., *About a Third of Large U.S. Newspapers Have Suffered Layoffs Since 2017*, PEW RES. CTR. (July 23, 2018), https://perma.cc/G9AT-ES6D ......................................................................................................................... 13

Harlan Yu & Stephen Schultze, *Using Software to Liberate U.S. Case Law*, 18 ACM XRDS 12 (2011), *available at* https://perma.cc/7FPD-NL4E .................. 16

Holly Yan & Dakin Andone, *Who is New York Terror Suspect Sayfullo Saipov*, CNN (Nov. 2, 2017, 5:00 PM), https://perma.cc/S2WU-96YB ........................... 8

James Queally, *Los Angeles Barred from Enforcing Nearly All Gang Injunctions, Federal Judge Rules*, L.A. TIMES (Mar. 15, 2018, 9:30 PM), https://perma.cc/K2SW-T4CQ................................................................................. 9

James Tozer, *Getting Into a Scrape*, MEDIUM (Nov. 29, 2018), https://perma.cc/5MFU-QGH2 ......................................................................... 15

Jared Brey, *As Newsrooms Do More With Less, Can Reporters Keep Up?*, COLUM. J. REV. (Sept. 12, 2018), https://perma.cc/NU8G-UX5H .................................. 14

Jennifer Gollan & Shane Shifflett, *Federal Judge's Rulings Favored Companies in Which He Owned Stock*, KQED (Nov. 20, 2012), https://perma.cc/DY4Q-7E7L .............................................................................. 15

John Riley, *FBI May Have Been Watching Accused Bike Path Attacker, Court Filing by Attorneys Say*, AM N.Y. (Dec. 14, 2018, 8:19 PM), https://perma.cc/Q5SF-FAPW .......................................................................... 8

Juliet Macur, *Olympic Committee Alerted to Sex Crimes in Gymnastics Years Ago, Court Filing Says*, N.Y. TIMES (Nov. 22, 2018), https://perma.cc/27PY-MK7X........................................................................... 10

Kate Mather & James Queally, *Judge Halts L.A. Gang Injunction Against an Echo Park Man Who Denies Being in a Gang*, L.A. TIMES (Sept. 7, 2017, 1:15 PM), https://perma.cc/K575-ZHR9............................................................................... 9

Laura C. Morel, *Government Court Hold Migrant Families Indefinitely in Unlicensed Detention Centers Under New Plan*, REVEAL (Nov. 19, 2018), https://perma.cc/B6HZ-3YU5 ............................................................ 12

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse Reporter*, 9 J. App. Prac. & Process 299 (2007) .......................... 10

Matt Dempsey, *How 21 Newsrooms Pooled Funds for Texas Public Data*, SOURCE (Oct. 24, 2018), https://perma.cc/96ST-WKYA ................................................ 16

*Newspapers Fact Sheet*, PEW RES. CTR. (June 13, 2018), https://perma.cc/MN6C-F275 ............................................................ 13

Penelope Muse Abernathy, *The Expanding News Desert*, U. OF N. CAROLINA CENTER FOR INNOVATION AND SUSTAINABILITY IN LOCAL MEDIA, *available at* https://bit.ly/2Rq6b47 ........................................................... 14

Pengjie Gao et al., *Financing Dies in Darkness?  The Impact of Newspaper Closures on Public Finance* (Oct. 21, 2018), *available at* https://perma.cc/PBB8-VLJN ............................................................ 14

Rachel Weiner et al., *Paul Manafort Shared 2016 Polling Data with Russian Associate, According to Court Filing*, WASH. POST (Jan. 8, 2019), https://wapo.st/2TAMIdu ........................................................... 7

D. Victoria Baranetsky, *Data Journalism and the Law*, COLUM. J. REV. (Sept. 19, 2018), https://perma.cc/RAM4-FPT9 ................................................ 15

Sharon LaFraniere et al, *Prosecutors Say Trump Directed Illegal Payments During Campaign*, N.Y. TIMES (Dec. 7, 2018), https://perma.cc/H252-RDEP ............... 7

Susan E. Seager, *Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40 Years Ago*, 32 J. MEDIA, INFO., & COMMS. L. 1 (2016) ........................................................... 11

Susan McGregor, *CAR Hits the Mainstream*, COLUM. J. REV. (Mar. 18, 2013), https://perma.cc/6QTX-7CGM ................................................ 14

Tom Stites, *New Data Tracks How Fast News Deserts are Spreading*, POYNTER (June 1, 2018), https://perma.cc/BA52-P7HQ .................................................... 14

