# In the United States Court of Appeals for the Federal Circuit

---

NATIONAL VETERANS LEGAL SERVICES PROGRAM,
NATIONAL CONSUMER LAW CENTER, ALLIANCE FOR JUSTICE,
*Plaintiffs-Appellants/Cross-Appellees*,

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee/Cross-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 1:16-745-ESH (THE HON. ELLEN S. HUVELLE)

---

## RESPONSE AND REPLY BRIEF OF PLAINTIFFS-APPELLANTS/CROSS-APPELLEES

---

WILLIAM H. NARWOLD
MEGHAN OLIVER
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
bnarwold@motleyrice.com

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
deepak@guptawessler.com

*Counsel for Plaintiffs-Appellants/Cross-Appellees*

July 12, 2019

# CERTIFICATE OF INTEREST

As required by Federal Circuit Rule 47.4, I certify the following:

1. The full names of all parties represented by me are: National Veterans Legal Services Program, National Consumer Law Center, and Alliance For Justice.

2. The names of the real parties in interest, if different from the parties named above, are: Not applicable.

3. There are no parent corporations or publicly held companies that own 10% or more of the stock of any party represented by me.

4. The names of all law firms and the partners and associates that appeared for the plaintiffs-appellants in the trial court or are expected to appear in this Court are:

| | |
|---|---|
| DEEPAK GUPTA | WILLIAM H. NARWOLD |
| JONATHAN E. TAYLOR | ELIZABETH SMITH |
| GUPTA WESSLER PLLC | MEGHAN S.B. OLIVER |
| 1900 L Street NW, Suite 312 | MOTLEY RICE LLC |
| Washington DC 20036 | 28 Bridgeside Blvd. |
| | Mount Pleasant, SC 29464 |

5. Plaintiffs-Appellants/Cross-Appellees know of no pending matters in this or any court that will directly affect or be directly affected by this Court's decision in this appeal.

Dated: July 12, 2019

/s/ Deepak Gupta
DEEPAK GUPTA
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
deepak@guptawessler.com

# TABLE OF CONTENTS

Certificate of interest.................................................................................. i

Table of authorities................................................................................. iiii

Statement of related cases ..................................................................... ix

Introduction and summary of argument ............................................... 1

Argument ................................................................................................. 4

    I.    The government has no defense on the merits. .................................. 4

        A.    The government offers no plausible interpretation of the E-Government Act.................................................................... 4

        B.    The government cannot satisfy the clear-statement rule, which is mandated by two separate constitutional concerns. ....................................................................... 7

        C.    The two arguments that the government makes to support its position were correctly rejected by the district court. ....................................................................... 10

    II.    The government's jurisdictional challenge is foreclosed by at least 65 years of binding precedent..................................................... 14

        A.    The Little Tucker Act's text and decades of settled precedent make clear that there is jurisdiction here. .............. 14

        B.    The government's proposed jurisdictional requirement cannot be reconciled with this Court's cases, and it would pose no barrier to jurisdiction here in any event. ......... 18

            1.    There is no "money-mandating" jurisdictional requirement for illegal-exaction claims........................... 21

            2.    Even if there were a money-mandating requirement for illegal-exaction claims, it would be satisfied here..... 26

Conclusion ............................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Adair v. United States,*
497 F.3d 1244 (Fed. Cir. 2007) ............................................................... 27

*Advocate Health Care Network v. Stapleton,*
137 S. Ct. 1652 (2017) ............................................................................ 6

*Aerolineas Argentinas v. United States,*
77 F.3d 1564 (Fed. Cir. 1996) ..................................................... *passim*

*American Airlines, Inc. v. United States,*
551 F.3d 1294 (Fed. Cir. 2008) ............................................................ 24

*American Airlines, Inc. v. United States,*
68 Fed. Cl. 723 (2005) ........................................................................... 16

*Auto Club Insurance Association v. United States,*
103 Fed. Cl. 268 (2012) ......................................................................... 24

*Bausch & Lomb, Inc. v. United States,*
148 F.3d 1363 (Fed. Cir. 1998) .............................................................. 5

*Beer v. United States,*
696 F.3d 1174 (Fed. Cir. 2012) (en banc) ........................................... 28

*Bowman v. United States,*
35 Fed. Cl. 397, 401 (1996) ................................................................... 24

*Brazos Electric Power Cooperative, Inc. v. United States,*
144 F.3d 784 (Fed. Cir. 1998) ............................................................... 15

*Bull v. United States,*
295 U.S. 247 (1935) ............................................................................... 29

*Casa de Cambio Comdiv v. United States,*
291 F.3d 1356 (Fed. Cir. 2002) ........................................................... 20

*Clapp v. United States,*
127 Ct. Cl. 505 (1954) ..................................................................... 14, 16

*Clinton v. Strong,*
  9 Johns. 370 (Sup. Ct. N.Y. 1812) .......................................................... 25

*Curtis v. Martin,*
  44 U.S. 106 (1845) ................................................................................. 25

*Cyprus Amax Coal Co. v. United States,*
  205 F.3d 1369 (Fed. Cir. 2000) ....................................................... 28, 29

*D'Apuzzo v. United States,*
  No. 16-62769, 2019 WL 2642696 (S.D. Fla. June 27, 2019) ...................... 24

*Doe v. United States,*
  463 F.3d 1314 (Fed. Cir. 2006) ...................................................... 20, 27

*Dooley v. United States,*
  182 U.S. 222 (1901) ............................................................................ 17

*Duncan v. Walker,*
  533 U.S. 167 (2001) .............................................................................. 4

*Eastern Connecticut Citizens Action Group v. Powers,*
  723 F.2d 1050 (2d Cir. 1983) ................................................................ 2

*Eastport Steamship Corp. v. United States,*
  372 F.2d 1002 (Ct. Cl. 1967) ........................................... 17, 20, 21, 26

*Eversharp, Inc. v. United States,*
  125 F. Supp. 244 (Ct. Cl. 1954) ........................................................... 15

*Federal Power Commission v. New England Power Co.,*
  415 U.S. 345 (1974) .............................................................................. 7

*Figueroa v. United States,*
  466 F.3d 1023 (Fed. Cir. 2006) ............................................................ 24

*Figueroa v. United States,*
  57 Fed. Cl. 488 (2003) ........................................................................ 24

*Florida Power & Light Co. v. United States,*
  846 F.2d 765 (D.C. Cir. 1988) .............................................................. 8

*GPX International Tire Corp. v. United States,*
    678 F.3d 1308 (Fed. Cir. 2012) ................................................. 6

*Hatter v. United States,*
    953 F.2d 626 (Fed. Cir. 1992) ................................................. 27

*Hayes v. Harvey,*
    903 F.3d 32 (3d Cir. 2018) (en banc) ...................................... 6