Toni Locy, COVERING AMERICA'S COURTS:  A CLASH OF RIGHTS (2013) ............. 12

Zoe Tillman, *Federal Employees Are Suing Over the Shutdown.  The Government Still Hasn't Figured Out How Much It Owes From the One in 2013.*, BUZZFEED NEWS (Jan. 9, 2019, 7:03 PM), https://perma.cc/X5HF-EXXV ........................ 12

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

*Amici curiae* are the Reporters Committee for Freedom of the Press, American Society of News Editors, Associated Press Media Editors, Association of Alternative Newsmedia, Bay Area News Group, BuzzFeed, California News Publishers Association, First Amendment Coalition, First Look Media Works, Inc., Freedom of the Press Foundation, International Documentary Assn., Investigative Reporting Workshop at American University, The Media Institute, MPA – The Association of Magazine Media, The National Press Club, National Press Club Journalism Institute, National Press Photographers Association, The New York Times Company, Online News Association, PEN America, POLITICO LLC, Radio Television Digital News Association, Reporters Without Borders, Reveal from The Center for Investigative Reporting, The Seattle Times Company, Sinclair Broadcast Group, Inc., Society of Professional Journalists, and Tully Center for Free Speech.[1]

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* state that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person other than *amici*, its members, and its counsel contributed money that was intended to fund preparing or submitting this brief.

Many of the *amici* fall within class certified by the district court, *See* Order, *Nat'l Veterans Legal Servs. Program, et al. v. United States*, 1:16-cv-00745-ESH (D.D.C. Jan. 24, 2017), ECF No. 32. However, *amici*'s membership in the certified class should not preclude the filing of this *amicus* brief because *amici* are acting as "'friend[s] of the court,' . . . [and do] not represent the parties but participate[] only for the benefit of the Court." *Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C.

1

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, *amicus curiae* support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. A supplemental statement of identity and interest of *amici* is included below as Appendix A.

*Amici* file this brief in support of Plaintiffs-Appellants National Veterans Legal Services Program, National Consumer Law Center, and Alliance for Justice. As representatives and members of the news media, *amici* have a strong interest in ensuring that the press and the public can easily and affordably access court documents. Members of the news media frequently use court records to report on matters of public concern, and such records serve as the foundation for reporting on the justice system. The news media is a conduit for the public to receive information; when reporters cannot access court records because of excessive fees, the public loses.

---

2003). Accordingly, this Court should not consider them parties for the purpose of the filing of this *amicus* brief. *See Devlin v. Scardelletti*, 536 U.S. 1, 9–10 (2002) ("Nonnamed class members . . . may be parties for some purposes and not for others."); *see also* Motion for Leave to File *Amicus Curiae* Br., *Nat'l Veterans Legal Servs. Program, et al. v. United States*, 1:16-cv-00745-ESH (D.D.C. Sept. 5, 2017), ECF No. 53.

The E-Government Act of 2002 permits the Judicial Conference to charge reasonable fees for electronic access to court records "only to the extent necessary." Pub. L. No. 107-347, § 205(e), 116 Stat. 3899, 2915 (Dec. 17, 2002) (hereinafter "E-Government Act of 2002"). Charging fees through the Public Access of Court Electronic Records system ("PACER") which are higher than the cost of dissemination imposes an unauthorized practical limitation on access to court records by journalists and members of the public. Independent journalists and local news media, in particular, cannot afford to pay excessive fees. It is vital that access to court records not be inhibited by fees in excess of what the E-Government Act of 2002 permits. *Amici* write to emphasize the importance of reasonable fees and access to court records by all members of the press and public.

## SOURCE OF AUTHORITY TO FILE

Counsel for all parties have consented to the timely filing of this brief. *See* Fed. R. App. P. 29(a)(2); Fed. Cir. R. 29(c).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Access to court records is vital for the public to fully understand the judicial system and its proceedings.  Court records reveal who the parties to litigation are and their factual allegations, legal claims, and arguments, as well as the decision-making process of the judiciary.  Access to court records promotes transparency, encourages trust in the judicial process, and allows the public to engage in oversight of courts.  The news media frequently relies on court records to report on criminal and civil cases, and media coverage permits the public to engage in meaningful discussion about the judicial system, generally, and the allegations made or issues raised in a particular case.  Limiting the costs of accessing court documents to the marginal costs of operating PACER will promote access, which, in turn, will promote accuracy in the news media's reporting and further advance the public's knowledge about the judicial system.