*Houser v. United States,*
    114 Fed. Cl. 576 (2014) ........................................................ 28

*In re United States,*
    463 F.3d 1328 (Fed. Cir. 2006) .............................................. 27

*Kidd v. Swartwout,*
    14 F. Cas. 457 (C.C.S.D.N.Y. 1843) (No. 7,756) ..................... 25

*Kleber v. CareFusion Corp.,*
    914 F.3d 480 (7th Cir. 2019) (en banc) .................................... 5

*Lee v. Lincoln,*
    15 F. Cas. 210 (C.C.D. Mass. 1841) (No. 8,195) ..................... 25

*Mallow v. United States,*
    161 Ct. Cl. 446 (1963) ..................................................... 15, 18

*Martinez v. United States,*
    333 F.3d 1295 (Fed. Cir. 2003) .............................................. 22

*National Association of Broadcasters v. Federal Communications Commission,*
    554 F.2d 1118 (D.C. Cir. 1976) ................................................ 8

*National Cable Television Association, Inc. v. United States,*
    415 U.S. 336 (1974) ............................................................... 7

*New York Life Insurance Co. v. United States,*
    118 F.3d 1553 (Fed. Cir. 1997) ................................. 15, 17, 22

*Norman v. United States,*
    429 F.3d 1081 (Fed. Cir. 2005) .............................................. 19

*O'Bryan v. United States,*
 93 Fed. Cl. 57 (2010), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011) .............................15, 16

*Ogden v. Maxwell,*
 18 F. Cas. 613 (C.C.S.D.N.Y. 1855) (No. 10,458).................................................... 25

*Ontario Power Generation, Inc. v. United States,*
 369 F.3d 1298 (Fed. Cir. 2004) ......................................................................22, 29

*Pan American World Airways v. United States,*
 122 F. Supp. 682 (Ct. Cl. 1954) ...........................................................................15

*Peretz v. United States,*
 501 U.S. 923 (1991)............................................................................................ 10

*Pierce County, Washington v. Guillen,*
 537 U.S. 129 (2003) ......................................................................................... 1, 6

*Rapanos v. United States,*
 547 U.S. 715 (2006).............................................................................................12

*Ross v. Blake,*
 136 S. Ct. 1850 (2016).......................................................................................... 4

*Roth v. United States,*
 378 F.3d 1371 (Fed. Cir. 2004) ........................................................................... 22

*Rumsfeld v. Forum for Academic & Institutional Rights,*
 547 U.S. 47 (2006) .............................................................................................. 6

*Silver Buckle Mines Inc. v. United States,*
 117 Fed. Cl. 786 (2014) ...................................................................................... 16

*Silver Buckle Mines, Inc. v. United States,*
 132 Fed. Cl. 77 (2017) ........................................................................................ 16

*Skinner v. Mid-America Pipeline Co.,*
 490 U.S. 212 (1989)......................................................................................... 2, 7

*South Puerto Rico Sugar Co. Trading Corp. v. United States,*
 334 F.2d 622 (Ct. Cl. 1964)..................................................................................15

*Telecare Corp. v. Leavitt*,
409 F.3d 1345 (Fed. Cir. 2005) ...............................................................15

*Tennessee Valley Authority v. Hill*,
437 U.S. 153 (1978) ...................................................................... 11

*United States v. Mitchell*,
463 U.S. 206 (1983) ........................................................ 20, 23, 27

*United States v. Testan*,
424 U.S. 392 (1976) ............................................................. 16, 22

*United States v. White Mountain Apache Tribe*,
537 U.S. 465 (2003) ...............................................................20, 27

*Virgin Islands Port Authority v. United States*,
136 Fed. Cl. 7 (2018) .............................................................26, 27

*Virgin Islands Port Authority v. United States*,
922 F.3d 1328 (Fed. Cir. 2019) ...........................................................26

## Statutes and constitutional provisions

28 U.S.C. § 1346(a)(2) ....................................................................14, 15, 18

28 U.S.C. § 1913 note .........................................................................4, 8, 12

United States Constitution Amendment V .............................................. 30

## Other authorities

Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*,
N.Y. Times, Feb. 4, 2019 ......................................................................... 1

Maggie McKinley, *Petitioning and the Making of the Administrative State*,
127 Yale L.J. 1538 (2018) ....................................................................... 25

Report to Accompany Bill S. No. 96 (Feb. 25, 1846) ................................... 25

S. Rep. No. 107-174 (2002) ...............................................................1, 5, 9

Antonin Scalia & Bryan Garner, *Reading Law* (2012) ................................... 10

Matthew H. Solomson, *Court of Federal Claims: Jurisdiction, Practice, &*
  *Procedure* (2016) .........................................................2, 21, 22, 23

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants/Cross-Appellees are unaware of any related cases.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Congress has limited the judiciary's authority to charge fees for access to electronic court records. After concluding that PACER fees were "higher than the marginal cost of disseminating the information," Congress amended the law to make records "freely available to the greatest extent possible." Appx2596 (S. Rep. No. 107-174, at 23 (2002)). Following the E-Government Act of 2002, the judiciary is now authorized to charge fees "only to the extent necessary" to "reimburse expenses incurred in providing" the "services rendered." The question on appeal is what this amended statute means.

The government's answer: nothing. The E-Government Act, in its view, imposes "no specific constraint." Gov. Br. 32. But this "gives the amendment no 'real and substantial effect' and, accordingly, cannot be the proper understanding of the statute." *Pierce Cnty., Wash. v. Guillen*, 537 U.S. 129, 145 (2003). The Act's sponsor, Senator Lieberman, has filed a brief explaining that this position "is at odds with the text, history, and purpose of the E-Government Act." Lieberman Br. 3–4. The government offers no response, and hence no competing account of the Act's text, history, or purpose. Nor does it respond to the "impressive array of supporting briefs from retired judges, news organizations, civil rights groups," and legal technology firms—all detailing the practical harms of continuing to violate the E-Government Act. *See* Adam Liptak, *Attacking a Pay Wall that Hides Public Court Filings*, N.Y. Times,

Feb. 4, 2019. The government likewise fails to grapple with the two constitutional background rules that indisputably apply here: Congress must speak clearly before authorizing user fees "to recover administrative costs not inuring directly to the benefit" of the users. *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 224 (1989). And, because First Amendment interests are at stake, "fees used to defray administrative expenses are permissible, but *only to the extent necessary* for that purpose." *E. Conn. Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 (2d Cir. 1983) (emphasis added). The government never explains why Congress would have chosen precisely the same words to achieve the opposite result.