If the district court's interpretation of the E-Government Act of 2002 to allow PACER fees beyond the marginal cost of dissemination of court records is allowed to stand, it will inhibit reporters' ability to access court records given the current budgetary constraints of the news industry.  As news outlets across the country face leaner budgets, few can readily afford daunting fees for court records, especially independent journalists and community news media companies.  The district court's ruling stymies the ability of the press to produce original reporting

about cases of public interest and concern, and fails to take into account the vast benefits to judicial administration that come with modern technology.

Ready access to court documents is also consistent with the First Amendment and the longstanding tradition of transparency in our judicial system. The public has a qualified right of access to judicial proceedings and court records under both the First Amendment and common law; these rights are vital to a healthy and functioning democracy. Limiting fees for access to court records through PACER to the cost of dissemination serves the goal of enabling public oversight of the court.

For the reasons stated herein, *amici* urge this Court to reverse the district court's ruling insofar as it allows fees beyond the cost of disseminating court records, as the E-Government Act of 2002 requires.

## ARGUMENT

**I.    The public and the press benefit from access to electronic court records.**

A.    The news media uses electronic court records to inform the public about matters of public concern.

A wide variety of news organizations use PACER to access electronic records in the federal district and appellate courts and to report on a broad array of topics that are in the public's interest. Journalists routinely rely on electronic court records to report on matters of national and local importance, government misconduct, and ongoing public controversies.

Reporters regularly use court records accessible on PACER to reveal details of judicial proceedings of national importance for their audiences. For instance, with relatively few public statements made by investigators or the parties charged, the press has primarily used court filings to report on the Special Counsel investigation into Russian interference with the 2016 election. *See, e.g.*, Carrie Johnson, *Michael Flynn Asks for No Prison Time, Cites Help He Gave Special Counsel*, NPR (Dec. 11, 2018, 10:22 PM), https://perma.cc/2PTB-X2E4 (citing court filings explaining Flynn's arguments); Sharon LaFraniere et al, *Prosecutors Say Trump Directed Illegal Payments During Campaign*, N.Y. TIMES (Dec. 7, 2018), https://perma.cc/H252-RDEP (citing numerous court filings to report that "[t]ogether, the filings laid bare the most direct evidence to date linking Mr. Trump to potentially criminal conduct"); David Voreacos & Stephanie Baker, *Mueller's Move on Ex-Skadden Lawyer Puts Heat on Manafort, Gates*, BLOOMBERG (Feb. 20, 2018), https://perma.cc/N2JG-QHME (relying on court filings to report on criminal charges); Rachel Weiner et al., *Paul Manafort Shared 2016 Polling Data with Russian Associate, According to Court Filing*, WASH. POST (Jan. 8, 2019), https://wapo.st/2TAMIdu (using improperly redacted court filings to report that prosecutors a top campaign official for President Trump, "lied about sharing polling data . . . related to the 2016 presidential campaign"). Much of the information gleaned from these court filings was previously unknown to the public.

Court filings accessible on PACER similarly allow the press to report news at the local level, even when local officials are silent or refuse to provide comment. For example, using court records, the press has recently reported that Sayfullo Saipov, who killed eight people near the World Trade Center in 2017 by driving a truck through a crowd of pedestrians and cyclists, may have been under FBI surveillance even before his attack. *See* John Riley, *FBI May Have Been Watching Accused Bike Path Attacker, Court Filing by Attorneys Say*, AM N.Y. (Dec. 14, 2018, 8:19 PM), https://perma.cc/Q5SF-FAPW; Holly Yan & Dakin Andone, *Who is New York Terror Suspect Sayfullo Saipov*, CNN (Nov. 2, 2017, 5:00 PM), https://perma.cc/S2WU-96YB. Neither the prosecution nor any other public officials had released this information before, and no government official provided comment on the story. *See* Riley, *supra*; Benjamin Weiser, *F.B.I. Wiretap Recorded Suspect on Eve of Bike Path Terror Attack*, N.Y. TIMES (Dec. 17, 2018), https://perma.cc/6U5L-5YXC (noting that the U.S. Attorney's office, the FBI, and defense counsel declined to comment).

In addition, reporters have used court records available on PACER to inform the public about possible government misconduct or controversial government activities. *The Los Angeles Times* used court filings to explain why a federal court held that the Los Angeles Police Department's use of "gang injunctions"—civil court orders prohibiting individuals from associating with friends or family in certain neighborhoods—violated constitutional due process. *See* James Queally,

*Los Angeles Barred from Enforcing Nearly All Gang Injunctions, Federal Judge Rules*, L.A. TIMES (Mar. 15, 2018, 9:30 PM), https://perma.cc/K2SW-T4CQ. Earlier stories similarly relied on court filings to report that the city was considering revising the policy for placing people under a gang injunction and the process for removing them. *See* Kate Mather & James Queally, *Judge Halts L.A. Gang Injunction Against an Echo Park Man Who Denies Being in a Gang*, L.A. TIMES (Sept. 7, 2017, 1:15 PM), https://perma.cc/K575-ZHR9.