Lacking a response on the merits, the government seeks refuge in a novel jurisdictional argument. It says that jurisdiction is lacking over the illegal-exaction claims because there is no money-mandating statute. But that argument is foreclosed by decades of Supreme Court and Federal Circuit precedent holding that "[t]he Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). This is hornbook law. "The Federal Circuit repeatedly has distinguished between money-mandating and illegal exaction claims" and, given this precedent, "there is no basis to engraft money-mandating requirements onto illegal exaction claims." Matthew H. Solomson, *Court of Federal Claims: Jurisdiction, Practice, & Procedure* 5-10, 5-14 (2016). The government's

argument would work a sea change in the law—one that has no footing in the text, history, or purpose of the Tucker Act. It would remove any remedy for violations of the statute, leave the plaintiffs with no recourse, and leave citizens in future cases unprotected against even the most blatantly unlawful takings.

Apart from the legal arguments, the government speculates that requiring the judiciary to comply with the E-Government Act could "starve" "vital programs of funding." Govt. 32. That speculation is unfounded. Everyone in this litigation agrees that these programs warrant funding. The question is whether that funding will come at the expense of public access to court records, or whether it will instead come through the appropriations process. Congress answered that policy question when it enacted the E-Government Act, and it is not for this Court (or any court) to make a contrary choice. Moreover, as the retired federal judges point out in their amicus brief, the judiciary appears to have already obtained the necessary funding for this year through appropriations, and it should be able to obtain the necessary funding for future years as well. Fed. Judges' Br. 22. And because any judgment will come from the Judgment Fund, "the Judiciary is not directly on the hook for reimbursing any past over-charging." *Id.* This Court may therefore apply the law as Congress has written it, confident that doing so will not harm the judiciary. To the contrary, doing so would be "good for the Judiciary and for society." *Id.* at 23.

**ARGUMENT**

## I. The government has no defense on the merits.

### A. The government offers no plausible interpretation of the E-Government Act.

As we stated in our opening brief (at 6 & 24), the question that forms the basis of this appeal concerns the meaning of the E-Government Act, which amended the statute authorizing PACER fees to add the words "only to the extent necessary." 28 U.S.C. § 1913 note. "The key dispute between the parties," we explained, is about "the meaning of this phrase: 'only to the extent necessary' *to what*?" Opening Br. 24. In our view, the answer is supplied by the statute's text and history. Fees are statutorily authorized "only to the extent necessary" "to reimburse [the] expenses incurred in providing" the "services rendered" in exchange for the fees (here, providing access to records through PACER). 28 U.S.C. § 1913 note. No other reading gives effect "to every clause and word of [the] statute." *See Duncan v. Walker*, 533 U.S. 167, 174 (2001).

We further explained (at 2) that "the fundamental, insurmountable problem for the government" is that its proposed interpretation gives the E-Government Act no effect. That result is contrary to the Supreme Court's instruction that "courts must presume" that amendments "have real and substantial effect." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). And it is contrary to the statute's history. Congress passed the E-Government Act to change the "existing law, [under which] users of PACER are

charged fees that are higher than the marginal cost of disseminating the information," and usher in a regime in which this information is "freely available to the greatest extent possible." Appx2596 (S. Rep. No. 107-174, at 23 (2002)). This is also how the Act's sponsor understood the law. A decade ago, Senator Lieberman told the AO that the statute required it to "create a payment system that is used only to recover the direct cost of distributing documents via PACER." Appx2622, Appx2627.

The government provides no response to any of this. It offers no account of what the phrase "only to the extent necessary" means or why Congress would have amended the statute to add it. Save for a passing reference in the statement of the case, the government does not even acknowledge the existence of this language or the amendment that produced it until the second-to-last page of its brief. And even then, the most the government can muster is a sentence or two about what it thinks the amendment *didn't* do—not an explanation of what it actually did.

That is fatal to the government's position. For the government to be right on the merits, it has to give meaning to the words "only to the extent necessary" so that the amendment would have actually accomplished something. It cannot "instead act[] as though the amendment . . . had not taken place." *Ross*, 136 S. Ct. at 1858; *see also Kleber v. CareFusion Corp.*, 914 F.3d 480, 486 (7th Cir. 2019) (en banc) ("A mountain of precedent supports giving effect to statutory amendments."); *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) (applying this rule).

Yet that is exactly how the government treats the E-Government Act. Ignoring the Act's text and history, the government says that the amendment "established no specific constraint" and does not prohibit using PACER fees to fund "future new services." Gov. Br. 32. But that is just another way of saying that the amendment did nothing and that the language is meaningless. A "statute cannot be interpreted in a manner that would 'negate[] its recent revision, and indeed would render it [] largely meaningless." *GPX Intern. Tire Corp. v. United States*, 678 F.3d 1308, 1312 (Fed. Cir. 2012) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 57–58 (2006)).

Even if the language had been part of the original statute, rather than the focus of a separate amendment, the government would have to "offer [an] account of what function that language would serve on their proposed interpretation." *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("In essence, the employees ask us to treat those words as stray marks on a page—notations that Congress regrettably made but did not really intend. Our practice, however, is to 'give effect, if possible, to every clause and word of a statute.'"). "This canon is of particular importance where, as is true here, the relevant statutory text at issue was added by amendment." *Hayes v. Harvey*, 903 F.3d 32, 42 (3d Cir. 2018) (en banc).

Application of this principle is all that is needed to reject the government's reading. It "gives the amendment no 'real and substantial effect' and, accordingly, cannot be the proper understanding of the statute." *Pierce Cnty.*, 537 U.S. at 145.

**B.  The government cannot satisfy the clear-statement rule, which is mandated by two separate constitutional concerns.**

The government's reading is impermissible for a second reason: It runs afoul of the Supreme Court's rule that "Congress must indicate clearly" when it intends to authorize the imposition of a user fee "to recover administrative costs not inuring directly to the benefit" of those who receive the services for which the fee charged. *Skinner*, 490 U.S. at 224.

The government does not deny that this clear-statement rule applies here. Nor does it point to any language establishing that Congress, which amended the statute to authorize PACER fees "only to the extent necessary," provided the requisite clear intent. Nor could the government possibly do so. As we noted in our opening brief (at 29), the government's position suffers from a basic problem of logic: "there is no way to both (a) give effect to Congress's decision to amend the statute to add the limiting phrase 'only to the extent necessary,' and (b) find that the clear-authorization requirement is satisfied." The government makes no effort to try to square this circle.