On another occasion, when a Florida police chief was sentenced to prison for ordering officers to arrest black people for crimes they did not commit to improve his police department's reputation, reporters looked to court documents to report that the chief had told officers to—groundlessly—arrest and charge people for burglaries. *See* Christine Hauser, *Florida Police Chief Gets 3 Years for Plot to Frame Black People for Crimes*, N.Y. TIMES (Nov. 28, 2018), https://perma.cc/TK9W-S59A. The police department's self-reported decrease in burglaries and "perfect record" for solving burglaries was exposed as a fraud as a result of reporting based on court records obtained from the chief's criminal prosecution. *Id.*

Court records available through PACER also shed light on ongoing matters of public debate. Following the conviction of Lawrence G. Nassar, a former physician for the American gymnastics team, for sex crimes, reporters used court documents that showed that the United States Olympic Committee had known

about sexual abuse in gymnastics for over two decades before Nassar's crimes became public. *See* Juliet Macur, *Olympic Committee Alerted to Sex Crimes in Gymnastics Years Ago, Court Filing Says*, N.Y. TIMES (Nov. 22, 2018), https://perma.cc/27PY-MK7X. The court filings included sworn statements explaining that the Olympic Committee had struggled internally about how to handle sexual assault cases, with some members discouraging any sort of investigation or discipline at all. *Id.*

     B.    Ready access to electronic court records encourages accuracy in <u>reporting.</u>

As the examples in Section I.A demonstrate, court records are among the most reliable sources of information for reporting on lawsuits and matters of public concern. As official primary sources, court records are important tools for accurately and completely reporting news. As longtime Supreme Court correspondent Lyle Denniston wrote:

> No courthouse reporter can do his or her work without prompt—sometimes, virtually immediate—access to original documents. . . . News reporters and editors are fond of saying that a reporter is only as good as his or her sources. For the courthouse reporter—indeed, for any reporter who would undertake to cover the law, possibly at any level—there is no source equal to, and certainly none superior to, an actual document.

Lyle Denniston, *Horse-and-Buggy Dockets in the Internet Age, and the Travails of a Courthouse Reporter*, 9 J. App. Prac. & Process 299, 299–300 (2007).

Reporting on legal disputes is most authoritative and accurate when court records are readily available for inspection, copying, and reference by members of the news media. Indeed, many states have recognized the reliability of reporting on official records by recognizing a common law fair report privilege or adopting a statutory privilege that shields reporters from liability when they accurately report material from official meetings, records, or statements. *See* Susan E. Seager, *Forget Conditional State Fair Report Privileges; The Supreme Court Created an Absolute Fair Report Privilege in* Cox Broadcasting Corp. v. Cohn *Based on the First Amendment Over 40 Years Ago*, 32 J. MEDIA, INFO., & COMMS. L. 1 n.1 (2016) (noting that "[a]t least 47 states and the District of Columbia have adopted either a common law or statutory fair report privilege"); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491–92 (1975) ("Great responsibility is . . . placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations.").

Reporters and their readers benefit tremendously when news reports can directly reference and quote from court documents. In a textbook on legal news reporting, professor and veteran journalist Toni Locy stresses this point and advises reporters to not rely solely on press releases and attorney statements, and to instead "review[] court filings or other public records" when reporting on cases.

Toni Locy, COVERING AMERICA'S COURTS: A CLASH OF RIGHTS 3–4, 9, 61–67 (2013).

Moreover, many media outlets choose to publish court records relied on in their reporting by posting them alongside an online story, or directly linking to the court filings themselves. *See, e.g.*, Zoe Tillman, *Federal Employees Are Suing Over the Shutdown. The Government Still Hasn't Figured Out How Much It Owes From the One in 2013.*, BUZZFEED NEWS (Jan. 9, 2019, 7:03 PM), https://perma.cc/X5HF-EXXV (linking to court filings); Laura C. Morel, *Government Court Hold Migrant Families Indefinitely in Unlicensed Detention Centers Under New Plan*, REVEAL (Nov. 19, 2018), https://perma.cc/B6HZ-3YU5 (same). This practice helps bolster a news outlet's credibility with its audience and allows interested readers to readily dive into the source material to learn more. *See* Craig Silverman, *Show the Reporting and Sources that Support Your Work*, AM. PRESS INST. (Sept. 24, 2014, 2:00 PM), https://perma.cc/M8UU-H6E5. However, these benefits only manifest when reporters can easily and affordably access public court records.