Instead, the government tries to distinguish *Skinner* on its facts. This misses the point. The reason *Skinner* matters is not because of its particular fact pattern, but because of the rule that the Supreme Court was describing in that case—a rule that emanates from several earlier cases that we discussed in our opening brief and that the government ignores. *See* Opening Br. 26–28, 42–43 (discussing *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336 (1974); *Fed. Power Comm'n v. New England Power*

*Co.*, 415 U.S. 345 (1974); *Nat'l Ass'n of Broadcasters v. FCC*, 554 F.2d 1118 (D.C. Cir. 1976); *Fla. Power & Light Co. v. United States*, 846 F.2d 765 (D.C. Cir. 1988)). These cases stand for the uncontested proposition that, when user fees "exceed their reasonable attributable cost they cease being fees and become taxes levied, not by Congress," but by a different branch of government, which is "prohibited" absent clear authorization from Congress. *Nat'l Ass'n of Broadcasters*, 554 F.2d at 1129 n.28.

Again, the government makes no attempt to satisfy this constitutionally mandated default rule. It points out (at 33) that the statute "explicitly authorizes the Judiciary to distinguish among users in setting fees in order to promote public access to information." But that just underscores why the government's interpretation of the statute is incorrect. The sentence on which the government relies expressly delegates authority to the AO to decide how to allocate the costs of PACER among those who use the service and thus may be subject to a fee—decisions that the plaintiffs here do not challenge—so long as the AO does so "to avoid unreasonable burdens and to promote public access to such information." 28 U.S.C. § 1913 note. In stark contrast to that express delegation, Congress did nothing of the sort for the AO's ability to charge PACER fees to fund *non*-PACER costs. Just the opposite: Congress changed the law to authorize the judiciary to charge fees "only to the extent necessary" "to reimburse [the] expenses incurred in providing" the "services rendered" in exchange for those fees. *Id.*

8

Contrary to the government's suggestion (at 3, 32), Congress was not required to "explicitly" "disapprove" of the excessive fees, or to place "specific constraint[s] on expenditures." Imposing such a requirement would flip the clear-authorization rule on its head (to say nothing of the rule that amendments must be given effect). The burden is on the government to identify a clear statutory authorization for the fees it has charged, not on the plaintiffs to identify clear congressional disapproval.

For what it is worth, however, Congress *did* register its disapproval of the excessive fees when it amended the law. It did so not only in the statutory text, but also in the legislative history. Congress indicated that it wanted to change the "existing law" because "users of PACER are charged fees that are higher than the marginal cost of disseminating the information." Appx2596 (S. Rep. No. 107-174, at 23 (2002)). Further, by removing the requirement that *any* fees be charged (replacing "shall" with "may"), Congress expressed its desire "to move from a fee structure in which electronic docketing systems are supported primarily by user fees to a fee structure in which this information is freely available to the greatest extent possible." *Id.* Just as the government fails to engage with the amendment's text, it also fails to mention these statements of congressional intent.[1]

---

[1] Even if the government were right that the E-Government Act should not be read "to halt the use of PACER fee revenue on CM/ECF," that would not justify the full amount of the fees. Gov. Br. 3. Accepting this argument would instead yield a middle-ground interpretation akin to the conclusion reached by the district court, because the Act would not authorize the subsequent expansion of PACER revenue.

Nor does the government say anything about the First Amendment (or quarrel with any part of our argument on this score). *See* Opening Br. 30–32. It does not deny that First Amendment interests are implicated by imposing a paywall for access to public case files, as the Judicial Conference itself has recognized. It does not dispute that, when that is so, "fees used to defray administrative expenses are permissible, but *only to the extent necessary* for that purpose." *Id.* at 30 (citing cases). And it does not say why Congress would have wanted a different rule here, let alone endeavor to find "clear evidence" of such intent, when Congress specifically amended the statute to add the same language ("only to the extent necessary"). *Id.* at 31–32 (quoting *Peretz v. United States*, 501 U.S. 923, 930 (1991)); *see* Scalia & Garner, *Reading Law* 247–48 (2012).

## C. The two arguments that the government makes to support its position were correctly rejected by the district court.

Rather than meaningfully engage with the arguments in our opening brief, the government doubles down on the same two arguments it made below, both of which the district court correctly rejected.

The government sticks to its position that "the statute allows PACER fees to be used for any expenditure that is related to 'disseminating information through electronic means.'" Appx30; *see* Gov. Br. 26–27. In attempting to justify this position, the government makes two interpretative moves. It starts off by asserting that its reading is "reasonabl[e]"—without offering any analysis of the statute's text, history, or structure; without responding to any of our arguments to the contrary; and

without acknowledging that it must actually show that the statute *unambiguously requires* this reading. Gov. Br. 27. Then, the government says that this "conclusion is reinforced" by the fact that PACER fees are deposited into the general IT fund, and that "any doubt" about the statute's meaning is resolved by the post-enactment actions of the Appropriations Committees. *Id.* at 27–28.

Our opening brief explains why these arguments are not persuasive, and the government offers no rebuttal. *See* Opening Br. 32–36; *see also id.* at 36–43. A few points, however, are worth emphasizing:

**1.** Unlike the AO, which previously took the position that the Appropriations Committee "amended" the statute to confer "expanded" authority to charge fees, *see* Appx2631, Appx3091, the government places far less weight on the appropriations process as a guide to statutory meaning. It relies on this process only to the extent that it would resolve "doubt" about the proper interpretation of the statute. But even this more modest reliance is misplaced. *First*, as explained, the amendment is not ambiguous because the government's interpretation of it (that it did nothing) is not plausible. *Second*, even if there were some doubt about its meaning, that would just establish that the statute does not satisfy the clear-statement rule and thus does not authorize PACER fees to exceed PACER costs. *Third*, the post-enactment actions of the Appropriations Committee provide no insight into what the E-Government Act means. *See TVA v. Hill*, 437 U.S. 153, 191 (1978); *Rapanos v. United States*, 547 U.S. 715, 750

(2006). The Committee didn't discuss the statute, much less attempt to interpret it, but simply withheld objection to proposed spending plans. And the statute concerns how money is *raised*, not how it is *spent*. The government repeatedly conflates this distinction by framing the question as being about "expenditures" rather than fees. But the question is about fees; expenditures are relevant only because they establish that *the fees* exceed the amount necessary to recoup the costs of operating PACER.

**2.** The government's reliance on the IT fund also conflates this distinction. The plaintiffs do not contend that the expenditures violate the statute governing the IT fund. They argue that the fees violate the E-Government Act. Congress's decision in 1990 to have the fees deposited into the IT fund does not tell us anything about the meaning of an amendment passed 12 years later expressly limiting these fees "only to the extent necessary." If anything, the statutory text that discusses the IT fund undermines the government's position. It says that fees collected "*as a charge for services rendered* shall be deposited as *offsetting collections* to [the IT fund] *to reimburse expenses incurred in providing these services*." 28 U.S.C. § 1913 note (emphasis added). As the district court observed, the government simply "ignore[s]" that language. Appx30. The government continues to do so on appeal: It declines to say what it thinks "charge for services rendered" and "expenses incurred in providing these services" mean.