## II.    PACER fees in excess of those authorized by the E-Government Act of 2002 hinder journalists' ability to access court records.

PACER fees that exceed the cost of disseminating court records are particularly troublesome for journalists as many newsrooms are facing tighter budgets. From January 2017 to April 2018, at least 36 percent of the largest newspapers in the United States experienced layoffs; those with the highest

circulations were most likely to be affected.  *See* Elizabeth Grieco et al., *About a Third of Large U.S. Newspapers Have Suffered Layoffs Since 2017*, PEW RES. CTR. (July 23, 2018), https://perma.cc/G9AT-ES6D (noting that 56 percent of newspapers with circulations of greater than 250,000 suffered layoffs).  As advertising revenue has faced a steep drop—from an estimated $49 million in 2005 to $16 million in 2017—newsrooms have similarly made cuts to their staff and been forced to make do with a more limited budget for reporting.  *See Newspapers Fact Sheet*, PEW RES. CTR. (June 13, 2018), https://perma.cc/MN6C-F275 (noting that the number of newsroom employees has dropped from nearly 73,000 in 2005, to around 39,000 in 2017, with no notable increase in average salary).  In this environment, many news outlets simply cannot afford large fees for court records.

In addition, although the government argued below that court records are available free of charge through terminals at the courthouse, *see* Def.'s Mem. in Supp. of Cross-Mot. for S.J. & in Opp. to Pls.' Mot. for S.J. 23, *Nat'l Veterans Legal Servs. Program v. United States*, No. 16-cv-745 (D.D.C. Nov. 17, 2017), ECF No. 74-1, news organizations may not have the budget or personnel to send reporters to access court records in person.  At the same time that some newsrooms have shrunk in size, the financial strain has eliminated other newsrooms altogether.  One study reports that 171 counties in the United States do not have a local newspaper.  *See* Penelope Muse Abernathy, *The Expanding News Desert*, U. OF N. CAROLINA CENTER FOR INNOVATION AND SUSTAINABILITY IN LOCAL MEDIA,

*available at* https://bit.ly/2Rq6b47.  These "news deserts" are often less affluent and cannot financially sustain a local newspaper, much less a reporter who could afford to routinely travel to the federal courthouse to access public court filings. *See* Tom Stites, *New Data Tracks How Fast News Deserts are Spreading*, POYNTER (June 1, 2018), https://perma.cc/BA52-P7HQ; *see also* Pengjie Gao et al., *Financing Dies in Darkness?  The Impact of Newspaper Closures on Public Finance* (Oct. 21, 2018), *available at* https://perma.cc/PBB8-VLJN (noting that cities that lost a local newspaper will often see an increase in borrowing costs).

Though newsrooms have slimmed, the news has not.  Story quotas are becoming the new norm in the industry, and some reporters publish more than three stories a day.  Jared Brey, *As Newsrooms Do More With Less, Can Reporters Keep Up?*, COLUM. J. REV. (Sept. 12, 2018), https://perma.cc/NU8G-UX5H.  In this environment, a primary source document—often a court filing—becomes an especially vital tool to quickly verify a story and accurately report it to the public.

Limiting PACER fees to the cost of dissemination is especially helpful for data journalists who rely on large datasets to report on trends or patterns.  *See* Susan McGregor, *CAR Hits the Mainstream*, COLUM. J. REV. (Mar. 18, 2013), https://perma.cc/6QTX-7CGM (describing a rise in "computer assisted reporting," in which reporters use computer programs to analyze large datasets to report on or enhance news stories to better inform the public).  Some data journalists have

"scraped" data[2] from PACER to help with their reporting, and to benefit the public. *See, e.g.*, @big_cases, Twitter, https://twitter.com/big_cases?lang=en (Twitter account run by USAToday reporter Brad Heath that uses computer code to automatically scrape PACER for updates on certain newsworthy cases).  For example, Jennifer Gollan and Shane Shifflett, two data journalists for the Center for Investigative Reporting, compiled a list of judges and the companies they had stock in and scraped PACER to pinpoint when judges had presided over cases where they had a financial interest in one of the parties.  *See* Amanda Hickman, *Scraping-for-Journalists*, GitHub (March 14, 2017), https://perma.cc/ARN2-NZZR.  Based on the results, they were able to report that one judge had given three favorable rulings to companies that he had invested in over a four-year time period.  Jennifer Gollan & Shane Shifflett, *Federal Judge's Rulings Favored Companies in Which He Owned Stock*, KQED (Nov. 20, 2012), https://perma.cc/DY4Q-7E7L (noting that each company's stock rose at least a dollar per share after the judge's favorable ruling).