**3.** Finally, we note that the government's position on appeal is significantly broader than the AO's previous characterization of its statutory authority in one

important respect. The government asserts (at 27) that PACER fees are not excessive because "[t]here is no dispute that all of the expenditures at issue here were for services that provide [electronic] 'access to information.'" But this virtually boundless description of the services that PACER fees may fund—those that provide *any kind* of electronic information to *anyone*—leaves out an important modifier: the word "public."[2] Indeed, the very text on which the government relies just a few pages later, in discussing *Skinner* (at 33), makes clear that any fee-setting discretion the AO might have must be tied to the promotion of "public access" to information. And that is how the AO itself has characterized its authority. *See* Appx18 (quoting letter from the AO saying that PACER fees are "used only to fund *public access* initiatives"); Appx15 (quoting spending plan saying that PACER fees will be used "first to pay the expenses of the PACER program" and then "to fund other initiatives related to *public access*").

The categories listed by the government, however, include programs that do not provide public access to information—for example, a program for notifying law enforcement, an internal case-management system and technology upgrades for the courts, filing services for lawyers and litigants, and flat-screen TVs and web services for jurors. *See* Gov. Br. 27. As important as these programs are, they lie outside even the AO's conception of its statutory authority to charge PACER fees.

---

[2] Notably, the government does not mention CM/ECF, *see* Gov. Br. 27, and only the most capacious understanding of the phrase "access to information" would encompass an e-filing service and internal case-management system.

## II. The government's jurisdictional challenge is foreclosed by at least 65 years of binding precedent.

Unable to mount a viable defense on the merits, the government shifts focus to a different question: whether "the summary judgment order should be vacated for lack of Little Tucker Act jurisdiction." Gov. Br. 1. The answer to that question—compelled by the Act's text and decades of settled precedent—is no.

### A. The Little Tucker Act's text and decades of settled precedent make clear that there is jurisdiction here.

The Little Tucker Act provides jurisdiction over monetary claims against the federal government that are "founded either upon the Constitution, or any Act of Congress." 28 U.S.C. § 1346(a)(2). The jurisdictional question in this appeal is whether the claims here are "founded . . . upon . . . any Act of Congress."

It has long been settled that "a claim to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute, is a claim 'founded upon any Act of Congress.'" *Clapp v. United States*, 127 Ct. Cl. 505, 513 (1954). For decades, this Court and its predecessor have rejected the argument made by the government in this case, "where the Government has the citizen's money in its pocket" and asserts a lack of Tucker Act jurisdiction "as an excuse for keeping it there." *Id.* at 512–13. We are not aware of any case in which this Court has held that it lacks jurisdiction to determine whether a government-imposed fee is unlawful and should be returned to those who paid it.

To the contrary, the cases uniformly hold the opposite. "This court has long recognized that where the government collects money pursuant to an erroneous construction of a statute, a claim for the return of that sum is cognizable as a claim founded on an act of Congress and, as such, is a claim within the express jurisdiction [of the Tucker Act]." *O'Bryan v. United States*, 93 Fed. Cl. 57, 66 (2010), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011); *see Mallow v. United States*, 161 Ct. Cl. 446, 453 (1963) ("[A] claim to recover an illegal exaction made by . . . the Government acting under a power supposedly conferred by a Federal statute is regarded by the courts as a 'claim against the United States founded . . . upon . . . [an] Act of Congress,' within the meaning of . . . 28 U.S.C. 1346(a)(2)."). Thus, this Court has squarely held, "[t]he Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power." *Aerolineas*, 77 F.3d at 1573; *see also Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1348 (Fed. Cir. 2005) (applying this holding). A raft of other precedent holds the same.[3]

_____

[3] *See, e.g.*, *Aerolineas*, 77 F.3d at 1573 (citing cases); *N.Y. Life Ins. Co. v. United States*, 118 F.3d 1553, 1556 (Fed. Cir. 1997) (finding jurisdiction to recover fees "based on the allegedly erroneous interpretation of a statute"); *S. Puerto Rico Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 626 (Ct. Cl. 1964) (claim to recover fees unauthorized by statute is "squarely bottomed on an Act of Congress" under the Tucker Act); *Eversharp, Inc. v. United States*, 125 F. Supp. 244, 246 (Ct. Cl. 1954) (same for exaction claim "founded upon the misinterpretation and misapplication of an Act of Congress"); *Pan Am. World Airways v. United States*, 122 F. Supp. 682, 683 (Ct. Cl. 1954) (finding "jurisdiction to entertain a suit for [the] recovery" of fees the government allegedly had "no right" to charge because it "misinterpreted the relevant statute"); *see also Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998)

This precedent is controlling here. The government has charged fees to the plaintiffs that it asserts are authorized by statute. The plaintiffs argue the opposite. They claim that the fees exceed the statutory limit set by the E-Government Act, and they seek a refund of the amount that was taken from them in violation of the statute. That is the classic illegal-exaction scenario for which there has always been Tucker Act jurisdiction under this Court's cases. As one court has explained: "Whether or not [the statute] actually authorized the [government] to collect the fees at issue, [it was] invoked by [the government] to justify [its] exaction, and [the statute's] interpretation is central to this cause of action. This is sufficient basis for this court to take cognizance of this case under the clear precedent of this court's predecessor, the Court of Claims, and the Federal Circuit." *Silver Buckle Mines Inc. v. United States*, 117 Fed. Cl. 786, 791 (2014) (applying *Clapp* and *Aerolineas*).

This "clear precedent" has been well-settled for so long that the Supreme Court considered it "established" as far back as four decades ago. *See United States v. Testan*, 424 U.S. 392, 400–01 (1976). As this Court has noted, the Supreme Court in

_____

(describing a refund suit as the "touchstone of Tucker Act jurisdiction"). Applying this precedent, lower courts routinely exercise jurisdiction over illegal-exaction claims. *See, e.g.*, *Silver Buckle Mines, Inc. v. United States*, 132 Fed. Cl. 77, 94 (2017) ("[An] action seeking recovery of [certain] fees [from the government] is an illegal exaction claim that is clearly within this court's jurisdiction."); *O'Bryan*, 93 Fed. Cl. at 66 ("Such a claim is, of course, well within our jurisdiction."); *Am. Airlines, Inc. v. United States*, 68 Fed. Cl. 723, 728 (2005) (finding jurisdiction over a "claim that the [government] did not have statutory . . . authority" to charge "the user fees at issue").