---

[2] Web scraping refers to using a computer program to open websites and pull the relevant information.  *See* James Tozer, *Getting Into a Scrape*, Medium (Nov. 29, 2018), https://perma.cc/5MFU-QGH2.  One of the most powerful tools for investigative journalists "who want to get the story first, or find exclusives that no one has spotted," these programs are often automated and made for a particular website.  *See* D. Victoria Baranetsky, *Data Journalism and the Law*, Colum. J. Rev. (Sept. 19, 2018), https://perma.cc/RAM4-FPT9 (citing Paul Bradshaw, Scraping for Journalists 462 (2d ed. 2017)).

Yet PACER's charge-per-page model, under the fees currently charged, "effectively shut[s] out" many journalists, academics, and other members of the public who want to access large volumes of public court documents. *See* Harlan Yu & Stephen Schultze, *Using Software to Liberate U.S. Case Law*, 18 ACM XRDS 12 (2011), *available at* https://perma.cc/7FPD-NL4E. For instance, one federal court estimated that Gollan and Shifflett's investigative project would cost "many thousands of dollars" and be "prohibitively expensive" with regular PACER fees. *See In re Gollan & Shifflet ex rel. Exemption from Electronic Public Access Fees*, 728 F.3d 1033, 1035 (9th Cir. 2013) (declining to review fee waiver application on jurisdictional grounds). PACER's fees can be simply out of reach for many newsrooms, even if the dataset is particularly important. *See, e.g.*, Matt Dempsey, *How 21 Newsrooms Pooled Funds for Texas Public Data*, SOURCE (Oct. 24, 2018), https://perma.cc/96ST-WKYA (describing how 21 Texas-based newsrooms pooled together $3500 to purchase Texas's voter registration database and voting history data because, although recognizing the data's value, no individual newsroom could afford it).

Moreover, members of the media are generally not eligible to obtain a PACER fee exemption under the Electronic Public Access Fee Schedule, despite the overwhelming public interest in ensuring affordable access to members of the media who, in turn, inform the public. *See* Electronic Public Access Fee Schedule, PACER, https://perma.cc/ZUH7-YG5L (effective Dec. 1, 2013). Some 501(c)(3)

media organizations *may* receive a fee waiver, but most news media organizations are for-profit and simply cannot squeeze accessing numerous public court records into their limited budget. *See In re Gollan & Shifflett*, 728 F.3d at 1040 n.5 (explaining that a 501(c)(3) media organization can be exempt if it can show financial hardship, but also that applications from media organizations "should be approached with caution").

## III. The E-Government Act of 2002's limitation of PACER fees to the cost of dissemination is consistent with the First Amendment and common law presumptions of public access to court records.

The common law provides a broad presumptive right of access to public records, including judicial documents. *See Nixon v. Warner Comm'ns, Inc.*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."); *United States v. Hubbard*, 650 F.2d 293, 314 (D.C. Cir. 1980) (recognizing "this country's common law traditions of public access to records of a judicial proceeding."). Indeed, for more than a century, courts have underscored that "*all* persons have the right of access, and to its [, the court's,] records." *Ex parte Drawbaugh*, 2 App. D.C. 404, 407–08 (1894).

The First Amendment also "guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *Wash. Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991) (in the context of plea agreements);

*see also In re Hearst Newspapers, LLC*, 641 F.3d 168, 182 (5th Cir. 2011);

*Oregonian Publ'g Co. v. U.S. Dist. Ct.*, 920 F.2d 1462, 1466 (9th Cir. 1990);

*United States v. Haller*, 837 F.2d 84, 86 (2d Cir. 1988); *United States v. Santarelli*,

778 F.2d 1388, 1390  (11th Cir. 1984) ("[T]he public has a First Amendment right

to see and hear that which is admitted in evidence in a public sentencing

hearing."); *see also* Br. of American Civil Liberties Union, American Association

of Law Libraries, American Library Association, Cato Institute, & Knight First

Amendment Institute at Columbia University as *Amici Curiae* in Support of

Appellants & Cross-Appellees National Veterans Legal Services Program, et al.,

Section I (noting that the First Amendment right of access has extended to a

variety of judicial records and proceedings).