*Testan* "approved the Court of Claims' assertion of its jurisdiction over claims seeking return of money paid to the government." *N.Y. Life Ins.*, 118 F.3d at 1556; *see also id.* (explaining that *Testan* "reflect[s] the Supreme Court's approval of the *Eastport* [*Steamship Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)] statement that the Court of Claims had jurisdiction over suits seeking the return of money improperly paid to, exacted or retained by the government"). Indeed, long before *Testan*, the Supreme Court observed that "jurisdiction . . . under the Tucker act" has been "repeatedly sustained" for "actions for the recovery of duties illegally exacted" in violation of "a law of Congress." *Dooley v. United States*, 182 U.S. 222, 223, 228 (1901).

This Court's precedent is so well-settled, in fact, that the government too has accepted it as the law. Time and again in its briefs to this Court, the U.S. Department of Justice has conceded that, when the government has charged a fee based on an asserted statutory authority (as it has here), those who paid the fee may sue for a refund under the Tucker Act. In *Aerolineas*, for example, DOJ acknowledged that under "well-established law pertaining to the illegal-exaction doctrine," the court "possesses jurisdiction . . . when the plaintiff can establish that it paid money 'directly or in effect to the government.'" U.S. Br. in *Aerolineas*, Nos. 94-5076, 94-5077, filed July 19, 1994, at 21 (quoting *Eastport*, 372 F.2d at 1007). The government objected only to "extend[ing] the illegal exaction doctrine" beyond this classic scenario (the scenario here) to also cover the scenario there, where the plaintiffs "invoke[d] the

doctrine as a way to recover, from the Government, funds they paid to *third parties*." *Id.* at 22 (emphasis added). Even then, this Court rejected the argument and found jurisdiction. *See* 77 F.3d at 1568. Since *Aerolineas*, moreover, DOJ has (until now) repeatedly accepted the existence of jurisdiction over illegal-exaction claims. *See, e.g.*, U.S. Br. in *Telecare Corp. v. Leavitt*, No. 04-1389, filed Oct. 4, 2004, at 31 ("[T]his claim is properly presented under the Little Tucker Act" because "[t]he complaint seeks the return of money that plaintiff paid [the government].").

So if one thing is abundantly clear from this Court's cases, it is that "a claim to recover an illegal exaction made by . . . the Government acting under a power supposedly conferred by a Federal statute" is a claim "'founded . . . upon . . . [an] Act of Congress,' within the meaning of . . . 28 U.S.C. 1346(a)(2)." *Mallow*, 161 Ct. Cl. at 453. The Supreme Court, the government in previous cases, and decades of this Court's precedent all recognize jurisdiction in that scenario. Because that is precisely the scenario here, jurisdiction in this case should be beyond dispute.

**B.    The government's proposed jurisdictional requirement cannot be reconciled with this Court's cases, and it would pose no barrier to jurisdiction here in any event.**

Without citing or discussing any of this binding precedent—or any case in which this Court has found a lack of jurisdiction under similar circumstances—the government now reverses course. It argues that, even though the plaintiffs are seeking the recovery of a fee paid to the government based on an asserted statutory

authority, that does *not* mean that their claims are founded upon an Act of Congress under the Little Tucker Act. That is, the government asks this Court to adopt a new rule that is contrary to at least 65 years of precedent and that would threaten all illegal-exaction cases going forward.

The government bases this request on a misreading of a single sentence of dicta—from a case that did not even involve an illegal-exaction claim, and where it was common ground between the parties that jurisdiction exists over such claims. *See Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).[4] That sentence reads: "To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'" *Id.* The sentence appears in a paragraph that describes the existing illegal-exaction precedent as a way of explaining why the claims in that case—which sought "just compensation for an alleged taking of real property"—did *not* involve an illegal exaction: "because the land was not exacted '*due*

_____

[4] In *Norman,* DOJ told this Court the opposite of what it now argues—namely, that "where the Government misapplies a statute or regulation and thereby 'exacts' a monetary payment without authority," an "action lies for the return of 'citizens' money' that the Government has 'in its pocket.'" U.S. Br. in *Norman*, No. 05-5039, filed Apr. 27, 2005, at 54; *see id.* at 58–59 (contrasting this "classic illegal exaction claim" with the claim there—a takings claim seeking "consequential damages" for the loss of real property, which "is not the type of exaction that (if unlawful) would give rise to [a] claim under the Tucker Act").

*to* [a] misapplication of" the statute as required by *Aerolineas*, *Casa de Cambio Comdiv* [*v. United States*, 291 F.3d 1356 (Fed. Cir. 2002),] and *Eastport*." *Id.* at 1095–96. In other words, the opinion in *Norman* was attempting only to summarize this Court's past precedent, not supplant it. It is not plausible to read *Norman* as silently overruling more than a half-century of precedent by adding a sentence intended to summarize (albeit imprecisely, as we will explain) the uncontested case law governing a claim not before the Court.

Yet that is the upshot of the government's position here. Relying on what it calls "*Norman*'s jurisdictional standard" (which it says is "axiomatic"), the government asserts that "this Court's precedent requires [plaintiffs] to show that the substantive statute" was not just the basis for the challenged fee, but that it "provides a damages cause of action by 'necessary implication.'" Gov. Br. 17, 21. What the government is essentially saying is that the statute must be what is known as "money-mandating"— meaning that it "is 'reasonably amenable to the reading that it mandates a right of recovery in damages,'" or "can fairly be interpreted" as doing so. *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472–73 (2003); *United States v. Mitchell*, 463 U.S. 206, 217 (1983)).

There are two problems with this argument: *First*, there is no "money-mandating" requirement for illegal-exaction claims. *Second*, even if there were such a requirement, it would be satisfied here.

### 1. There is no "money-mandating" jurisdictional requirement for illegal-exaction claims.

The first problem with the government's argument is that it seeks to create a requirement for illegal-exaction claims that the Supreme Court and this Court have traditionally rejected. This Court has long distinguished between illegal-exaction claims (where the government has taken money from someone in violation of a law) and money-mandating claims (where the government failed to pay someone what they are owed by law). *See Eastport*, 372 F.2d at 1007–08 (discussing these two distinct categories of claims). Only "[i]n the second group, where no such payment has been made," must there be an allegation "that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Id.* at 1007. "In the first group (where money or property has been paid or taken)," by contrast, the claim must only "assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Id.*

Adhering to this traditional distinction, "[t]he Federal Circuit repeatedly has distinguished between money-mandating and illegal exaction claims." Solomson, *Court of Federal Claims* 5-10. In several cases decided around the same time as *Norman*, the Court contrasted money-mandating claims, which "require that the 'particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum,'" with illegal-exaction claims, which contain no such

requirement. *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004); *see also Roth v. United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) (distinguishing "actions to recover illegal exactions of money by the United States" from "actions brought pursuant to money-mandating statutes"); *Martinez v. United States*, 333 F.3d 1295, 1302–03 (Fed. Cir. 2003) (same).