    These constitutional and common law rights of access arise from a

recognition that public access to judicial proceedings and records "permits the

public to participate in and serve as a check upon the judicial process—an essential

component in our structure of self-government." *See Globe Newspaper Co. v.

Superior Court*, 457 U.S. 596, 606 (1982); *Hubbard*, 650 F.2d at 314–15 ("Access

to records serves the important functions of ensuring the integrity of judicial

proceedings in particular and of the law enforcement process more generally.").

As the Supreme Court has explained, "The value of openness lies in the fact that

people not actually attending trials can have confidence that standards of fairness

are being observed . . . ." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 508

(1984) ("*Press-Enterprise I*"). Thus, "[i]n addition to ensuring actual fairness, the openness of judicial proceedings helps ensure the appearance of fairness." *In re N.Y. Times Co. ex rel. Certain Sealed Court Records*, 585 F. Supp. 2d 83, 90 (D.D.C. 2008) (citing *Press-Enterprise I*, 464 U.S. at 508).

Although the presumptions of access apply to all members of the public, access to court records by members of the news media is especially important because the press serves as a conduit of information to the public. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (stating that members of the press often "function[] as surrogates for the public"). "[A]n informed public is the essence of working democracy," and "an untrammeled press [is] a vital source of public information." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (quoting *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936)). The Supreme Court has recognized the news media's vital role in facilitating public monitoring of the judicial system in particular, noting:

> A responsible press has always been regarded the handmaiden of effective judicial administration, especially in the criminal field. . . . The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

The E-Government Act of 2002's authorization of the judiciary to prescribe "reasonable fees" for access to electronic records "only to the extent necessary" is

consistent with the purpose and values undergirding the public's First Amendment and common law rights of access to judicial proceedings and court records. *See* Pls.-Appellants Opening Br. 30–32, ECF No. 20. In addition, the Electronic Public Access Fee Schedule's fee waiver provision, which was implemented at the direction of Congress and applies when a requester demonstrates that a waiver "is necessary . . . to avoid unreasonable burdens and *to promote public access of information*," also serves the goal of fostering a transparent judicial system. *See* Electronic Public Access Fee Schedule, PACER, https://perma.cc/ZUH7-YG5L (effective Dec. 1, 2013); *see also In re Gollan & Shifflet*, 728 F.3d at 1035 (rejecting appeal to overturn administrative decision that denied an application for PACER fee exemptions on jurisdictional grounds). These provisions both serve to promote the openness that is the hallmark of "the most transparent branch in government," Chief Justice John G. Roberts, Remarks at 2018 Federal Judicial Conference of the Fourth Circuit (June 29, 2018), and is "an indispensable attribute" of the judicial system, *Richmond Newspapers*, 447 U.S. at 569.

Especially in light of the First Amendment principles implicated by ready and affordable public access to court records, the government should only charge those PACER fees necessary to recoup its costs.

## CONCLUSION

For the foregoing reasons, *amici* urge this Court to reverse the district court's order denying Plaintiffs-Appellants' motion for summary judgment as to liability, reverse the court's partial grant of the government's motion for summary judgment, and remand to the district court for further proceedings.

Dated: January 28, 2019

Respectfully submitted,

/s/ *Bruce D. Brown*
Bruce D. Brown
  *Counsel of Record*
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
(202) 795-9300
bbrown@rcfp.org

# APPENDIX A

## STATEMENT OF INTEREST FOR *AMICI CURIAE*

With some 500 members, **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press Media Editors** is a nonprofit, tax-exempt organization of newsroom leaders and journalism educators that works closely with The Associated Press to promote journalism excellence. APME advances the principles and practices of responsible journalism; supports and mentors a diverse network of current and emerging newsroom leaders; and champions the First Amendment and promotes freedom of information.

**Association of Alternative Newsmedia** ("AAN") is a not-for-profit trade association for approximately 110 alternative newspapers in North America. AAN newspapers and their websites provide an editorial alternative to the mainstream press. AAN members have a total weekly circulation of seven million and a reach of over 25 million readers.

**Bay Area News Group** is operated by MediaNews Group, one of the largest newspaper companies in the United States with newspapers throughout California and the nation. The Bay Area News Group includes *The Oakland Tribune*, *The Daily Review*, *The Argus*, *San Jose Mercury News*, *Contra Costa Times*, *Marin Independent Journal*, *West County Times*, *Valley Times*, *East County Times*, *Tri-Valley Herald*, *Santa Cruz Sentinel*, *San Mateo County Times*, *Vallejo Times-Herald* and *Vacaville Reporter*, all in California.