The Supreme Court has drawn the same distinction. In discussing the backpay claims in *Testan*, "the Court pointed out that because the [plaintiffs] 'do not rest their claims upon a contract [*or*] *seek the return of money paid by them to the Government* [i]t follows that the asserted entitlement to money damages depends on whether any federal statute can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *N.Y. Life Ins.*, 118 F.3d at 1556 (quoting *Testan*, 424 U.S. at 400) (emphasis added). "The Court reiterated that principle on the next page when it stated: 'Where the United States is the defendant *and the plaintiff is not suing for money improperly exacted or retained*, the basis of the federal claim . . . does not create a cause of action for money damages unless [it is money-mandating]." *Id.* (quoting *Testan*, 424 U.S. at 401–02) (emphasis added); *see also Aerolineas*, 77 F.3d at 1579 (Nies, J., concurring) ("As recognized in [*Testan*], a Tucker Act claim for damages against the United States based upon a statute may take one of two forms: a claim under a money-mandating statute or a claim for money improperly exacted."); Solomson, *Court of Federal Claims* 5-11 ("The Supreme Court in [*Testan*] recognized

22

th[e] distinction between illegal exaction and money-mandating claims."). And the Supreme Court maintained this distinction in *United States v. Mitchell*, 463 U.S. at 222 n.23, when it did not disturb the lower court's conclusion that there was "undoubted[ly]" jurisdiction over "claims that the Government illegally kept some of the [plaintiff's] own money or property" in the form of fees collected.

Under this framework, the rule is clear: plaintiffs "must rely *either* on a statute that mandates payment of money from the government to the claimant *or* on an illegal exaction, that is, a payment to the government by the claimant that is obtained without statutory authority." *Aerolineas*, 77 F.3d at 1579 (Nies, J., concurring) (emphasis added). But they need not do both. The plaintiffs in this case have done the latter. That is sufficient for purposes of establishing jurisdiction under the Little Tucker Act. As the leading treatise on Tucker Act jurisdiction confirms—in a section entitled "Illegal Exaction Claims Do Not Depend on a Money-Mandating Provision of Law"—"there is no basis to engraft money-mandating requirements onto illegal exaction claims." Solomson, *Court of Federal Claims* at 5-10, 5-14.

To the extent that *Norman*, in attempting to summarize precedent, "blurred the clear, longstanding distinction between illegal exaction and money-mandating claims," it was simply being "imprecise." Solomson, *Court of Federal Claims* at 5-11. This Court has not understood *Norman* to collapse the traditional distinction. To the contrary, the distinction remains in effect. In 2006, the Court affirmed a decision that

exercised jurisdiction over an illegal-exaction claim without imposing a money-mandating requirement. *See Figueroa v. United States*, 466 F.3d 1023, 1029 (Fed. Cir. 2006), *affirming* 57 Fed. Cl. 488 (2003); *see also Figueroa*, 57 Fed. Cl. at 496 ("In the context of an illegal exaction, the court has jurisdiction regardless of whether the provision relied upon can be reasonably construed to contain money-mandating language."). In 2008, the Court did so again. *See Am. Airlines, Inc. v. United States*, 551 F.3d 1294 (Fed. Cir. 2008). In that case, even DOJ agreed that there was jurisdiction over the claims "for unlawful exaction of user fees"—claims that, from a jurisdictional perspective, are indistinguishable from those here. *See* U.S. Br. in *Am. Airlines*, No. 07-5174, filed Dec. 21, 2007, at 1. Lower courts, too, have generally kept these categories separate, both before and after *Norman. See, e.g., Auto Club Ins. Ass'n v. United States*, 103 Fed. Cl. 268, 273 (2012) (explaining that, in illegal-exaction cases, the Tucker Act "enables suit even in the absence of a money-mandating statute"); *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996) (same). [5]

---

[5] A recent district-court decision, *D'Apuzzo v. United States*, No. 16-62769, 2019 WL 2642696 (S.D. Fla. June 27, 2019), is not to the contrary. There, the court found a lack of Little Tucker Act jurisdiction for claims challenging charges made for accessing judicial opinions, in violation of the PACER fee schedule. The claim in that case was not based on a violation of a statute—the E-Government Act does not mandate that judicial opinions be free—but a violation of the AO's fee schedule. *Id.* at *10. That claim, unlike the claims in this case, does not fit within the plain text of the Little Tucker Act or this Court's illegal-exaction precedent because it is not founded on a statute, regulation, or constitutional provision. *Id.* at *11.

Precedent aside, this Court's treatment of illegal-exaction claims comports with the Tucker Act's history. Before its enactment in 1887, sovereign immunity prevented citizens from bringing illegal-exaction actions against the government. Instead, citizens had to petition Congress or the Treasury for a refund of money obtained unlawfully (or to bring actions against the officials who collected the money and then, if successful, petition for repayment). *See, e.g.*, *Clinton v. Strong*, 9 Johns. 370, 370 (Sup. Ct. N.Y. 1812) (claim against officer "that the costs having been illegally exacted, might be recovered back"); Report to Accompany Bill S. No. 96 (Feb. 25, 1846) (providing repayment after court found fee "illegally and unjustly exacted"). Congress grew dissatisfied with this petitioning system, so it enacted the Tucker Act to waive sovereign immunity and establish jurisdiction over monetary claims against the government, including illegal-exaction claims. *See* Maggie McKinley, *Petitioning and the Making of the Administrative State*, 127 Yale L.J. 1538, 1582–84, 1586 n.189 (2018). Before the Tucker Act, just as now, courts had jurisdiction over illegal-exaction claims as long as plaintiffs alleged that the government had charged them more money than the law authorized. *See, e.g.*, *Curtis v. Martin*, 44 U.S. 106 (1845); *Clinton*, 9 Johns. at 370; *Lee v. Lincoln*, 15 F. Cas. 210 (C.C.D. Mass. 1841) (No. 8,195); *Kidd v. Swartwout*, 14 F. Cas. 457 (C.C.S.D.N.Y. 1843) (No. 7,756); *Ogden v. Maxwell*, 18 F. Cas. 613 (C.C.S.D.N.Y. 1855) (No. 10,458). There was no additional requirement that the plaintiff cite a money-mandating provision.

There is a good reason for maintaining this longstanding approach. A "[p]laintiff need not point to a money-mandating provision" for an illegal-exaction claim, as one court recently explained, "because the necessary remedy to the government improperly using its authority to place 'a citizen's money in its pocket' is a return of that sum." *Virgin Islands Port Auth. v. United States*, 136 Fed. Cl. 7, 14 (2018); *see also id.* ("We see no further obligation, under this first class of illegal exaction claims, for a plaintiff to point to anything in the statute or regulation on which the government relies that anticipates an abuse of the statute and authorizes the plaintiff to sue for return of the monies."). This Court did not disagree. Just a few months ago, in affirming that decision, the Court held that there was jurisdiction without requiring money-mandating language. *See* 922 F.3d 1328, 1333–34 (Fed. Cir. 2019) (citing *Eastport* and *Aerolineas*). The Court should hold the same here.

### 2. Even if there were a money-mandating requirement for illegal-exaction claims, it would be satisfied here.

In contrast to the mountain of precedent discussed above, which requires the exercise of jurisdiction here, there is no precedent on the government's side of the ledger. Indeed, this Court has never done what the government is asking it to do here: find a lack of jurisdiction over an illegal-exaction claim because the statute alleged to have been violated does not contain money-mandating language. This Court has never crossed that Rubicon because, as we have explained, no such requirement exists. But even if there were such a requirement, the inability of the

government to identify a case just illustrates why the requirement would easily be satisfied here: because "the necessary remedy to the government improperly using its authority to place 'a citizen's money in its pocket' is a return of that sum." *Virgin Islands*, 136 Fed. Cl. at 14. Or, at the very least, this would be a "fair inference" to make—which is all that is needed for a statute to qualify as money-mandating. *See Doe*, 463 F.3d at 1324.

Under the Supreme Court's cases, a statute is money-mandating if it "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell*, 463 U.S. at 216–17 (quotation marks omitted). If the statute is "reasonably amenable" to this reading, even if it contains no express money-mandating language, the requirement will be satisfied. *White Mountain*, 537 U.S. at 473; *see also Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007) ("Thus, Tucker Act jurisdiction requires merely that the statute be 'fairly interpreted' or 'reasonably amenable' to the interpretation that it 'mandates a right of recovery in damages,' not that a plaintiff-appellant has stated a 'proper claim' based on the statute or pled it properly." (quoting *White Mountain*, 537 U.S. at 472–73)).

So, for example, provisions fixing judicial pay have been held by this Court to be money-mandating. *See, e.g.*, *Hatter v. United States*, 953 F.2d 626, 628 (Fed. Cir. 1992) (Compensation Clause); *In re United States*, 463 F.3d 1328, 1334 (Fed. Cir. 2006) ("[The bankruptcy-judge pay statute] clearly is a money-mandating statute."). Relying on

this precedent, federal judges who had been improperly denied cost-of-living adjustments were able to successfully prosecute several class actions in recent years and obtain damages despite lacking an express cause of action either under the Compensation Clause (applicable to Article III judges) or by statute (applicable to Article I judges). *See, e.g.*, *Beer v. United States*, 696 F.3d 1174 (Fed. Cir. 2012) (en banc) (holding that Article III judges had been unconstitutionally deprived of compensation); *Houser v. United States*, 114 Fed. Cl. 576 (2014) (certifying class action by Article I bankruptcy judges for backpay); *Barker v. United States*, No. 12-826 (Fed. Cl.) (class action filed by Article III judges for backpay). The analysis should be no different here. Just as it is reasonable to assume that failing to pay someone the full amount required will result in a monetary remedy for the amount owed, it is reasonable to assume that charging someone more than the amount permitted will result in a monetary remedy for the unlawful amount collected.[6]

    This Court's cases recognize as much. Of particular relevance, this Court has held that a provision prohibiting the collection of certain taxes or duties is money-mandating. *See Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000).

---

[6] The government speculates (at 22) that Congress might not have wanted the claims in this case to be adjudicated given "the appearance of a conflict of interest." But Congress has full confidence in the federal judiciary's impartiality, which is why Congress could entrust the courts with enforcing even judicial-pay statutes, despite any concerns about an appearance of a "conflict of interest." *See, e.g.*, *Smith v. United States*, No. 13-583 (Fed. Cl.) (suit for backpay by Court of Federal Claims judges).

The "necessary implication" of such a provision, the Court concluded, "is that the remedy for its violation entails a return of money unlawfully exacted." *Id.* As a result, "when fairly interpreted, [the provision] affords an independent cause of action for monetary remedies"—even apart from the illegal-exaction doctrine. *Id.*[7]

The statutory provision at issue in this case is similar. It prohibits the collection of PACER fees that exceed PACER costs. The natural remedy for violating this provision—the *only* remedy—is "a return of [the] money unlawfully exacted." *See Cyprus Amax*, 205 F.3d at 1373; *see also Bull v. United States*, 295 U.S. 247, 260 (1935) ("If that which the sovereign retains was unjustly taken in violation of its own statute, the withholding is wrongful" and thus "[r]estitution is owed."). To disallow such an illegal-exaction claim would be to remove any remedy for violations of the statute. This Court should not condone that result. Not only would it leave the plaintiffs in this case with no recourse, it would also leave citizens in future cases unprotected against even the most blatantly unlawful takings by the government. Our legal system protects against even *lawful* takings made "without just compensation." *See* U.S. Const. Amend. V. It necessarily follows that the plaintiffs enjoy protection against the unlawful takings in this case.

_____

[7] This Court has confirmed that it did not decide *Cyprus Amax* on an illegal-exaction theory. *See Ontario Power*, 369 F.3d at 1302 (describing *Cyprus Amax* as a money-mandating case). But it could have: "Unlike most substantive rights asserted under Tucker Act jurisdiction, the Export Clause may form the basis for both the [illegal-exaction and money-mandating] categories of claims." *Id.* at 1301.

# CONCLUSION

The Court should answer the controlling question of law that formed the basis of this interlocutory appeal by interpreting 28 U.S.C. § 1913 note, as amended by the E-Government Act of 2002, to authorize PACER fees "only to the extent necessary" to "reimburse expenses incurred" in providing access to records through PACER, which is the "service[] rendered" in return for the fees. Further, the Court should hold that the government has violated this statute by imposing PACER fees that exceed the expenses actually incurred in providing records upon request through PACER. Accordingly, the Court should reverse the district court's denial of the plaintiffs' motion for summary adjudication as to liability, reverse the court's partial grant of the government's cross-motion for summary judgment, and remand to the district court for further proceedings.

Respectfully submitted,

/s/ Deepak Gupta

WILLIAM H. NARWOLD
MEGHAN OLIVER
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
bnarwold@motleyrice.com

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
deepak@guptawessler.com

July 12, 2019

*Counsel for Plaintiffs-Appellants/ Cross-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(1)(A) because this brief contains 8,035 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta
*Counsel for Plaintiffs-Appellants/*
*Cross-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit by using the CM/ECF system. All participants in the case will be served by the CM/ECF system except for Joseph H. Hunt, to whom on July 12, 2019 I sent a copy of the foregoing brief by U.S. mail.

*/s/ Deepak Gupta*
Deepak Gupta