**BuzzFeed** is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

**The California News Publishers Association** ("CNPA") is a nonprofit trade association representing the interests of over 1300 daily, weekly and student newspapers and news websites throughout California.

**First Amendment Coalition** is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

**First Look Media Works, Inc.** is a new non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting.

**Freedom of the Press Foundation** is a non-profit organization that supports and defends public-interest journalism focused on transparency and accountability. The organization works to preserve and strengthen First and Fourth Amendment rights guaranteed to the press through a variety of avenues, including public advocacy, legal advocacy, the promotion of digital security tools, and crowd-funding.

**The International Documentary Association** (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

**The Investigative Reporting Workshop**, a project of the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**The Media Institute** is a nonprofit research foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster

three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**MPA – The Association of Magazine Media**, ("MPA") is the largest industry association for magazine publishers. The MPA, established in 1919, represents over 175 domestic magazine media companies with more than 900 magazine titles. The MPA represents the interests of weekly, monthly and quarterly publications that produce titles on topics that cover news, culture, sports, lifestyle and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

**The National Press Club** is the world's leading professional organization for journalists. Founded in 1908, the Club has 3,100 members representing most major news organizations. The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

**The National Press Club Journalism Institute** is the non-profit affiliate of the National Press Club, founded to advance journalistic excellence for a transparent society. A free and independent press is the cornerstone of public life, empowering engaged citizens to shape democracy. The Institute promotes and defends press freedom worldwide, while training journalists in best practices, professional standards and ethical conduct to foster credibility and integrity.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**The New York Times Company** is the publisher of *The New York Times* and *The International Times*, and operates the news website nytimes.com.

**Online News Association** ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

**PEN American Center** ("PEN America") is a non-profit association of writers that includes novelists, journalists, editors, poets, essayists, playwrights, publishers, translators, agents, and other professionals. PEN America stands at the intersection of literature and human rights to protect open expression in the United States and worldwide. We champion the freedom to write, recognizing the power of the word to transform the world. Our mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible, working to ensure that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to make it possible for everyone to access the views, ideas, and literatures of others. PEN America has approximately 5,000 members and is affiliated with PEN International, the global writers organization with over 100 Centers in Europe, Asia, Africa, Australia, and the Americas.

**POLITICO** is a global news and information company at the intersection of politics and policy. Since its launch in 2007, POLITICO has grown to more than 350 reporters, editors and producers. It distributes 30,000 copies of its Washington newspaper on each publishing day, publishes POLITICO Magazine, with a circulation of 33,000 six times a year, and maintains a U.S. website with an average of 26 million unique visitors per month.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic

journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reporters Without Borders** has been fighting censorship and supporting and protecting journalists since 1985. Activities are carried out on five continents through its network of over 150 correspondents, its national sections, and its close collaboration with local and regional press freedom groups. Reporters Without Borders currently has 10 offices and sections worldwide.

**Reveal from The Center for Investigative Reporting**, founded in 1977, is the nation's oldest nonprofit investigative newsroom. Reveal produces investigative journalism for its website https://www.revealnews.org/, the Reveal national public radio show and podcast, and various documentary projects. Reveal often works in collaboration with other newsrooms across the country.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with the *Yakima Herald-Republic* and *Walla Walla Union-Bulletin*, all in Washington state.

**Sinclair** is one of the largest and most diversified television broadcasting companies in the country. The Company owns, operates and/or provides services to 191 television stations in 89 markets. The Company is a leading local news

provider in the country and has multiple national networks, live local sports production, as well as stations affiliated with all the major networks.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**The Tully Center for Free Speech** began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief of *amici curiae* complies with:

1) the type-volume limitation of Fed. Cir. R. 28.1(b), Fed. R. App. P. 29(a)(5), and Fed. R. App. P. 32(e) because it contains 6,200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-processing system used to prepare the brief; and

2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman.

*/s/ Bruce D. Brown*
Bruce D. Brown, Esq.
*Counsel of Record*
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS

Dated:       January 28, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing Corrected Brief of *Amici Curiae* the Reporters Committee for Freedom of the Press and 27 Media Organizations in Support of Plaintiffs-Appellants electronically with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system on January 28, 2019.

I certify that all participants in this case, below, are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Deepak Gupta, *deepak@guptawessler.com*
Alisa Beth Klein, *alisa.klein@usdoj.gov*
William H. Narwold, *bnarwold@motleyrice.com*
Mark B. Stern, *mark.stern@usdoj.gov*
Jonathan Taylor, *jon@guptawessler.com*

*/s/ Bruce D. Brown*
Bruce D. Brown
  *Counsel of Record*
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS